**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATE OF NEW YORK *ex rel.* TZAC, INC.<br><br>                     Plaintiff-Relator,<br><br>    v.<br><br>NEW ISRAEL FUND,<br><br>                    Defendant. | **No. 1:20-cv-2955-GHW**<br><br>**ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF NEW ISRAEL FUND'S**
**MOTION TO DISMISS**

Jeffrey S. Bucholtz, *Pro Hac Vice*
Gabriel Krimm, *Pro Hac Vice*
KING & SPALDING LLP
1700 Pennsylvania Ave., NW
Washington, DC 20006
Tel: (202) 626-2907
Fax: (202) 626-3737
jbucholtz@kslaw.com
gkrimm@kslaw.com

J. Emmett Murphy
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036
Tel: (212) 556-2100
Fax: (212) 556-2222
jemurphy@kslaw.com

Brian Hauss
Arianna Demas
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
Tel: (212) 549-2604
Fax: (212) 549-2649
bhauss@aclu.org
ademas@aclu.org

*Counsel for Defendant New Israel Fund*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 1

LEGAL STANDARDS ...................................................................................................... 3

ARGUMENT ................................................................................................................. 3

I.   The Public Disclosure Bar Prohibits This Action. .................................................. 3

    A.   The Complaint is Based Entirely on Information in the Public Domain. ................. 4

    B.   TZAC is Not an Original Source. ............................................................ 9

II.  Federal Law Preempts TZAC's Effort to Enforce Federal Tax Law .......................... 9

III. The Complaint Fails to Plead Facts Showing a Violation of § 501(c)(3) ........................ 14

    A.   TZAC Has Failed to Plead With Particularity That NIF Engaged in
        "Electioneering." ............................................................................ 14

    B.   The Grantees' Alleged Conduct Is Not Partisan Political Activity. ....................... 16

    C.   Adopting TZAC's Interpretation of § 501(c)(3) in This False Claims Act Suit
        Would Raise Grave Constitutional Concerns. .......................................... 21

CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advance Pharm., Inc. v. United States,*
   391 F.3d 377 (2d Cir. 2004) ................................................................................23

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009)............................................................................................3

*Ass'n of Bar v. Comm'r,*
   858 F.2d 876 (2d Cir. 1988) ...............................................................................12

*Big Mama Rag, Inc. v. United States,*
   631 F.2d 1030 (D.C. Cir. 1980)..........................................................................24

*Bob Jones Univ. v. United States,*
   461 U.S. 574 (1983)......................................................................................12, 13

*Buckman Co. v. Plaintiffs' Legal Comm.,*
   531 U.S. 341 (2001)......................................................................................12, 13

*Chen ex rel. U.S. v. EMSL Analytical, Inc.,*
   966 F. Supp. 2d 282 (S.D.N.Y. 2013) ..............................................................3, 5

*Citizens Union v. Att'y Gen.,*
   408 F. Supp. 3d 478 (S.D.N.Y. 2019) ...............................................................12

*City of Chicago v. Morales,*
   527 U.S. 41 (1999)..............................................................................................21

*City of Houston v. Hill,*
   482 U.S. 451 (1987)............................................................................................22

*DiFolco v. MSNBC Cable L.L.C.,*
   622 F.3d 104 (2d Cir. 2010) ................................................................................4

*FCC v. Fox Television Stations, Inc.,*
   567 U.S. 239 (2012)............................................................................................22

*FMC Corp. v. Holliday,*
   498 U.S. 52 (1990)..............................................................................................11

*Fulani v. Brady,*
   935 F.2d 1324 (D.C. Cir. 1991) ..............................................................11, 12, 18

*Fulani v. League of Women Voters Educ. Fund*,
    882 F.2d 621 (2d Cir. 1989) ................................................................................................18

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972)..............................................................................................................21

*Green Mountain R.R. Corp. v. Vermont*,
    404 F.3d 638, (2d Cir. 2005) ...............................................................................................11

*Hill v. Colorado*,
    530 U.S. 703 (2000)..............................................................................................................21

*In re Primus*,
    436 U.S. 412 (1978)..............................................................................................................23

*Jennings v. Rodriguez*,
    138 S. Ct. 830 (2018)............................................................................................................21

*Keyishian v. Bd. of Regents*,
    385 U.S. 589 (1967)..............................................................................................................22

*Kolender v. Lawson*,
    461 U.S. 352 (1983)........................................................................................................21, 22

*Marentette v. Abbott Labs., Inc.*,
    886 F.3d 112 (2d Cir. 2018) ...........................................................................................11, 14

*N.Y. ex rel. Khurana v. Spherion Corp.*,
    No. 15 CIV. 6605 (JFK),
    2016 WL 6652735 (S.D.N.Y. Nov. 10, 2016) .......................................................................4

*NAACP v. Button*,
    371 U.S. 415 (1963)........................................................................................................22, 23

*Nat'l Found., Inc. v. United States*,
    13 Cl. Ct. 486 (1987) ...........................................................................................................15

*Ohio A. Phillip Randolph Inst. v. Smith*,
    335 F. Supp. 3d 988 (S.D. Ohio 2018) ...............................................................................19

*Regan v. Taxation with Representation*,
    461 U.S. 540 (1983)..................................................................................................12, 23, 24

*S.C. Green Party v. S.C. State Election Comm'n*,
    612 F.3d 752 (4th Cir. 2010) ...............................................................................................20

*Shuttlesworth v. City of Birmingham*,
    382 U.S. 87 (1965) .................................................................................................22

*Sierra Club v. Con-Strux, LLC*,
    911 F.3d 85 (2d Cir. 2018) ......................................................................................3

*Smith v. Goguen*,
    415 U.S. 566 (1974) .............................................................................................22

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
    547 F.3d 406 (2d Cir. 2008) ..................................................................................4

*State ex rel. Jamaica Hosp. Med. Ctr., Inc. v. UnitedHealth Grp., Inc.*,
    922 N.Y.S.2d 342 (App. Div. 2011) ...................................................................4, 9

*State ex rel. Seiden v. Utica First Ins. Co.*,
    943 N.Y.S.2d 36 (App. Div. 2012) .........................................................................3

*United States v. Sci. Applications Int'l Corp.*,
    626 F.3d 1257 (D.C. Cir. 2010) ...........................................................................25

*Universal Health Servs., Inc. v. U.S. ex rel. Escobar*,
    136 S. Ct. 1989 (2016) .........................................................................................25

*U.S. ex rel. Alcohol Found. v. Kalmanovitz Charitable Found., Inc.*,
    186 F. Supp. 2d 458 (S.D.N.Y. 2002) .................................................................6, 7

*U.S. ex rel. Atkins v. McInteer*,
    470 F.3d 1350 (11th Cir. 2006) ...........................................................................23

*U.S. ex rel. Chorches for Bankr. Estate of Fabula v. Am. Med. Response, Inc.*,
    865 F.3d 71 (2d Cir. 2017) .......................................................................3, 15, 16

*U.S. ex rel. Dick v. Long Island Lighting Co.*,
    912 F.2d 13 (2d Cir. 1990) ....................................................................................3

*U.S. ex rel. Doe v. John Doe Corp.*,
    960 F.2d 318 (2d Cir. 1992) ..................................................................................4

*U.S. ex rel. Grant v. United Airlines, Inc.*,
    912 F.3d 190 (4th Cir. 2018) ...............................................................................23

*U.S. ex rel. Green v. Serv. Contract Educ. & Training Trust Fund*,
    843 F. Supp. 2d 20 (D.D.C. 2012) .........................................................................7

*U.S. ex rel. Kester v. Novartis Pharm. Corp.*,
    43 F. Supp. 3d 332 (S.D.N.Y. 2014) .....................................................................4

*U.S. ex rel. Kraxberger v. Kansas City Power & Light Co.*,
    756 F.3d 1075 (8th Cir. 2014) ................................................................................6

*U.S. ex rel. Kreindler & Kreindler v. United Techs. Corp.*,
    985 F.2d 1148 (2d Cir. 1993) ........................................................................4, 7, 9

*U.S. ex rel. Oliver v. Philip Morris USA, Inc.*,
    101 F. Supp. 3d 111 (D.D.C. 2015) .......................................................................6

*U.S. ex rel. Osheroff v. Humana Inc.*,
    776 F.3d 805 (11th Cir. 2015) ............................................................................6, 7

*U.S. ex rel. Purcell v. MWI Corp.*,
    807 F.3d 281 (D.C. Cir. 2015) .............................................................................25

*U.S. ex rel. Rosner v. WB/Stellar IP Owner, L.L.C.*,
    739 F. Supp. 2d 396 (S.D.N.Y. 2010) ...................................................................5

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
    455 U.S. 489 (1982).............................................................................................22

*Williams v. Affinion Grp., LLC*,
    889 F.3d 116 (2d Cir. 2018) ................................................................................16

**Statutes**

26 U.S.C. § 501(c)(3)..................................................................................................*passim*

26 U.S.C. § 7428(a) .........................................................................................................10

26 U.S.C. § 7623(b) .........................................................................................................13

26 U.S.C. § 7801(a)(1).................................................................................................10, 13

31 U.S.C. § 3729(d) .....................................................................................................11, 13

N.Y. State Fin. Law § 188(7)..............................................................................................3

N.Y. State Fin. Law § 189(1)(h)........................................................................................23

N.Y. State Fin. Law § 189.1 ..............................................................................................24

N.Y. State Fin. Law § 190(9)(b)......................................................................................3, 6

**Rules & Regulations**

26 C.F.R. § 1.501(c)(3)-1...................................................................................................17

26 C.F.R. § 301.7623-1(c) ............................................................................. 13

13 N.Y.C.R.R. § 400.5 .................................................................................... 9

Fed. R. Civ. P. 9(b) ................................................................................... 3, 15

Fed. R. Civ. P. 44.1 ...................................................................................... 20

Rev. Rul. 2007-41, 2007-25 I.R.B. ............................................................... 17

Rev. Rul. 68-489, 1968-2 C.B. 210 .............................................................. 15

Rev. Rul. 72-513, 1972-2 C.B. 246 .............................................................. 18

I.R.S. Priv. Ltr. Rul. 91-52-039 (Sep. 30, 1991) ......................................... 18

IRS Info. Ltrs., 2019 WL 3048649 (June 28, 2019) ..................................... 15

**Other Authorities**

Basic Law: The Knesset § 6(a) .................................................................... 20

Basic Law: The Knesset § 7A ...................................................................... 20

Br. Amici Curiae Am. Civil Liberties Union &
   Brennan Ctr. Justice in Supp. of Appellants,
   *Vieth v. Jubelirer*, 541 U.S. 267 (2004)
   (No. 02-1580), 2003 WL 22069782 ..................................................... 19

Br. Amici Curiae Am. Civil Liberties Union, N.Y. Civil Liberties Union,
   ACLU of N.C., & ACLU of Md. in Supp. of Appellee,
   *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019)
   (Nos. 18-422, 18-726), 2019 WL 1167922 ......................................... 19

Sponsors Memo., 2010 A.B. 11568, 233d Leg., Reg. Sess. (N.Y. 2010) ...................................... 6

**INTRODUCTION**

Seeking to sue on behalf of the State of New York, the Zionist Advocacy Center (TZAC) has filed this *qui tam* action against New Israel Fund (NIF) demanding $110 million in treble damages plus civil penalties, based on allegedly false certifications of compliance with federal tax law. According to TZAC, NIF certified to the Internal Revenue Service that it had not "engage[d] in direct or indirect political campaign activities" within the meaning of 26 U.S.C. § 501(c)(3)— certifications that TZAC contends were false because NIF gave grants to Israeli organizations that defend human, civil, and Israeli constitutional rights.

TZAC's novel effort to use the New York False Claims Act to challenge NIF's federal tax compliance should be dismissed for multiple reasons. First, the New York False Claims Act prohibits *qui tam* actions based on publicly disclosed information, which is all TZAC has to offer. Second, Congress has reserved the power to enforce federal tax law to the IRS alone, and TZAC's effort to take federal tax law into its own hands to challenge a third party's § 501(c)(3) compliance conflicts with federal law. Finally, TZAC has failed to plead facts showing that NIF violated federal tax law to begin with.

**BACKGROUND**

Since its founding in 1979, NIF has been dedicated to the advancement of democracy and equality in Israel. Its cause attracts millions of dollars in charitable donations each year, which NIF distributes in the form of grant aid to private Israeli organizations engaged in the promotion of human and civil rights, social and economic justice, religious pluralism, and other charitable causes. For at least the past decade, NIF has publicized these grants in a comprehensive annual report and audit, which it archives on its website for anyone to see. *See* NIF, *Financials*, Ex. A1.

1

Because it is organized and operated as a not-for-profit charity, NIF has been recognized as exempt from federal income tax under § 501(c)(3) of the Internal Revenue Code.  As a result, the IRS publishes NIF's annual "Form 990" information return for review by the public.  *See* IRS, *Form 990 Series Downloads*, Ex. B1; IRS, *New Israel Fund*, Ex. B3.  And those filings, combined with NIF's own financial and operational transparency, enable both government officials and private watchdogs alike to scrutinize NIF's compliance with the legal restrictions that attend its federal tax-exempt status.  *See, e.g.*, Ex. C.

TZAC "advocates on behalf of the Jewish State."  Compl. ¶ 5 (ECF No. 1-2, Ex. B to NIF Notice of Removal).  Its complaint is candid about its motivation for filing this lawsuit: it disagrees with NIF's mission.  According to TZAC, "[a]lthough the stated purpose of NIF is to help strengthen Israel's democracy," NIF opposes what TZAC views as "Israeli security" by supporting organizations that, as TZAC sees it, "seek to undermine Israel."  *Id.* ¶ 2.  Apparently dissatisfied with its ability to advance its cause in the marketplace of ideas and the regular channels of federal tax law enforcement, TZAC has filed this *qui tam* action to litigate its grievance instead.

TZAC's complaint, filed in state court in August 2019, combines NIF's public tax filings and financial information with the publicly disclosed activities of NIF grantees and alleges that NIF engaged in "electioneering" inconsistent with its representations in its IRS Form 990s.  *See id.* ¶ 1.  The only provision of tax law that the complaint identifies is § 501(c)(3) of the Internal Revenue Code.  TZAC's theory for how NIF's alleged noncompliance with § 501(c)(3) implicates the New York FCA is one conclusory sentence with no supporting citation: "As a result of NIF's federal tax exemption, it receives exemption from taxation in the State and City of New York."  *Id.* ¶ 21.  New York declined to intervene, Order ¶ 1 (ECF No. 1-4, Ex. D), the state court unsealed the action, and NIF removed it to this Court and now moves to dismiss.

## LEGAL STANDARDS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Sierra Club v. Con-Strux, LLC*, 911 F.3d 85, 88 (2d Cir. 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). False Claims Act claims like TZAC's must also "state with particularity the circumstances constituting [the alleged] fraud." Fed. R. Civ. P. 9(b); *see U.S. ex rel. Chorches for Bankr. Estate of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 81 (2d Cir. 2017).

## ARGUMENT

### I.  The Public Disclosure Bar Prohibits This Action.

The New York False Claims Act's "public disclosure bar" prohibits this lawsuit.  Like its federal counterpart, the New York statute directs courts to "dismiss a qui tam action" if the allegations in the complaint are "substantially the same [as] allegations or transactions" that have been "publicly disclosed" in, among other things, "the news media" or "a … government report." N.Y. State Fin. Law § 190(9)(b).  An exception allows suit by an "original source" of the information.  *Id.*; *see also id.* § 188(7).  If an action is based on information "in the public domain, and the *qui tam* plaintiff was not a source of that information, then the suit is barred."  *U.S. ex rel. Dick v. Long Island Lighting Co.*, 912 F.2d 13, 18 (2d Cir. 1990).[1]

---

[1] Because "[t]he NYFCA follows the federal False Claims Act …, it is appropriate to look toward federal law when interpreting the New York act."  *State ex rel. Seiden v. Utica First Ins. Co.*, 943 N.Y.S.2d 36, 39 (App. Div. 2012).  This Court has thus relied on federal-law precedents when interpreting New York's public disclosure bar.  *See Chen ex rel. U.S. v. EMSL Analytical, Inc.*, 966 F. Supp. 2d 282, 305 (S.D.N.Y. 2013).  NIF's motion is made under Rule 12(b)(6) because New York's public disclosure bar, like its federal counterpart, no longer speaks of the court's jurisdiction.  *See* N.Y. State Fin. Law § 190(9)(b); *Chorches*, 865 F.3d at 80 ("[W]e join the majority of our sister circuits that have addressed the issue in holding that the [federal] public disclosure bar is no longer jurisdictional.").

This bar serves a sensible purpose well illustrated by this case. "When the material elements of a fraud are already in the public domain, the government has no need for a relator …." *State ex rel. Jamaica Hosp. Med. Ctr., Inc. v. UnitedHealth Grp., Inc.*, 922 N.Y.S.2d 342, 343 (App. Div. 2011) (quotation marks omitted). The bar thus aims "to prevent '[opportunistic] lawsuits by those who learn of the fraud through public channels … [and] contribute[] nothing to [its] exposure.'" *U.S. ex rel. Kester v. Novartis Pharm. Corp.*, 43 F. Supp. 3d 332, 344 (S.D.N.Y. 2014) (quoting *U.S. ex rel. Doe v. John Doe Corp.*, 960 F.2d 318, 319 (2d Cir. 1992)). Such "strangers to the fraud" only hamper the government's enforcement efforts by co-opting *qui tam* procedures for their own private ends. *U.S. ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1158 (2d Cir. 1993) (quotation marks omitted). TZAC is exactly the sort of plaintiff the public disclosure bar aims to prohibit. TZAC has ripped its allegations from the public domain, and it has not even attempted to qualify as an original source. It cannot pursue this lawsuit on New York's behalf.[2]

### A.    The Complaint is Based Entirely on Information in the Public Domain.

The allegations in TZAC's complaint are "substantially similar" to—in fact, *exactly the same as*—information "contained in prior 'public disclosures.'" *Kester*, 43 F. Supp. 3d at 346

---

[2] In ruling on NIF's motion, the Court may consider documents that are "incorporated by reference in the complaint and documents that are 'integral' to the complaint because the plaintiff 'relies heavily upon [their] terms and effect.'" *N.Y. ex rel. Khurana v. Spherion Corp.*, No. 15 CIV. 6605 (JFK), 2016 WL 6652735, at *11 (S.D.N.Y. Nov. 10, 2016) (quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)). The Court may also "take judicial notice of the fact that press coverage and judicially noticeable public records contained certain information, without regard to the truth of their contents." *Id.* (citing *Chen*, 966 F. Supp. 2d at 294). The exhibits to this motion fall into these permissible categories because they either are referenced and relied on in the complaint or establish that certain information was publicly available "without regard to [its] truth." *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).

(quoting *Chen*, 966 F. Supp. 2d at 296–97).  To begin, the allegedly "false certifications" made in NIF's federal tax filings have been publicized in government reports and news media alike.  *See* Compl. ¶¶ 8–21.  The IRS publishes monthly compilations of every Form 990 it receives from a § 501(c)(3) charity.  *See* IRS, *Form 990 Series Downloads*, Ex. B1.  And it likewise maintains a searchable public database, *see* IRS, *Tax Exempt Organization Search*, Ex. B2, with a profile on NIF that includes NIF's most recent Form 990 filings.  *See* IRS*, New Israel Fund*, Ex. B3.

These public resources constitute "government reports" under the public disclosure bar.  In *U.S. ex rel. Rosner v. WB/Stellar IP Owner, L.L.C.*, 739 F. Supp. 2d 396 (S.D.N.Y. 2010), this Court held that a New York City Department of Finance database contained "reports" within the meaning of the federal FCA because it was "readily available to the public," "the searches [were] free and unlimited," and the results "present[ed] synthesized tax benefit histories for many different properties over many years."  *Id.* at 407.  So too here.  Through a simple name-based search in the IRS database, anyone with an internet connection can access a dedicated page listing NIF's Employer Identification Number; NIF's status as a Public Charity; and the reporting period, return identification number, and return type of NIF's most recent tax filings.  Any member of the public can use this database to access copies of NIF's tax returns, organized by form and year.  *See* Ex. B3.  The IRS's "organization" and "synthesis" of NIF's tax data into an easy-to-use public database constitutes a "public disclosure."  *Rosner*, 739 F. Supp. 2d at 407.

Moreover, TZAC's reliance on the information contained in NIF's Form 990s doubly triggers the public disclosure bar because the same tax information has been collected, republished, and exhaustively analyzed in the "news media" as well.  As is common in the world of nonprofit charities, numerous watchdog organizations have produced and periodically updated profiles on NIF for review by potential donors and the public.  *See* Charity Navigator, *New Israel Fund*, Ex. C;

ProPublica, *New Israel Fund*, Ex. D1; NGO Monitor, *New Israel Fund*, Ex. E1.  Each of these profiles evaluates NIF's operations and finances based on NIF's Form 990 filings and other public information.  And as particularly relevant here, ProPublica's "Nonprofit Explorer" has catalogued and republished every NIF Form 990 dating back to 2001—well before the initiation of the "fraud" alleged in the complaint.  *See* Exs. D1–D11.

These free and open resources fall within the "news media" category of the public disclosure bar.  Courts have applied that label to a wide range of public websites "intended to disseminate information" on a host of topics.  *U.S. ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 813 (11th Cir. 2015).  Such sites do not merely post content on the internet; they create, collect, and distribute information to the public just like any other "news media."  *See U.S. ex rel. Kraxberger v. Kansas City Power & Light Co.*, 756 F.3d 1075, 1079 (8th Cir. 2014); *cf.* 5 U.S.C. § 552(a)(4) (defining "representative of the news media" in much the same way).[3]  And the charity watchdogs have done just that.  Catering to a segment of the public interested in tax-exempt charities, these websites—"[n]o different from newspaper reporters"—"disseminate information to" that public audience "in a periodic manner."  *U.S. ex rel. Alcohol Found. v. Kalmanovitz Charitable Found., Inc.*, 186 F. Supp. 2d 458, 463 (S.D.N.Y. 2002).  In so doing, they have given

---

[3] In 2010, New York amended its public disclosure bar to make clear its agreement with the consensus view of the federal courts: although many web resources qualify as "news media," a disclosure is not "in the 'news media' *merely* because … [it] ha[s] been posted on the internet." N.Y. State Fin. Law § 190(9)(b)(iii) (emphasis added); *see also* Sponsors Memo. at 1, 2010 A.B. 11568, 233d Leg., Reg. Sess. (N.Y. 2010) ("The bill … strengthens the Act to assure that the New York law continues to be at least as effective as the federal Act."); *see generally U.S. ex rel. Oliver v. Philip Morris USA, Inc.*, 101 F. Supp. 3d 111, 124–25 (D.D.C. 2015) (explaining the line the federal courts have drawn between web pages that count as "news media" and those—such as anonymous blog posts and informal forum discussions—that do not).

"strangers" to "the [alleged] fraud" access to NIF's tax filings in a way that far exceeds the capacity of ordinary print and television.  *Kreindler*, 985 F.2d at 1158.  These "particular website[s]" thus "qualif[y] as news media in light of the concern motivating the FCA's public disclosure bar." *U.S. ex rel. Green v. Serv. Contract Educ. & Training Trust Fund*, 843 F. Supp. 2d 20, 33 (D.D.C. 2012).  NIF's tax filings are in the public domain.

The same goes for TZAC's allegations of NIF's grant-making activities.  TZAC alleges that NIF gave grants to six Israeli organizations: Zazim: Community Action, Compl. ¶ 23; the Israel Religious Action Center (IRAC), *id.* ¶ 24; Tag Meir Forum, *id.* ¶ 26; Adalah, *id.* ¶ 28; Mossawa, *id.* ¶ 30; and Adam Teva, *id.* ¶ 31.  But this is no revelation, as NIF has published annual reports listing each of its grant recipients for every year since 2007.  *See* NIF, *Financials* Ex. A1; *see also* Exs. A2–A12 (NIF's detailed financial statements from 2008 to 2018, all made available publicly through NIF's website).  Like the republication of NIF's tax filings, these distributions fall within the public disclosure bar because NIF uses them to "disseminate information about [its grant-giving] programs."  *Osheroff*, 776 F.3d at 813.  Indeed, NIF's financial disclosure page is "readily accessible to the public on [NIF's] external website" because it aims "specifically to advertise" NIF's charitable giving.  *Green*, 843 F. Supp. 2d at 32.

But even if NIF's website did not quality as "news media," the grant information would still be publicly disclosed through other outlets.  Most notably, the watchdog group NGO Monitor has republished and analyzed each of NIF's financial statements for over a decade.  *See* Exs. E2–E12.  Like the ProPublica resource discussed above, NGO Monitor's website qualifies as "news media" because it provides periodic reports of new information to an interested public audience. *See Alcohol Found.*, 186 F. Supp. 2d at 463; *Green*, 843 F. Supp. 2d at 33.  In so doing, it has publicly disclosed each and every NIF grant mentioned in the complaint.

Finally, the grantee conduct that TZAC calls "electioneering" all occurred in public view and received a broad range of media coverage.  In fact, TZAC admits that NIF's "grantees proudly post on their websites what they have been doing."  Compl. ¶ 33[-1].[4]  And several of the "electioneering" activities have received coverage by—or even occurred on—NIF's website as well.  *See, e.g.*, Compl. ¶ 25[-1]; *see also* Ex. A13 (reporting on the petition referenced in Compl. ¶ 23, the video referenced in ¶ 24, and the protest referenced in ¶ 26).  These postings are public disclosures for all of the reasons already discussed.  *See supra* at 6–7.

Moreover, third-party news reports also place TZAC's allegations squarely within the public domain.  TZAC alleges that "Zazim: Community Action started a petition to disqualify Otzma Yehudit candidates."  Compl. ¶ 23; *see infra* at 17 & n.8.  That petition was reported in the Israeli newspaper *Haaretz*.  *See* Ex. F.  TZAC alleges that IRAC, a public-interest litigation group, engaged in "electioneering" activities before the Israeli Central Election Committee and Supreme Court.  *See* Compl. ¶¶ 24–25[-2].[5]  Given that this "electioneering" occurred in open government proceedings, its conspicuous appearance in various media outlets is no surprise.  *See* Exs. G1–G3.  TZAC alleges that "Tag Meir Forum … co-hosted a protest in 2019 … against the merger of the New Right Party and Otzma Yehudit Party."  Compl. ¶ 26.  That event was covered by *Times of Israel* Blog.  *See* Ex. H.  TZAC alleges that Adalah participated in various "petitions" and "representations," which (naturally) occurred in open government proceedings and garnered substantial media attention.  *See* Exs. I1–I5.  Lastly, TZAC alleges that Mossawa "electioneered"

---

[4] The complaint uses several paragraph numbers more than once.  NIF has distinguished duplicate paragraph numbers with bracketed notations (*e.g.*, ¶ 33[-1], ¶ 33[-2]).

[5] IRAC is the public and legal advocacy arm of the Reform movement of Judaism in Israel.

through its own website and newsletter.  *See* Compl. ¶ 30; *see* Exs. J1–J3.  The article at issue was likewise republished by Mossawa's American sister organization, Friends of Mossawa.  *See* Ex. J4.

In sum, TZAC's complaint is no more than a digest of public information that TZAC has openly taken from government reports and the news media.[6]

### B.    TZAC is Not an Original Source.

Like federal law, New York law considers a relator an "original source" if it "voluntarily disclose[s]" its fraud allegations "to the state or a local government" "prior to a public disclosure" or if it "has knowledge that is independent of and materially adds to the publicly disclosed allegations" and "has voluntarily provided [that] information to the state or a local government before or simultaneously with [the] filing" of the lawsuit.  N.Y. State Fin. Law § 188(7).  TZAC does not attempt to claim this exception, *cf. Jamaica*, 922 N.Y.S.2d at 343 (noting relator's failure to allege original-source status), and for good reason.  TZAC is not an NIF insider, and *NIF itself* is the original source of its own tax-filing and grant-distributing information.  *See supra* at 4–5, 7. Nor was TZAC the first to shed light on the "electioneering activity" it attributes to NIF's grantees. *See supra* at 8–9.  All TZAC did was compile public information into a complaint and demand a relator's bounty.  The law does not permit such opportunism.  *Kreindler*, 985 F.2d at 1157.

## II.    Federal Law Preempts TZAC's Effort to Enforce Federal Tax Law.

TZAC's complaint seeks to use New York's False Claims Act to enforce federal tax law. As noted above, *see supra* at 2, the complaint never identifies any provision of New York tax law

---

[6] Because NIF does not argue for dismissal "*solely* because of an alleged public disclosure in a federal report, hearing, audit or investigation," 13 N.Y.C.R.R. § 400.5 (emphasis added), the New York regulation directing the State to oppose dismissal in such a case does not apply.

that NIF supposedly violated, while repeatedly accusing NIF of violating § 501(c)(3) of the Internal Revenue Code. *See* Compl. ¶¶ 4, 21. But Congress has made clear that only the Secretary of the Treasury may enforce federal tax law, so TZAC's effort to assume that mantle is preempted.[7]

Congress has dictated that "the administration and enforcement of" the Internal Revenue Code "shall be performed by or under the supervision of the Secretary of the Treasury" "[e]xcept as otherwise *expressly* provided by law." 26 U.S.C. § 7801(a)(1) (emphasis added). Yet TZAC seeks to enforce the Code on New York's behalf. The massive penalty TZAC demands stems solely from NIF's alleged false certification of compliance with 26 U.S.C. § 501(c)(3); TZAC neither identifies any analogous provision of New York law that NIF allegedly violated nor pleads how NIF allegedly falsely certified compliance to New York with any such New York law.

Moreover, Congress has underscored its intent to restrict litigation concerning federal tax-law compliance by carefully limiting judicial review of the IRS's § 501(c)(3) determinations. To litigate the "continuing qualification of [a § 501(c)(3)] organization" in court, "an appropriate pleading" must be filed in "the United States Tax Court, the United States Court of Federal Claims, or the district court of the United States for the District of Columbia." 26 U.S.C. § 7428(a). And such a pleading is "appropriate" only if filed "by the organization the qualification or classification of which is at issue," *id.* § 7428(b)(1)—not by a third-party opponent of that organization.

This lawsuit is thus the wrong type of action, brought by the wrong party, in the wrong court. Where the structure and purpose of the law shows a clear intent to preserve exclusive federal

---

[7] To be clear, NIF is not contending that New York lacks authority to enforce its own tax law if its law parallels federal tax law. That is not what the complaint seeks to do: it does not so much as mention any provision of New York tax law, let alone plead a viable theory for how NIF allegedly violated New York tax law.

administration of a federal regulatory regime, state law cannot interfere.  *See FMC Corp. v. Holliday*, 498 U.S. 52, 56–57 (1990); *Marentette v. Abbott Labs., Inc.*, 886 F.3d 112, 117 (2d Cir. 2018); *Green Mountain R.R. Corp. v. Vermont*, 404 F.3d 638, 641 (2d Cir. 2005).  Allowing TZAC to invoke state law to work around these federal enforcement restrictions would conflict with Congress's clear directives.  *Cf. Fulani v. Brady*, 935 F.2d 1324, 1327 (D.C. Cir. 1991) (*Fulani II*) ("[T]he statutory scheme created by Congress is inconsistent with, if not preclusive of, third party litigation of tax-exempt status."); *Marentette*, 886 F.3d at 120 (holding that state-law claim alleging non-compliance with Organic Foods Production Act (OFPA) conflicted with OFPA; the lack of a third-party remedy "is simply the manner that Congress chose to enforce the statute").

Still further, Congress has made its intent to limit litigation about § 501(c)(3) compliance to the specific channels described above even clearer by prohibiting back-door challenges mounted through the *federal* False Claims Act.  Congress carved federal tax filings out of the Act, providing that the otherwise-comprehensive prohibition on false claims, records, and statements "does not apply to claims, records, or statements made under the Internal Revenue Code."  31 U.S.C. § 3729(d).  Relators can challenge claims made to the entire gamut of federal agencies, under the entire gamut of regulatory regimes—except those made to the IRS under the Code.  This provision emphasizes Congress's intent to keep § 501(c)(3) determinations within the exclusive purview of the IRS.  It would strain credulity to suggest that Congress has allowed *states* to overrule its specific prohibition through their own false claims laws.  *Cf. Marentette*, 886 F.3d at 120 (holding that "[t]he enforcement scheme that Congress actually provided" showed "Congress did not want to permit individual consumers to challenge certification decisions made" by federal regulators).

These provisions create a system of federal tax law enforcement that makes good sense. For over a century, Congress has used the Revenue Code to subsidize charitable works. *Bob Jones*

*Univ. v. United States*, 461 U.S. 574, 589–90 (1983); *see Regan v. Taxation with Representation*, 461 U.S. 540, 543 (1983).   At the same time, Congress has recognized that deciding which organizations should and should not receive tax subsidies is a delicate and often controversial task. *See Bob Jones*, 461 U.S. at 596.   It has thus conferred that task on the IRS alone, *see Citizens Union v. Att'y Gen.*, 408 F. Supp. 3d 478, 483–84 (S.D.N.Y. 2019), subject to limited judicial oversight only at the request of those denied § 501(c)(3) status by the IRS, *see Fulani II*, 935 F.2d at 1327; *cf. Ass'n of Bar v. Comm'r*, 858 F.2d 876 (2d Cir. 1988) (considering appeal from Tax Court in which bar association challenged IRS's denial of its *own* request for § 501(c)(3) status). And to make doubly sure that this sensitive regime would function as it intended, Congress forbade third parties from challenging those determinations in court.   *See Fulani II*, 935 F.2d at 1327 ("[I]t certainly is telling that Congress … create[d] a specific remedy for the adjudication of a § 501(c)(3) determination even on behalf of the one entity whose standing is least subject to challenge ….."). TZAC's effort to repurpose New York's false claims law shows the wisdom of Congress's choices: allowing private parties like TZAC to police third parties' compliance with federal tax law would invite abusive litigation by those with political axes to grind.

In light of Congress's framework, TZAC's claim resembles those held preempted in *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001).   In *Buckman*, the Supreme Court considered whether consumers injured by a medical device could bring a state-law claim against a company that allegedly defrauded the Food and Drug Administration into granting marketing approval for the device.   *See id.* at 343.   The Court held such "fraud on the FDA" claims preempted by federal law.   *See id.* at 344.   It reasoned that "the federal statutory scheme amply empowers the FDA to punish and deter fraud against" itself and recognized that FDA exercises its enforcement discretion carefully "to achieve a somewhat delicate balance of statutory objectives."

12

*Id.* at 348.  That "statutory scheme" included third-party whistleblower provisions, extensive investigative and enforcement authority, and a range of "enforcement options that allow[ed FDA] to make a measured response to suspected fraud."  *Id.* at 349.  Permitting private parties to bring state-law "fraud-on-the-FDA" claims would thus interfere "with the FDA's responsibility to police fraud consistently with the Administration's judgment and objectives."  *Id.* at 350.  Because "Congress intended that [the Food, Drug, and Cosmetic Act] be enforced exclusively by the Federal Government," the plaintiffs' state-law claims were preempted.  *Id.* at 352.

It is even clearer that a state-law claim seeking to enforce the Internal Revenue Code is preempted.  Federal law entrusts the IRS with the broad discretion to interpret, *see Bob Jones*, 461 U.S. at 596, and the exclusive power to enforce and administer, 26 U.S.C. § 7801(a)(1), the thin and sometimes blurry line the Code draws between charity and electioneering.  Congress has precluded the use of even the federal FCA in ways that could interfere with the IRS's authority.  *See* 31 U.S.C. § 3729(d).  And Congress has opted not to allow third parties to sue to challenge a charity's compliance with § 501(c)(3), while allowing third parties to raise concerns through a whistleblower complaint program administered by the IRS.  *See* 26 U.S.C. § 7623(b); 26 C.F.R. § 301.7623-1(c).  The terms and structure of these federal statutes show a clear congressional intent to make the IRS an expert, politically neutral, and *exclusive* regulator of § 501(c)(3) compliance.

Just as the plaintiffs in *Buckman* could not use state law to usurp FDA's authority to enforce the Food, Drug, and Cosmetic Act and decide for itself whether it had been defrauded, TZAC cannot purport to invoke New York law to litigate whether NIF has defrauded the IRS by submitting false certifications of compliance with the Code.  *See* Compl. ¶ 7[-2].  And just as the plaintiffs in *Marentette* could not invoke state law to claim "that although Abbott's product was certified as organic pursuant to the OFPA, the product is not actually organic under the Act,"

because "demand[ing] adjudication of a product's organic status separate and apart from the scheme Congress laid out in the law" would "necessarily undermine[] Congress's purpose," 886 F.3d at 118, TZAC cannot use state law to "demand[] adjudication" of NIF's § 501(c)(3) compliance "separate and apart from the scheme Congress laid out in the" Revenue Code.

## III.   The Complaint Fails to Plead Facts Showing a Violation of § 501(c)(3).

TZAC's contention that NIF has not complied with § 501(c)(3) is not just preempted—it is also meritless.  First, most of the complaint's "electioneering" allegations describe conduct by NIF's grantees, without alleging facts sufficient to attribute the grantees' conduct to NIF, and where the complaint does allege conduct by NIF, its allegations are conclusory and fall far short of the particularity required by Rule 9(b).  Second, and most fundamentally, the alleged conduct does not constitute prohibited "electioneering."  Federal tax law does not prohibit the defense of basic rights and Israel's system of laws, even if such advocacy might incidentally benefit or hinder certain candidates in their campaigns for office.  TZAC's effort to narrow the permissible scope of advocacy for a charity—through the uniquely ill-suited means of a backward-looking, quasi-criminal fraud claim—should be rejected.

### A.   TZAC Has Failed to Plead With Particularity That NIF Engaged in "Electioneering."

TZAC's complaint fails to adequately plead prohibited "electioneering" by NIF for two basic reasons: (1) most of the complaint's allegations describe conduct by NIF's grantees rather than by NIF itself, and the complaint does not justify attributing the grantees' alleged conduct to NIF; and (2) in the few places where the complaint alleges that NIF itself engaged in conduct that TZAC labels "electioneering," the complaint is far too conclusory to satisfy Rule 9(b).

In many places, the complaint alleges that an NIF grantee engaged in conduct that TZAC contends is "electioneering" while making no effort to allege that NIF was involved in the grantee's alleged conduct.  For example, paragraph 26 alleges only that Tag Meir Forum "co-hosted a protest" against the merger of two political parties; it does not mention NIF.  *See also* Compl. ¶¶ 24, 25[-2], 28, 29, 30, 31 (similarly alleging conduct only by grantees).  Yet the link between NIF and any alleged third-party "electioneering" is one of the critical "circumstances constituting [the alleged] fraud" that TZAC must plead with particularity.  Fed. R. Civ. P. 9(b); *see Chorches*, 865 F.3d at 81.  An Israeli organization's mere receipt of NIF grant money does not make it NIF's alter ego such that all of the grantee's conduct is necessarily imputed to NIF.  To the contrary, the IRS has long made clear that a § 501(c)(3) organization does not "jeopardize its exemption …, even though it distributes funds to nonexempt organizations"—such as foreign nonprofits—"provided it retains control and discretion over use of the funds for [exempt] purposes."  Rev. Rul. 68-489, 1968-2 C.B. 210; *see also* IRS Info. Ltrs., 2019 WL 3048649 (June 28, 2019) (explaining the continuing force of Rev. Rul. 68-489).  Thus, so long as NIF "controls [its] disbursement[s] and ensures that [they are] applied to exempt purposes," it does not bear responsibility for the independent actions of its grantees.  *Nat'l Found., Inc. v. United States*, 13 Cl. Ct. 486, 493 (1987), *as amended* (Nov. 10, 1987).

TZAC utterly ignores this point.  It makes no attempt to allege, even in conclusory terms, that the grantees used NIF grant money—as opposed to funds from the many other potential sources available to the grantees—to engage in the alleged conduct.  Likewise, the complaint contains no allegations—particularized or otherwise—about the terms of NIF's grant agreements.  Instead, the complaint merely identifies years in which NIF gave grants to the organizations at issue and then applies the "electioneering" epithet to some of those organizations' conduct.  *See,*

*e.g.*, Compl. ¶¶ 24, 28, 30, 31.  In so doing, it fails to draw any plausible connection—much less a particularly pleaded connection—between the grants and the conduct.

In a few places, the complaint mentions NIF as well as its grantees, but it never provides the particularity required by Rule 9(b).  For example, paragraph 23 alleges that "[a]n NIF grantee called Zazim: Community Action started a petition to disqualify Otzma Yehudit candidates and NIF gathered names to help Zazim in this effort."  The who, what, when, where, and how of this alleged conduct by NIF is entirely absent from the complaint.  *See Williams v. Affinion Grp., LLC*, 889 F.3d 116, 124 (2d Cir. 2018).  TZAC's failure to allege particularized facts showing that NIF, rather than merely a grantee, engaged in the alleged conduct may be explained by TZAC's apparent belief that it suffices for NIF to have known about a grantee's conduct.  *See* Compl. ¶ 32 ("NIF gave and continues to give general grants on a constant basis to organizations that are involved in electioneering which it knows about.").  But as explained above, NIF does not run afoul of § 501(c)(3) if one of its grantees uses other funds to engage in electioneering; such conduct is not attributable to NIF regardless of whether NIF "knows about" it.  Similarly, it is irrelevant whether NIF "proudly posted" on its website about what grantees were doing if the grantees used other funds.  *See* Compl. ¶ 27.

In short, the complaint relies on precisely the sort of "speculation" that Rule 9(b) exists to preclude.  *Chorches*, 865 F.3d at 86.

### B. The Grantees' Alleged Conduct Is Not Partisan Political Activity.

Putting aside these pleading failures, TZAC has not alleged grantee conduct that would violate § 501(c)(3) anyway.  Section 501(c)(3) authorizes tax exemptions for charitable non-profit organizations on the condition that the organization "does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in

16

opposition to) any candidate for public office." 26 U.S.C. § 501(c)(3). The IRS's regulations define such "participation or intervention" to include "the publication or distribution of written or printed statements or the making of oral statements on behalf of or in opposition to such a candidate." 26 C.F.R. § 1.501(c)(3)-1(c)(3)(iii); *see also* 26 C.F.R. § 1.501(c)(3)-1(b)(3)(iii) (applying the restriction to § 501(c)(3) organizations). Yet those same regulations decidedly *permit* "issue advocacy," which includes defending "human and civil rights secured by law." 26 C.F.R. § 1.501(c)(3)-1(d)(2). Determining whether a charity has crossed the line from permissible issue advocacy to prohibited "electioneering" "depends upon all of the facts and circumstances of each case." Rev. Rul. 2007-41, 2007-25 I.R.B.

According to TZAC, the grantees violated this prohibition by advocating to enforce Israel's Basic Law through (1) efforts to disqualify Kahanist parties and candidates from elections, *see* Compl. ¶¶ 23–27[8]; and (2) challenges to the disqualification of Arab candidates, *see* Compl. ¶ 28–29. Those actions, however, are entirely consistent with NIF's declared charitable purpose: to advance pro-democracy values and their expression in Israel's public life, safeguard human and civil rights—including in the Occupied Territories—and strengthen public trust in and support for democratic rights and values and the rule of law. TZAC's claim thus boils down to a theory that NIF's purpose is illegitimate if its conduct has an impact on a candidate's electoral prospects.

This simplistic position is wrong. Courts do not reflexively assume that any activity that incidentally benefits or harms a particular candidate violates § 501(c)(3). For instance, in *Fulani*

---

[8] The Kahanist parties Kach and Kahane Chai have long been recognized as terrorist groups in both Israel and the United States. *See Chai v. Dep't of State*, 466 F.3d 125, 129–30, 134 (D.C. Cir. 2006) ("Kahane Chai venerates Baruch Goldstein because he massacred 29 Arab worshippers at the Al-Haram Al-Ibrahimi (Sanctuary of Abraham) or Tomb of the Patriarchs in Hebron."). Otzma Yehudit, which literally translates to "Jewish Power," is widely identified with Kahanism.

*v. League of Women Voters Education Fund*, 882 F.2d 621 (2d Cir. 1989) (*Fulani I*), the Second

Circuit held that the League of Women Voters Education Fund did not engage in partisan political

activity when it excluded Dr. Lenora B. Fulani, an independent presidential candidate, from its

Republican and Democratic Party primary debates.[9]  Dr. Fulani's exclusion undoubtedly harmed

her electoral interests, but the Second Circuit explained that it must "consider the context in which

that limitation was made."  *Id.* at 629.  In particular, the Second Circuit considered Dr. Fulani's

challenge to the League's § 501(c)(3) status "against [the] backdrop" of the League's legitimate

exempt purpose in sponsoring the debates, which was "to help voters and supporters make an

informed choice when time came to vote in the Republican and Democratic primary contests."  *Id.*

Because Dr. Fulani was not seeking the Republican or Democratic nominations, the Second Circuit

held that the League's decision to exclude her was not "partisan," but rather "a logical

consequence" of the League's legitimate exempt purpose, given the "nature and role of primary

contests in the electoral process."  *Id.* at 630.[10]

---

[9] The Second Circuit reached the merits of the § 501(c)(3) issue in *Fulani I* without considering whether the provisions of federal tax law discussed in the previous section precluded Fulani's third-party challenge to the League's § 501(c)(3) compliance.  As noted above, the D.C. Circuit strongly suggested in the parallel *Fulani II* case that "the statutory scheme created by Congress is inconsistent with, if not preclusive of, third party litigation of tax-exempt status"; because the court held that Fulani lacked standing, it did not have to definitively resolve this preclusion issue.  935 F.2d at 1327; *see supra* at 11.

[10] *See also* Rev. Rul. 72-513, 1972-2 C.B. 246 (holding that a university did not engage in partisan political activity by providing office space and financial support to a student newspaper that endorsed candidates); I.R.S. Priv. Ltr. Rul. 91-52-039 (Sep. 30, 1991) (holding that a mail-bundling organization formed to give employment opportunities to people with mental disabilities was entitled to tax-exempt status, even though the organization "may be mailing or sorting materials that relate to a political campaign of a candidate for public office").

By the same token, legitimately exempt advocacy in support of civil rights, such as opposing a would-be dictator's attempt to exceed his term limits or to outlaw an opposition party, does not become partisan political activity simply because it helps or hurts particular candidates. Indeed, other charitable organizations have engaged in high-profile advocacy to defend constitutional rights in U.S. elections without losing their § 501(c)(3) status.  For example, the American Civil Liberties Union Foundation, a § 501(c)(3) organization, served as party counsel in a lawsuit challenging the constitutionality of extreme partisan gerrymandering in *Ohio A. Phillip Randolph Institute v. Smith*, 335 F. Supp. 3d 988 (S.D. Ohio 2018), and served as amicus counsel on a brief urging the Supreme Court to strike down the extreme partisan gerrymanders in *Rucho v. Common Cause* and *Vieth v. Jubelirer*.[11]  The congressional maps challenged in those cases were explicitly drawn to benefit specific candidates and parties, but that fact did not convert the ACLU Foundation's public interest litigation into partisan political activity.

The same principle applies to advocacy by NIF's grantees to enforce Israel's Basic Law in elections for Israel's parliament, the Knesset.  For example, TZAC's complaint alleges that an attorney affiliated with NIF grantee IRAC "argued before the Israel Supreme Court against the appeal of Baruch Marzel who had been disqualified from running for Knesset by the Israel Central Election Committee." Compl. ¶ 25[-2].  The complaint then references and incorporates a "picture [posted] on [IRAC's] Facebook account," *id*., which makes clear that the appeal concerned the issue of Marzel's "racism and racial incitement."  Ex. K1; *see supra* at 17 n.8.  According to Article

---

[11] Br. Amici Curiae Am. Civil Liberties Union, N.Y. Civil Liberties Union, ACLU of N.C., & ACLU of Md. in Supp. of Appellee, *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019) (Nos. 18-422, 18-726), 2019 WL 1167922; Br. Amici Curiae Am. Civil Liberties Union & Brennan Ctr. Justice in Supp. of Appellants, *Vieth v. Jubelirer*, 541 U.S. 267 (2004) (No. 02-1580), 2003 WL 22069782.

7A of Israel's Basic Law, "[a] candidates list shall not participate in elections to the Knesset, and a person shall not be a candidate for election to the Knesset, if the objects or actions of the list or the actions of the person, expressly or by implication, include ... incitement to racism."  Basic Law: The Knesset § 7A; *see* Fed. R. Civ. P. 44.1 (permitting judicial notice of foreign law).  Fighting to enforce this fundamental tenet of Israel's Basic Law is simply protecting the ground rules of democracy and fits well within NIF's permissible charitable purpose of promoting human, democratic, and civil rights in Israel and the Occupied Territories.

TZAC also alleges that Adalah engaged in partisan political activity by challenging the disqualification of several Arab candidates for the Knesset.  Compl. ¶¶ 28–29.  Again, Israel's Basic Law provides that "[e]very Israeli citizen who on the day of the admission of a candidates list containing his name is twenty-one years of age or over shall have the right to be elected to the Knesset, unless a court has deprived him of that right by virtue of Law."  Basic Law: The Knesset § 6(a).  Advocacy to protect the right of Arab candidates to run for the Knesset fits well within NIF's exempt purpose of defending human, constitutional, and civil rights in Israel.  Along the same lines, the ACLU Foundation has engaged in litigation challenging the constitutionality of ballot-access restrictions on behalf of excluded candidates.  *See, e.g.*, *S.C. Green Party v. S.C. State Election Comm'n*, 612 F.3d 752 (4th Cir. 2010) (ACLU Foundation served as counsel for the South Carolina Green Party and a disqualified candidate for state office, among others).  Just as the ACLU Foundation did not forfeit its § 501(c)(3) status by challenging the exclusion of minor party candidates from the ballot, NIF would not forfeit its § 501(c)(3) status by supporting free and fair elections that comport with Israel's Basic Law.

**C.     Adopting TZAC's Interpretation of § 501(c)(3) in This False Claims Act Suit Would Raise Grave Constitutional Concerns.**

If there were any ambiguity about the scope of § 501(c)(3)'s prohibition on partisan political activity, the canon of constitutional avoidance would require the Court to reject the interpretation urged by TZAC.   "Under the constitutional-avoidance canon, when statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems." *Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018).  TZAC accuses NIF of fraud and demands over a hundred million dollars in treble damages plus civil penalties despite the absence of any clear guidance from Congress or the IRS that the acts alleged are inconsistent with § 501(c)(3). Adopting such a novel interpretation of § 501(c)(3) and its accompanying regulations to impose such draconian, quasi-criminal retrospective liability would raise a serious question about whether the New York False Claims Act is unconstitutionally vague as applied in this manner to NIF and other non-profits engaged in similar advocacy.

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  "A statute can be impermissibly vague … if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits … [or] if it authorizes or even encourages arbitrary and discriminatory enforcement."  *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (citing *City of Chicago v. Morales*, 527 U.S. 41, 56–67 (1999)).  Of these two requirements, "the more important aspect of vagueness doctrine 'is ... the requirement that a legislature establish minimal guidelines to govern law enforcement.'"  *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)

(quoting *Smith v. Goguen*, 415 U.S. 566, 574 (1974)).  Thus, even a law that is not formally vague may violate due process if it is too easily susceptible to abuse by government officials.

Two thumbs are placed on the scale when assessing a vagueness challenge to a quasi-criminal regulation of speech or expressive activity.  First, although the Supreme Court has "expressed greater tolerance of enactments with civil rather than criminal penalties," *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982), it has made clear that quasi-criminal statutes "must be scrutinized [for vagueness] with particular care," *City of Houston v. Hill*, 482 U.S. 451, 459 (1987); *Hoffman Estates*, 455 US. at 499–500 & n.16.  This is because vague criminal statutes "permit 'a standardless sweep [that] allows" enforcement authorities—in this case, *private* qui tam *relators*—"to pursue their personal predilections.'" *Kolender*, 461 U.S. at 358 (quoting *Smith*, 415 U.S. at 575).

Second, laws regulating speech are subject to a "more stringent vagueness test" than laws regulating conduct.  *Hoffman Estates*, 455 U.S. at 499.  "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 604 (1967) (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)).  The heightened vagueness standard applied to laws regulating speech is necessary, both to "ensure that ambiguity does not chill protected speech," *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 254 (2012), and because there are heightened concerns about arbitrary enforcement where there is the "potential for arbitrarily suppressing First Amendment liberties," *Kolender*, 461 U.S. at 358 (quoting *Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 91 (1965)).

Applied as TZAC hopes, the New York False Claims Act would impose draconian damages and penalties against registered charities engaged in protected, and arguably *tax-preferred*, expression.  "When a civil statute imposes penalties that, although civil in description,

are penal in character, the statute is sometimes deemed quasi-criminal and subjected to stricter vagueness review." *Advance Pharm., Inc. v. United States*, 391 F.3d 377, 396 (2d Cir. 2004) (citations and internal quotation marks omitted).  Numerous courts have recognized that liability under the federal False Claims Act is "quasi-criminal" in nature, particularly because the statute imposes liability for treble damages, "a punishment which carries potentially crippling consequences." *U.S. ex rel. Grant v. United Airlines, Inc.*, 912 F.3d 190, 197 (4th Cir. 2018); *see also U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1360 (11th Cir. 2006).  New York's False Claims Act similarly authorizes treble damages plus penalties.  *See* N.Y. State Fin. Law § 189(1)(h).  Here, TZAC is seeking $110 million in treble damages as well as "costs, interest, [and] civil penalties." Compl. ¶ 39.  It is fair to presume that such massive liability would bankrupt most non-profit organizations, including NIF.

TZAC is also attempting to impose liability on NIF for speech and expressive activity on matters of public concern—namely, advocacy to enforce the democratic values enshrined in Israel's Basic Law.  The speech, petitioning, and litigation that TZAC imputes to NIF, a U.S. non-profit organization, is protected by the First Amendment.  *See, e.g.*, *In re Primus*, 436 U.S. 412, 428 (1978) ("For the ACLU, as for the NAACP, 'litigation is not a technique of resolving private differences'; it is 'a form of political expression' and 'political association.'" (quoting *Button*, 371 U.S. at 429).

To be sure, the First Amendment does not compel the government to subsidize partisan political activity.  In *Regan v. Taxation with Representation*, 461 U.S. 540 (1983), the Supreme Court held that the government may constitutionally prohibit § 501(c)(3) non-profits from engaging in certain forms of protected expression, reasoning that "[a] tax exemption has much the same effect as a cash grant" and Congress could "cho[ose] not to subsidize" certain forms of free

speech.  *Id.* at 544.  But "[e]ven though tax exemptions are a matter of legislative grace, the denial of which is not usually considered to implicate constitutional values, tax law and constitutional law are not completely distinct entities."  *Big Mama Rag, Inc. v. United States*, 631 F.2d 1030, 1034 (D.C. Cir. 1980).  Indeed, "the First Amendment was partly aimed at the so-called 'taxes on knowledge,' which were intended to limit the circulation of newspapers and therefore the public's opportunity to acquire information about governmental affairs."  *Id.* at 1034–35 (holding that IRS regulations regarding the § 501(c)(3) status of educational organizations were unconstitutionally vague).

At the very least, then, the law must provide § 501(c)(3) organizations with adequate notice to *know* what constitutionally protected speech is prohibited before quasi-criminal treble damages liability may be imposed.  Otherwise, the State is not merely denying a subsidy—it is actively penalizing non-profit organizations for exercising their constitutional rights.  Here, the IRS has never remotely suggested that advocacy to promote constitutional and civil rights constitutes prohibited partisan political activity under § 501(c)(3), regardless of whether it incidentally benefits particular candidates or parties, despite the fact that numerous non-profits have openly engaged in such activity for quite some time.

If this Court were to hold NIF liable under the New York False Claims Act, on the basis of an interpretation of § 501(c)(3) that has never been articulated by Congress, the IRS, or any court, it would unconstitutionally penalize NIF without adequate notice.  For similar reasons, TZAC has not adequately alleged that NIF committed any violation "knowingly" as required by the New York False Claims Act.  N.Y. State Fin. Law § 189.1.  Where a standard is as broadly drawn and imprecise as § 501(c)(3), regulated parties may make reasonable mistakes about the contours of the law's blurry line, and such ambiguity defeats the scienter required for False Claims Act

liability.  *See, e.g., Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 2002 (2016) ("[C]oncerns about fair notice and open-ended liability 'can be effectively addressed through strict enforcement of the Act's materiality and scienter requirements.'" (quoting *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1270 (D.C. Cir. 2010)); *U.S. ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287 (D.C. Cir. 2015) ("Strict enforcement of the FCA's knowledge requirement helps to ensure that innocent mistakes made in the absence of binding interpretive guidance are not converted into FCA liability ....").

In the end, these constitutional concerns reinforce the wisdom of Congress's choice to vest exclusive authority to enforce § 501(c)(3) in the IRS.  If private relators with axes to grind could subject non-profits whose missions they dislike to the risk of massive retroactive liability based on novel interpretations of federal tax law, protected expression would be chilled and the administration and enforcement of tax law would be destabilized.

## CONCLUSION

For the foregoing reasons, TZAC's complaint is barred by New York's public disclosure bar and preempted by federal law and fails to plead a valid claim.  For any or all of those reasons, the Court should dismiss this action with prejudice.

Dated: June 26, 2020

Respectfully submitted.

/s/  *Jeffrey S. Bucholtz*

Jeffrey S. Bucholtz, *Pro Hac Vice*          Brian Hauss
Gabriel Krimm, *Pro Hac Vice*               Arianna Demas
KING & SPALDING LLP                         AMERICAN CIVIL LIBERTIES
1700 Pennsylvania Ave., NW                  UNION FOUNDATION
Washington, DC 20006                        125 Broad St., 18th Floor
Tel: 202-626-2907                           New York, NY 10004
Fax: 202-626-3737                           Tel: (212) 549-2604
jbucholtz@kslaw.com                         Fax: (212) 549-2649
gkrimm@kslaw.com                            bhauss@aclu.org
                                            ademas@aclu.org

J. Emmett Murphy
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036
Tel: (212) 556-2100
Fax: (212) 556-2222
jemurphy@kslaw.com

*Counsel for Defendant New Israel Fund*