**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATE OF NEW YORK *ex rel.* TZAC, INC.<br><br>                    Plaintiff-Relator,<br><br>      v.<br><br>NEW ISRAEL FUND,<br><br>                    Defendant. | **No. 1:20-cv-2955-GHW**<br><br>**ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF NEW ISRAEL FUND'S**
**MOTION TO DISMISS TZAC'S AMENDED COMPLAINT**

Jeffrey S. Bucholtz, *Pro Hac Vice*
Gabriel Krimm, *Pro Hac Vice*
KING & SPALDING LLP
1700 Pennsylvania Ave., NW
Washington, DC 20006
Tel: (202) 626-2907
Fax: (202) 626-3737
jbucholtz@kslaw.com
gkrimm@kslaw.com

J. Emmett Murphy
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036
Tel: (212) 556-2100
Fax: (212) 556-2222
jemurphy@kslaw.com

Brian Hauss
Arianna Demas
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
Tel: (212) 549-2604
Fax: (212) 549-2649
bhauss@aclu.org
ademas@aclu.org

*Counsel for Defendant New Israel Fund*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 1

LEGAL STANDARDS ........................................................................................................ 4

ARGUMENT ..................................................................................................................... 5

I.   The Public Disclosure Bar Prohibits This Action. ............................................................... 5

    A.   The Complaint is Based Entirely on Information in the Public
        Domain. ...................................................................................................... 6

    B.   TZAC is Not an Original Source. ............................................................... 10

II.   TZAC's Tax Fraud Theory Fails as a Matter of New York Law. ..................................... 11

III.  TZAC Has Failed to Plead that NIF Knowingly Violated § 501(c)(3). ........................... 14

    A.   TZAC Has Failed to Properly Attribute the Conduct of NIF's
        Grantees to NIF. ......................................................................................... 14

    B.   TZAC Has Failed to Plead that NIF "Knowingly" Misrepresented Its
        Compliance with § 501(c)(3). ..................................................................... 16

CONCLUSION ................................................................................................................. 23

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..................................................................................................4, 17

*Biro v. Condé Nast*,
   807 F.3d 541 (2d Cir. 2015) ...............................................................................17

*Caputo v. Pfizer, Inc.*,
   267 F.3d 181 (2d Cir. 2001) ...............................................................................17

*Chapman v. Office of Children & Family Servs.*,
   423 F. App'x 104 (2d Cir. 2011) .........................................................................17

*Chen ex rel. U.S. v. EMSL Analytical, Inc.*,
   966 F. Supp. 2d 282 (S.D.N.Y. 2013) .............................................................5, 6

*Cohen v. S.A.C. Trading Corp.*,
   711 F.3d 353 (2d Cir. 2013) ...............................................................................17

*DiFolco v. MSNBC Cable L.L.C.*,
   622 F.3d 104 (2d Cir. 2010) .................................................................................6

*Fulani v. League of Women Voters Educ. Fund*,
   882 F.2d 621 (2d Cir. 1989) ...............................................................................22

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
   797 F.3d 160 (2d Cir. 2015) .................................................................................4

*Mikes v. Straus*,
   274 F.3d 687 (2d Cir. 2001) ...............................................................................14

*N.Y. ex rel. Khurana v. Spherion Corp.*,
   No. 15 CIV. 6605 (JFK),
   2016 WL 6652735 (S.D.N.Y. Nov. 10, 2016)....................................................6

*Nat'l Found., Inc. v. United States*,
   13 Cl. Ct. 486 (1987) .........................................................................................15

*Ohio A. Phillip Randolph Institute v. Smith*,
   335 F. Supp. 3d 988 (S.D. Ohio 2018) .............................................................22

*S.C. Green Party v. S.C. State Election Comm'n*,
  612 F.3d 752 (4th Cir. 2010) ....................................................................................23

*Sierra Club v. Con-Strux, LLC*,
  911 F.3d 85 (2d Cir. 2018) ..........................................................................................4

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
  547 F.3d 406 (2d Cir. 2008) .........................................................................................6

*State ex rel. Jamaica Hosp. Med. Ctr., Inc. v. UnitedHealth Grp., Inc.*,
  922 N.Y.S.2d 342 (App. Div. 2011)........................................................................5, 11

*State ex rel. Raw Data Analytics LLC v. JP Morgan Chase & Co.*,
  108 N.Y.S.3d 796 (Sup. Ct. 2019)...........................................................................5, 13

*State ex rel. Seiden v. Utica First Ins. Co.*,
  943 N.Y.S.2d 36 (App. Div. 2012) ...............................................................................5

*U.S. ex rel. Alcohol Found. v. Kalmanovitz Charitable Found., Inc.*,
  186 F. Supp. 2d 458 (S.D.N.Y. 2002) .......................................................................7, 9

*U.S. ex rel. Chorches for Bankr. Estate of Fabula v. Am. Med. Response, Inc.*,
  865 F.3d 71 (2d Cir. 2017) ...........................................................................4, 15, 16

*U.S. ex rel. Complin v. N.C. Baptist Hosp.*,
  --- F. App'x ----,
  No. 19-1243, 2020 WL 3167634 (4th Cir. Jun. 15, 2020).........................................18

*U.S. ex rel. Dick v. Long Island Lighting Co.*,
  912 F.2d 13 (2d Cir. 1990) ...........................................................................................5

*U.S. ex rel. Doe v. John Doe Corp.*,
  960 F.2d 318 (2d Cir. 1992) .........................................................................................6

*U.S. ex rel. Green v. Serv. Contract Educ. & Training Trust Fund*,
  843 F. Supp. 2d 20 (D.D.C. 2012).........................................................................7, 8, 9

*U.S. ex rel. Kester v. Novartis Pharm. Corp.*,
  43 F. Supp. 3d 332 (S.D.N.Y. 2014) ............................................................................6

*U.S. ex rel. Ketroser v. Mayo Found.*,
  729 F.3d 825 (8th Cir. 2013) ......................................................................................18

*U.S. ex rel. Kraxberger v. Kansas City Power & Light Co.*,
  756 F.3d 1075 (8th Cir. 2014) ..............................................................................8, 9, 10

*U.S. ex rel. Kreindler & Kreindler v. United Techs. Corp.*,
   985 F.2d 1148 (2d Cir. 1993) ............................................................................6, 8

*U.S. ex rel. Oliver v. Philip Morris USA, Inc.*,
   101 F. Supp. 3d 111 (D.D.C. 2015) ........................................................................7

*U.S. ex rel. Ondis v. City of Woonsocket*,
   587 F.3d 49 (1st Cir. 2009) .....................................................................................5

*U.S. ex rel. Osheroff v. Humana Inc.*,
   776 F.3d 805 (11th Cir. 2015) ............................................................................7, 8

*U.S. ex rel. Purcell v. MWI Corp.*,
   807 F.3d 281 (D.C. Cir. 2015) ..............................................................................18

*U.S. ex rel. Radcliffe v. Purdue Pharma, L.P.*,
   582 F. Supp. 2d 766 (W.D. Va. 2008) ....................................................................8

*U.S. ex rel. Radcliffe v. Purdue Pharma, L.P.*,
   600 F.3d 319 (4th Cir. 2010) ...................................................................................8

*U.S. ex rel. Rosner v. WB/Stellar IP Owner, L.L.C.*,
   739 F. Supp. 2d 396 (S.D.N.Y. 2010) .................................................................6, 7

*U.S. ex rel. Stinson, Lyons, Gerlin, & Bustamante, P.A. v. Prudential Ins. Co.*,
   944 F.2d 1149 (3d Cir. 1991) ..................................................................................6

*U.S. ex rel. Wood v. Allergan, Inc.*,
   246 F. Supp. 3d 772 (S.D.N.Y. 2017) ..................................................................18

*U.S. ex rel. Wood v. Allergan, Inc.*,
   899 F.3d 163 (2d Cir. 2018) ..................................................................................18

*United States v. Allergan, Inc.*,
   746 F. App'x 101 (3d Cir. 2018) ...........................................................................18

*Universal Health Servs., Inc. v. U.S. ex rel. Escobar*,
   136 S. Ct. 1989 (2016) ..........................................................................................14

*Williams v. Affinion Grp.*, LLC,
   889 F.3d 116 (2d Cir. 2018) ..................................................................................16

**Statutes**

26 U.S.C. § 501(a) ......................................................................................................12

31 U.S.C. § 3729(b)(1)(A).........................................................................................17

N.Y. State Fin. Law § 188 ................................................................................5, 10, 13, 17

N.Y. State Fin. Law § 189(1) ...................................................................................11, 13, 17

N.Y. State Fin. Law § 190(9)(b) ...................................................................................5, 7

N.Y. Tax Law § 209 .................................................................................................11

## Rules & Regulations

26 C.F.R. § 1.501(c)(3)-1 ............................................................................................ 19

20 N.Y.C.R.R. § 1-3.4(b)(6) ................................................................................*passim*

Fed. R. Civ. P. 9(b) ...............................................................................................4, 15, 17

Rev. Rul. 68-489,
    1968-2 C.B. 210 (1968) ................................................................................15, 19

Rev. Rul. 72-513,
    1972-2 C.B. 246 (1972) ................................................................................21

Rev. Rul. 2007-41,
    2007-1 C.B. 1421 (2007) ..............................................................................20

IRS Info. Ltrs.,
    2019 WL 3048649 (June 28, 2019) .............................................................15

IRS Priv. Ltr. Rul. 91-52-039,
    1991 WL 779998 (Sept. 30, 1991) ..............................................................21

N.Y. Dep't Tax. & Fin., Opinion Letter on Pet. No. C100317A,
    2010 WL 2721216 (Jun 23, 2010) ...............................................................13

## Other Authorities

Basic Law: The Knesset ...........................................................................................20, 21

Br. Amici Curiae Am. Civil Liberties Union, N.Y. Civil Liberties Union,
    ACLU of N.C., & ACLU of Md. in Supp. of Appellee,
    *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019)
    (Nos. 18-422, 18-726), 2019 WL 1167922 .................................................22

Br. Amici Curiae Am. Civil Liberties Union
   & Brennan Ctr. Justice in Supp. of Appellants,
   *Vieth v. Jubelirer*, 541 U.S. 267 (2004) (No. 02-1580),
   2003 WL 22069782 ...........................................................................................23

*Israel's Supreme Court Bans Jewish Extremist from Election*,
   AP News (Mar. 17, 2019), https://bit.ly/3aLfYbu ................................................20

Isabel Kershner,
   *Israeli Parliament Passes Law Enabling Ouster of Legislators*,
   N.Y. Times (July 19, 2016), https://nyti.ms/31i9KfX ..........................................21

Lloyd Hitoshi Mayer,
   *Politics at the Pulpit: Tax Benefits,*
   *Substantial Burdens, and Institutional Free Exercise*,
   89 B.U. L. Rev. 1137 (2009) ...............................................................................20

## INTRODUCTION

Despite amending its complaint, the Zionist Advocacy Center (TZAC) still fails to state a valid claim against the New Israel Fund (NIF).  In fact, TZAC's new pleading only confirms that its novel effort to use the New York False Claims Act to harass an organization whose mission TZAC disapproves of suffers from multiple dispositive flaws.  *First*, New York law prohibits *qui tam* actions based on publicly disclosed information, which is all TZAC has to offer.  *Second*, TZAC's theory of fraud misconceives NIF's New York tax obligations, which do not turn on NIF's compliance (or representations of compliance) with 26 U.S.C. § 501(c)(3).  *Finally*, TZAC has not pleaded facts showing that NIF knowingly violated § 501(c)(3) to begin with.  For any and all of these reasons, the Court should dismiss this action.

## BACKGROUND

NIF is a not-for-profit charity.  Am. Compl. ¶ 2 (Doc. 30).  Since its founding in 1979, NIF has been dedicated to the advancement of democracy and equality in Israel.  Its cause attracts millions of dollars in charitable donations each year, which NIF distributes as grant aid to Israeli nonprofits for the promotion of human and civil rights, social and economic justice, religious pluralism, and other charitable activity.

NIF's work is no secret.  On the contrary, NIF publicizes its grants and other activities in a comprehensive annual report and audit, which it archives on its website for anyone to see.  *See* NIF, *Financials*, Ex. A1.  In addition, the Internal Revenue Service publishes NIF's annual "Form 990" information return for review by the public.  *See* IRS, *Form 990 Series Downloads*, Ex. B1; IRS, *New Israel Fund*, Ex. B3.  These comprehensive public disclosures enable government officials and private watchdogs alike to scrutinize NIF's operations, including its entitlement to state and federal tax benefits.  *See, e.g.*, Ex. C.

Plaintiff TZAC is a self-proclaimed "advocate[]" for "the Jewish State."  Am. Compl. ¶ 5.

TZAC disagrees with NIF's mission.  According to TZAC, "[a]lthough the stated purpose of NIF

is to help strengthen Israel's democracy, NIF consistently opposes" (what TZAC views as) "Israeli

security" by "supporting organizations" that (as TZAC sees it) "seek to undermine Israel."  *Id.* ¶ 2.

Apparently dissatisfied with its inability to advance its criticism of NIF in the marketplace of

ideas—or to persuade the IRS to take action against NIF—TZAC has filed this action seeking to

force litigation about whether NIF has complied with § 501(c)(3) of the Internal Revenue Code

and seeking a relator's bounty.

TZAC first sued in New York state court in August 2019.  Compl. (Doc. 1-2, Ex. B to

Notice of Removal).  As originally filed, TZAC's complaint recited information from NIF's

published tax filings, financial disclosures, and other internet publications and then concluded that

NIF had engaged in "electioneering" inconsistent with its federal tax-exempt status.  *See id.* ¶ 1

The complaint alleged that NIF's *federal* tax exemption had been "obtained and maintain[ed]" by

fraud, *id.*, and that this supposed fraud against the IRS violated the New York False Claims Act

because NIF's federal tax exemption conferred "exemption from taxation in the State and City of

New York," *id.* ¶ 21; *see also id.* ¶ 4.  The complaint did not identify any provisions of New York

tax law that NIF had allegedly violated.

Having reviewed TZAC's allegations under seal, the State of New York declined to

prosecute this lawsuit on its own behalf.  Order ¶ 1 (Doc. 1-4, Ex. D).  The state court thus unsealed

the case, and NIF removed it to this Court.  Notice of Removal (Doc. 1).

NIF then moved to dismiss TZAC's original complaint.  Doc. 27.  In support of its motion,

NIF argued that (1) TZAC's complaint was barred by the New York False Claims Act's "public

disclosure bar"; (2) TZAC was impermissibly seeking to enforce federal tax law; and (3) TZAC

had failed to adequately plead a viable claim.  *See* Doc. 28.  In response, TZAC simultaneously filed an amended complaint—thus mooting NIF's motion to dismiss the original complaint—and a brief styled as "Memorandum of Law in Opposition to Motion to Dismiss" that argued preemptively in defense of the newly-filed amended complaint.  *See* Doc. 31 at 13 ("For all of these reasons, Relator's Amended Complaint should not be dismissed.").  While the amended complaint makes only slight modifications to the original, TZAC's superfluous brief crystallizes its flawed theory of false-claims liability.

For instance, although TZAC acknowledges that its "allegations concern transaction[s] that are on websites," *id.* at 3, it insists that public webpages—regardless of their accessibility, content, or purpose—do not count as "news media" unless they belong to a "news organization," *id.* at 4–5.  And although the term "news organization" appears nowhere in the New York statute, and TZAC does not explain what "news organization" means, TZAC nonetheless concludes that NIF could not be a "news organization" for unstated reasons.  *See id.* at 5.

In addition, while TZAC's original complaint did not identify any provisions of New York tax law or explain how misrepresentations about compliance with federal tax law would give rise to New York FCA liability, the amended complaint reveals TZAC's theory: "As a result of NIF's federal tax exemption, it receives exemption from taxation in the State and City of New York based on rule 20 N.Y.C.R.R. 1-3.4(b)(6)(i), (ii)."  Am. Compl. ¶ 22.  TZAC thus argues that it "is attempting to enforce New York State Tax Law which mirrors the federal law."  Doc. 31 at 7.  As explained below, however, TZAC ignores the plain language of the provision of New York law it relies on.  Contrary to TZAC's position, that rule does not "mirror" 26 U.S.C. § 501(c)(3); instead, it makes NIF's New York exemption turn on NIF's nonprofit status—which is undisputed.

Finally, TZAC has deleted certain allegations relating to what it labels "electioneering" by NIF grantees and added others.  *See* Am. Compl. ¶¶ 12–34; Doc. 31 at 8–13.  But TZAC has again failed to adequately plead its claim: most of TZAC's allegations concern conduct by NIF grantees, not by NIF itself, *see, e.g.,* Am. Compl. ¶ 30; TZAC does not allege that those grantees used NIF funding to engage in the alleged conduct; and many allegations lack the requisite particularity, *see, e.g., id.* ¶ 31.  Even more fundamentally, TZAC fails to plead a viable claim that NIF *knowingly* violated § 501(c)(3) and thus (on TZAC's erroneous theory of New York tax law) the New York False Claims Act.  The line between permissible issue advocacy and prohibited electioneering is notoriously hazy, and TZAC does not identify any judicial or administrative guidance that would have put NIF on notice that the conduct alleged would be deemed to fall on the wrong side of that line.

The Court should dismiss TZAC's amended complaint for any or all of the independently dispositive reasons discussed below.

## LEGAL STANDARDS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Sierra Club v. Con-Strux, LLC*, 911 F.3d 85, 88 (2d Cir. 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  In addition, to properly allege false-claims liability TZAC must "state with particularity the circumstances constituting [the alleged] fraud."  Fed. R. Civ. P. 9(b); *see U.S. ex rel. Chorches for Bankr. Estate of Fabula v. Am. Med. Response, Inc*., 865 F.3d 71, 81 (2d Cir. 2017); *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 182 n.14 (2d Cir. 2015) ("While the substantive elements of common-law fraud that must be *proven* are a matter of state

law, what must be *pleaded* and with what level of particularity are governed by Rules 9(b) and 12(b)(6).").  TZAC has done neither.

## ARGUMENT

### I.  The Public Disclosure Bar Prohibits This Action.

The New York False Claims Act's "public disclosure bar" still prohibits this lawsuit.  Like its federal counterpart, the New York statute directs courts to "dismiss a qui tam action" if the allegations in the complaint are "substantially the same [as] allegations or transactions" that have been "publicly disclosed" in "the news media" or "government report[s]."  N.Y. State Fin. Law § 190(9)(b).  A narrow exception allows suit by an "original source" of such information.  *Id.*; *see also id.* § 188(7).  Thus, if an action is based on information "in the public domain, and the *qui tam* plaintiff was not a source of that information, then the suit is barred."  *U.S. ex rel. Dick v. Long Island Lighting Co.*, 912 F.2d 13, 18 (2d Cir. 1990).[1]

The public disclosure bar serves a sensible purpose well illustrated by this case.  "When the material elements of a fraud are already in the public domain, the government has no need for a relator …."  *State ex rel. Jamaica Hosp. Med. Ctr., Inc. v. UnitedHealth Grp., Inc.*, 922 N.Y.S.2d 342, 343 (App. Div. 2011) (quoting *U.S. ex rel. Ondis v. City of Woonsocket*, 587 F.3d 49, 58 (1st Cir. 2009)).  The bar thus aims "to prevent '[opportunistic] lawsuits by those who learn of the fraud through public channels … [and] contribute[] nothing to [its] exposure.'"  *U.S. ex rel. Kester*

---

[1] Because New York law "follows the federal False Claims Act …, it is appropriate to look toward federal law when interpreting the New York act."  *State ex rel. Seiden v. Utica First Ins. Co.*, 943 N.Y.S.2d 36, 39 (App. Div. 2012); *see State ex rel. Raw Data Analytics LLC v. JP Morgan Chase & Co.*, 108 N.Y.S.3d 796, 802 & n.3 (Sup. Ct. 2019).  This Court has thus relied on federal precedents to apply the state public disclosure bar—even after New York's 2010 amendments.  *See Chen ex rel. U.S. v. EMSL Analytical, Inc.*, 966 F. Supp. 2d 282, 305 (S.D.N.Y. 2013).

*v. Novartis Pharm. Corp.*, 43 F. Supp. 3d 332, 344 (S.D.N.Y. 2014) (quoting *U.S. ex rel. Doe v. John Doe Corp.*, 960 F.2d 318, 319 (2d Cir. 1992)).  Such "strangers to the fraud" only hamper the government's enforcement efforts by co-opting *qui tam* procedures for their own private ends. *U.S. ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1158 (2d Cir. 1993) (quoting *U.S. ex rel. Stinson, Lyons, Gerlin, & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149, 1155 (3d Cir. 1991)).  TZAC is exactly the sort of plaintiff the public disclosure bar aims to prohibit:  It has culled every last one of its allegations from the public domain, and it has not even attempted to qualify as an original source.  It cannot pursue this lawsuit on New York's behalf.[2]

### A.    The Complaint is Based Entirely on Information in the Public Domain.

The allegations in TZAC's complaint are "substantially similar" to—in fact, *exactly the same as*—information "contained in prior 'public disclosures.'" *Kester*, 43 F. Supp. 3d at 346 (quoting *Chen*, 966 F. Supp. 2d at 296–97); *see also* Doc. 31 at 3 ("[A]ll the allegations concern transaction[s] that are on websites ….").

To begin, the allegedly "false certifications" made in NIF's federal tax filings are squarely in the public domain.  *See* Am. Compl. ¶¶ 9–20.  In *U.S. ex rel. Rosner v. WB/Stellar IP Owner, L.L.C.*, 739 F. Supp. 2d 396 (S.D.N.Y. 2010), this Court held that a New York City Department

---

[2] In ruling on NIF's motion, the Court may consider documents that are "incorporated by reference in the complaint and documents that are 'integral' to the complaint because the plaintiff 'relies heavily upon [their] terms and effect.'" *N.Y. ex rel. Khurana v. Spherion Corp.*, No. 15 CIV. 6605 (JFK), 2016 WL 6652735, at *11 (S.D.N.Y. Nov. 10, 2016) (quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)).  The Court may also "take judicial notice of the fact that press coverage and judicially noticeable public records contained certain information, without regard to the truth of their contents." *Id.* (citing *Chen*, 966 F. Supp. 2d at 294).  The exhibits to this motion fall into these permissible categories because they are either referenced and relied on in the complaint or establish that certain information was publicly available "without regard to [its] truth." *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).

of Finance database contained publicly disclosed government "reports" on real-estate taxation because it was "readily available to the public," "the searches [were] free and unlimited," and the results "present[ed] synthesized tax benefit histories for many different properties over many years." *Id.* at 407. As already mentioned, the IRS maintains a similar database applicable here. Anyone with an internet connection can access a dedicated page listing NIF's Employer Identification Number; NIF's status as a Public Charity; and the reporting period, return identification number, and return type of NIF's most recent tax filings. *See* Exs. B2–B3. The database likewise publishes copies of NIF's tax returns, organized by form and year. *See* Ex. B3. The IRS's "organization" and "synthesis" of NIF's tax data into an easy-to-use public database thus constitutes a "public disclosure." *Rosner*, 739 F. Supp. 2d at 407–08.

The same information has also been collected, republished, and exhaustively analyzed in the "news media." The "news media" category of the public disclosure bar applies broadly to print and electronic publications that periodically make new information "generally accessible to the public." *U.S. ex rel. Alcohol Found. v. Kalmanovitz Charitable Found., Inc.*, 186 F. Supp. 2d 458, 463 (S.D.N.Y. 2002). And although the New York False Claims Act specifies that a disclosure is not "in the 'news media' *merely* because … [it] ha[s] been posted on the internet," N.Y. State Fin. Law § 190(9)(b)(iii) (emphasis added), that caveat only codifies the view of the federal courts, which have applied the federal public disclosure bar to a broad range of websites "intended to disseminate information" to an interested public audience. *U.S. ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 813 (11th Cir. 2015). These courts have rejected public disclosure arguments based on obscure and secluded web postings, *see U.S. ex rel. Oliver v. Philip Morris USA, Inc.*, 101 F. Supp. 3d 111, 124–25 (D.D.C. 2015); *U.S. ex rel. Green v. Serv. Contract Educ. & Training Trust Fund*, 843 F. Supp. 2d 20, 32 (D.D.C. 2012), and—just like the New York statute—have rejected

the notion "that anything posted online would automatically constitute a public disclosure," *U.S. ex rel. Radcliffe v. Purdue Pharma, L.P.*, 582 F. Supp. 2d 766, 772 (W.D. Va. 2008), *rev'd in part on other grounds*, 600 F.3d 319 (4th Cir. 2010).  Yet they have applied the bar to internet publications that share the function and purpose of traditional news outlets: informing the public on recent events and previously unknown facts.  *See Osheroff*, 776 F.3d at 813; *U.S. ex rel. Kraxberger v. Kansas City Power & Light Co.*, 756 F.3d 1075, 1079 (8th Cir. 2014).

With respect to NIF's tax filings, various charity watchdogs have done just that.  Catering to a segment of the public interested in tax-exempt charities, these websites have produced and periodically updated profiles on NIF for review by potential donors and the public.  *See* Charity Navigator, *New Israel Fund*, Ex. C; ProPublica, *New Israel Fund*, Ex. D1; NGO Monitor, *New Israel Fund*, Ex. E1.  And as particularly relevant here, ProPublica's "Nonprofit Explorer" has catalogued and republished every NIF Form 990 dating back to 2001.  *See* Exs. D1–D11.  In so doing, it has given both the State and countless third parties access to NIF's tax filings, eliminating the need for a *qui tam* relator.  *Kreindler*, 985 F.2d at 1158.  These "particular website[s]" thus "qualif[y] as news media in light of the concerns motivating the FCA's public disclosure bar." *Green*, 843 F. Supp. 2d at 33.

The same goes for TZAC's allegations of NIF's grant-making activities.  TZAC alleges that NIF gave grants to five Israeli organizations: the Israel Religious Action Center (IRAC), Am. Compl. ¶ 25[3]; Adalah, *id.* ¶ 28; Mossawa, *id.* ¶ 29; Adam Teva, *id.* ¶ 30; and the Council for Peace and Security (CPS), *id.* ¶ 34.  But this is no revelation, as NIF has published annual reports listing each of its grant recipients for every year since 2007.  *See* NIF, *Financials* Ex. A1; *see also* Exs.

---

[3] IRAC is the public and legal advocacy arm of the Reform movement of Judaism in Israel.

A2–A12 (NIF's detailed financial statements from 2008 to 2018, all made available publicly through NIF's website). And the watchdog group NGO Monitor has republished and analyzed each of NIF's financial statements for over a decade. *See* Exs. E2–E12. Like the ProPublica resource discussed above, NGO Monitor's website qualifies as "news media" because it provides periodic reports of new information to an interested public audience. *See Alcohol Found.*, 186 F. Supp. 2d at 463; *Green*, 843 F. Supp. 2d at 33.

Finally, and most importantly, the conduct TZAC labels "electioneering" also occurred in public view and appeared in various news media reports. In fact, TZAC admits as much under the mistaken premise that "[a] company's own website clearly does not constitute news media, except when that company is itself a news organization." Doc. 31 at 4–5. But TZAC has it backwards. If an organization like NIF or one of its grantees is publishing news on its website or public social media account, then it *is* a "news organization" in the eyes of the public disclosure bar. *Kraxberger*, 765 F.3d at 1079. It is for this very reason that so many courts have applied the bar to so many diverse publications—electronic and otherwise. *Id.*; *cf. Alcohol Found.*, 186 F. Supp. 2d at 463 (explaining the bar's application to non-newspaper print publications).

The "imposition of a judicially created limit of 'news media' to encompass only the newspaper" or other traditional press would not square with the statutory text or the bar's well-settled purpose. *Alcohol Found.*, 186 F. Supp. 2d at 463; *see id.* at 463–65. And given that the bar inarguably extends to the internet as a medium, the courts' longstanding focus on the *function* and *purpose* of a public disclosure must apply to digital publications the same as it does to print. *Compare id.* at 463–65 (applying a functional and purposive approach to a public disclosure in print) *with Green*, 843 F. Supp. 2d at 31–33 (applying a functional and purposive approach to a public disclosure on the internet). That is the only logical course especially where, as here, the

websites at issue have been used specifically to publicize current events, *see* Exs. F1–F12, and the public (and the relator) have accessed those websites specifically to learn about the defendant's conduct, *see, e.g.*, Am. Compl. ¶ 32 ("[T]hese grantees proudly post on their websites what they have been doing …."); Doc. 31 at 4–5 (defending the amended complaint's complete reliance on public websites and social media for its allegations of "electioneering").  Indeed, the amended complaint itself shows that NIF and its grantees "function[] as … news organization[s]" and must be treated as such under the public disclosure bar.  *See Kraxberger*, 756 F.3d at 1079.  TZAC's open reliance on their web publications triggers the public disclosure bar.

Moreover, and in any event, the amended complaint repeats information published by the traditional press.  TZAC continues to rely on allegations that NIF worked to disqualify Otzma Yehudit candidates from the 2019 Knesset elections, Am. Compl. ¶ 24, despite coverage of that event in the Israeli newspaper *Haaretz*, *see* Ex. G1.  TZAC continues to rely on allegations that Adalah petitioned the Israeli Central Elections Commission to allow Haneen Zoabi to stand for election, Am. Compl. ¶ 28, despite coverage of that event in *JPost*, *see* Ex. G2.  TZAC makes new allegations regarding NIF's "New Initiatives for Democracy" campaign, Am. Compl. ¶ 32, despite coverage of that campaign in the traditional press, *see* Ex. G3.  And TZAC makes new allegations regarding the Council for Peace and Security, Am. Compl. ¶ 33–34, whose activities in the 2015 election were well documented in both print and television news, *see* Ex. G4.  At the very least, the allegations that retrace these public disclosures cannot form the basis of a *qui tam* suit.

**B.    TZAC is Not an Original Source.**

Like federal law, New York law allows an exception to the public disclosure bar for an "original source."  N.Y. State Fin. Law § 188(7).  But TZAC does not and could not claim to be an original source.  *See supra* at 6–10 (identifying the sources of information covered by TZAC's

allegations); *see also* Doc. 31 at 2–6 (acknowledging the same); *cf. Jamaica*, 922 N.Y.S.2d at 343 (noting relator's failure to allege original source status).

## II.  TZAC's Tax Fraud Theory Fails as a Matter of New York Law.

The amended complaint also fails to state a claim because NIF's alleged false certification regarding "electioneering" is immaterial to its New York tax obligations.  TZAC continues to allege that NIF fraudulently avoided state taxes by lying on its federal Form 990s.  *See* Am. Compl. ¶ 9–22.  But those forms cannot support false-claims liability unless the allegedly false certifications they contained were "*material* to an obligation to pay or transmit money or property to the state." N.Y. State Fin. Law § 189(1)(g) (emphasis added).  And under the plain language of the New York tax law provision that TZAC relies on, NIF's state tax exemption *does not* turn on its abstention from "electioneering" or its status under the federal tax code.

As noted above, the amended complaint spells out TZAC's theory for how alleged misrepresentations in federal Form 990s would translate into fraudulent avoidance of New York tax liability: "As a result of NIF's federal tax exemption, it receives exemption from taxation in the State and City of New York based on rule 20 N.Y.C.R.R. 1-3.4(b)(6)(i), (ii)." Am. Compl. ¶ 22.  According to TZAC, this New York regulation "mirrors" § 501(c)(3).  Doc. 31 at 7.  That, however, is not true.

The regulation TZAC invokes, which implements New York's "corporation franchise tax," *see* N.Y. Tax Law § 209, provides:

> (b) The following corporations are exempt from taxation …:
> \* \* \*
> (6) corporations organized other than for profit which do not have stock or shares or certificates for stock or for shares and which are operated on a nonprofit basis no part of the net earnings of which inures to the benefit of any officer, director, or member, including Not-for-Profit Corporations and Religious Corporations.

> (i) A corporation organized other than for profit, as described in this paragraph, which is exempt from Federal income taxation pursuant to subsection (a) of section 501 of the Internal Revenue Code, will be presumed to be exempt from [the franchise tax]. If a corporation organized other than for profit is denied exemption from taxation under the Internal Revenue Code, such corporation will be presumed subject to [the franchise tax].
> (ii) The determination of the Internal Revenue Service, denying or revoking exemption from Federal taxation under the Internal Revenue Code, will ordinarily be followed;

20 N.Y.C.R.R. § 1-3.4(b)(6).  As is evident, this rule states in no uncertain terms that "corporations organized other than for profit which do not have stock or shares or certificates for stock or for shares and which are operated on a nonprofit basis" are "exempt from" the franchise tax.  *Id.*  And as TZAC correctly alleges, "NIF is a … non-profit corporation."  Am. Compl. ¶ 2.  Thus, under the plain language of the only New York tax law TZAC invokes, NIF's state tax exemption turns on its undisputed non-profit status and *not* its compliance with § 501(c)(3).

Contrary to TZAC's apparent belief, the two romanette provisions under § 1-3.4(b)(6) do not provide otherwise.  To be sure, romanette (i) says that if a nonprofit receives a federal tax exemption under 26 U.S.C. § 501(a) it "will be presumed to be exempt from" the state franchise tax, and romanette (ii) says that an IRS decision to "deny[] or revok[e]" a federal exemption "will ordinarily be followed."  *Id.* § 1-3.4(b)(6)(i)–(ii).  But neither of these subordinate provisions purports to alter the clear rule that paragraph (b)(6) sets out; rather than change the *standard* for exemption—which, as explained above, turns on an organization's status as a nonprofit—these provisions address evidentiary issues about how to apply that standard in certain situations.  Thus, a federal exemption creates a "presum[ption]" of state tax exemption, but such a presumption is inherently non-dispositive and the ultimate issue remains whether the entity satisfies the standard set forth in paragraph (b)(6).  Likewise, the "ordinarily" language in romanette (ii) makes clear

that that provision merely provides an evidentiary guide and does not abrogate the standard it helps implement.

The New York Commissioner of Taxation and Finance has confirmed this straightforward reading. In a 2010 advisory opinion, the Commissioner explained that a not-for-profit corporation that "does not fall under any of the Federal tax exempt provisions of § 501" and "has never filed [a] Federal Form 990" nonetheless qualified for exemption under 20 N.Y.C.R.R. § 1-3.4(b)(6). *See* N.Y. Dep't Tax. & Fin., Opinion Letter on Pet. No. C100317A, 2010 WL 2721216, at *2 (Jun 23, 2010). Hewing to the regulation's clear terms, the Commissioner observed "that failure to have a Federal exemption creates only a presumption of taxability" and "this presumption may be rebutted." *Id.* In the case at issue, the organization petitioning for the opinion "me[t] the standards set forth in the exemption regulation" because it "operated on a not-for-profit basis and no part of its net earnings inure[d] to the benefit of any officer, director or member of the corporation." *Id.* at *1–3. It thus qualified for exemption under New York law despite never having submitted a federal Form 990 and never having received a federal tax exemption (and despite believing itself ineligible for a federal exemption). *Id.*

In light of the above, TZAC's claim fails as a matter of New York law. A false statement or certification cannot give rise to liability under the New York False Claims Act unless it is "material to an obligation to pay or transmit money or property to the state." N.Y. State Fin. Law § 189(1)(g). "'[M]aterial' means having a natural tendency to influence, or be[ing] capable of influencing[,] the payment or receipt of money or property." *Id.* § 188(5); *see also State ex rel. Raw Data Analytics LLC v. JP Morgan Chase & Co.*, 108 N.Y.S.3d 796, 806 n.6 (Sup. Ct. 2019) ("This is the same definition of materiality as set forth in the federal False Claims Act ...."). Because of that limitation, false-claims liability does not extend to "instances of regulatory

noncompliance that are irrelevant to" any claimed obligation to pay taxes. *Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001), *abrogated on other grounds by Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989 (2016).

The upshot of the materiality requirement is clear: because NIF is "organized other than for profit," "do[es] not have stock or shares or certificates for stock or for shares," and is "operated on a nonprofit basis," 20 N.Y.C.R.R. § 1-3.4(b)(6); *see* Am. Compl. ¶ 2, NIF is exempt under the New York tax law relied on by TZAC *regardless of NIF's status under § 501(c)(3)*.  NIF's certifications on its Form 990 and compliance with § 501(c)(3) are therefore immaterial to its state tax obligations and cannot give rise to false-claims liability.

## III.    TZAC Has Failed to Plead that NIF Knowingly Violated § 501(c)(3).

Even if it were material to TZAC's claim under the New York FCA, TZAC fails to allege facts showing that NIF's statements to New York regarding its § 501(c)(3) compliance were false, let alone *knowingly* false.  *First*, TZAC still fails to allege any particularized factual basis for attributing the conduct of NIF's grantees to NIF itself—despite NIF clearly raising this issue in its prior motion to dismiss.  *See* Doc. 28 at 14–16.  *Second*, TZAC fails to plead facts raising a plausible inference that NIF knew it had engaged in partisan political activity in violation of § 501(c)(3).  In particular, the factual allegations do not support TZAC's conclusion that NIF knew it was responsible for the specific grantee conduct alleged or that NIF knew or should have known that any of the alleged "electioneering" conduct violated the uncertain parameters of § 501(c)(3). For these additional reasons, the Court should dismiss the amended complaint.

### A.    TZAC Has Failed to Properly Attribute the Conduct of NIF's Grantees to NIF.

The amended complaint seemingly assumes that NIF is responsible for any action taken by any organization that has received an NIF grant.  In truth, NIF is responsible only for grantee

conduct that it chose to sponsor.  Accordingly, the link between NIF's grants and the alleged conduct of its grantees is one of the "circumstances" of the alleged fraud that TZAC must plead with particularity.  Fed. R. Civ. P. 9(b); *see Chorches*, 865 F.3d at 81.  TZAC's failure to do so requires dismissal.

The IRS has long made clear that a § 501(c)(3) organization does not "jeopardize its exemption …, even though it distributes funds to nonexempt organizations," such as foreign nonprofits, "provided it retains control and discretion over use of the funds for [exempt] purposes." Rev. Rul. 68-489, 1968-2 C.B. 210 (1968); *see also* IRS Info. Ltrs., 2019 WL 3048649 (June 28, 2019) (explaining the continuing force of Rev. Rul. 68-489).  Thus, so long as NIF "controls [its] disbursement[s] and ensures that [they are] applied to exempt purposes," it does not bear responsibility for the independent actions of its grantees.  *Nat'l Found., Inc. v. United States*, 13 Cl. Ct. 486, 493 (1987), *as amended* (Nov. 10, 1987).

Yet the amended complaint attributes grantee conduct to NIF in the most threadbare and conclusory terms.  Like the original complaint, TZAC's amended complaint repeatedly alleges the well-known, publicly disclosed facts that NIF gave grants to certain Israeli nonprofits in certain years.  *See, e.g.*, Am. Compl. ¶ 25 (alleging that NIF gave grants to IRAC in 2014, 2015, 2016, 2017, and 2018); *id.* ¶ 30 (alleging that NIF gave grants to Adam Teva in 2014, 2016, and 2017). Then, without the least bit of explanation as to what those grants were for, TZAC asserts that those nonprofits engaged in various forms of "electioneering."  *See, e.g., id.* ¶ 25 ("In 2019 IRAC published a video about the danger of the Otzma Yehudit Party …."); *id.* ¶ 30 ("In 2018 Adam Teva posted a list of candidates who undertook a pledge to follow a certain protocol to preserve trees.").  In paragraph after paragraph, TZAC fails to show any connection between the NIF grants and the alleged "electioneering" activity.  *See id.* ¶¶ 25–26, 28–30, 34.  Instead, TZAC offers only

the assertion that because "NIF gave and continues to give general grants on a constant basis to organizations that are involved in electioneering which it knows about … NIF has knowingly or recklessly allowed grantees to electioneer." *Id.* ¶ 31.  Even apart from its conclusory nature, this assertion ignores the need to link NIF's grants to the alleged electioneering: NIF is free to give grants to Israeli organizations that engage in "electioneering" so long as they do not use NIF's grants to do so.

The amended complaint thus rests on exactly the sort of "speculation" that Rule 9(b) exists to preclude.  *Chorches*, 865 F.3d at 86.  To state a claim for fraud based on *NIF's* certification "that it had not 'engage[d] in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office,'" Am. Compl. ¶ 9, TZAC must allege the who, what, when, where, and how of such activities by NIF.  *See Williams v. Affinion Grp., LLC*, 889 F.3d 116, 124–25 (2d Cir. 2018).  TZAC's mere assumption that the grantees used their NIF grants— as opposed to some other funding source—to engage in the alleged conduct does not suffice.  And without making any effort to identify the terms of any actual grant, TZAC plainly has not supported its conclusion that NIF's certification of compliance with § 501(c)(3) was false.

**B.    TZAC Has Failed to Plead that NIF "Knowingly" Misrepresented Its Compliance with § 501(c)(3).**

Equally fundamentally, TZAC fails plausibly to allege that NIF acted with the requisite scienter to support liability under the New York FCA.  As the State of New York emphasized in its Statement of Interest, *see* Doc. 32 at 9–10, the New York FCA requires the plaintiff to demonstrate that the defendant "knowingly" provided false information in violation of the FCA's provisions.  N.Y. State Fin. Law § 189(1).  And like the federal FCA, the New York statute defines "knowingly" to encompass "actual knowledge," "deliberate ignorance," or "reckless disregard of

the truth or falsity of the information." *Id.* § 188.3(a); *see* 31 U.S.C. § 3729(b)(1)(A).  It therefore *does not* reach "acts occurring by mistake or as a result of mere negligence."  New York State Fin. Law § 188.3(b).  As New York explained, the statute's rigorous scienter requirement ensures that it "c[an]not be applied to individuals or entities who inadvertently make false statements about their right to tax-exempt treatment due to good-faith, reasonable interpretations of the tax laws." Doc. 32 at 10.  If it were otherwise, the New York FCA would raise serious constitutional concerns because the combination of draconian liability for treble damages plus penalties and the haziness of the border separating permissible issue advocacy from prohibited electioneering would chill protected speech and threaten unfair surprise.  *See* Doc. 28 at 21–25.

Although "knowledge ... may be alleged generally," Fed. R. Civ. P. 9(b), it must still be grounded in *factual* allegations—and not legal conclusions—that make the inference of scienter plausible—and not merely possible, *see Chapman v. Office of Children & Family Servs.*, 423 F. App'x 104, 105 (2d Cir. 2011); *see also Biro v. Condé Nast*, 807 F.3d 541, 545 (2d Cir. 2015) ("'Rule 9(b) requires particularity when pleading fraud or mistake, while allowing … knowledge … to be alleged generally,' but 'does not give [a plaintiff] license to evade the less rigid—though still operative—strictures of Rule 8.'" (quoting *Iqbal*, 556 U.S. at 686–87)).  Accordingly, TZAC was required to "plead those events which give rise to a strong inference that [NIF] had … knowledge of the falsity [of its certifications] or a reckless disregard for the truth." *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013) (quoting *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 191 (2d Cir. 2001)).

TZAC's contention that NIF's Form 990 certifications were false turns on the proper interpretation of 26 U.S.C. § 501(c)(3).  For TZAC to prevail on its theory of fraud, NIF must have known or recklessly disregarded (1) that it was legally responsible for the alleged "electioneering,"

even when engaged in by its grantees and not NIF itself; and (2) that the conduct alleged by TZAC constituted prohibited "direct or indirect political campaign activities" within the meaning of § 501(c)(3).  The amended complaint fails to plead facts to support a reasonable inference of either.

Indeed, TZAC *could not* plead facts in support of those inferences because TZAC's theory depends on several novel interpretations of § 501(c)(3)'s broadly drawn and imprecise terms.  "[A] defendant's reasonable interpretation of any ambiguity inherent in the [law] belies the scienter necessary to establish a claim of fraud under the FCA," at least so long as the defendant was not "warned away from that interpretation" by available administrative and judicial guidance.  *U.S. ex rel. Wood v. Allergan, Inc*., 246 F. Supp. 3d 772, 828 (S.D.N.Y. 2017), *rev'd on other grounds*, 899 F.3d 163 (2d Cir. 2018) (citations and internal quotation marks omitted).  This is the only way to ensure that "innocent mistakes made in the absence of binding interpretive guidance are not converted into FCA liability."  *U.S. ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287 (D.C. Cir. 2015).  Accordingly, a complaint that fails to allege the existence of relevant guidance, or some other allegation showing the defendant's awareness that it was on the wrong side of the law's blurry line, must be dismissed.  *See U.S. ex rel. Ketroser v. Mayo Found.*, 729 F.3d 825, 830–32 (8th Cir. 2013); *accord U.S. ex rel. Complin v. N.C. Baptist Hosp.*, --- F. App'x ----, No. 19-1243, 2020 WL 3167634, at *4 (4th Cir. Jun. 15, 2020); *United States v. Allergan, Inc.*, 746 F. App'x 101, 110 (3d Cir. 2018).

In this case, TZAC first fails to plead that NIF knew or should have known that it was legally responsible for the alleged "electioneering" conduct of its grantees.  As already discussed, legal guidance from the IRS makes clear that NIF had every right to give money to the organizations "provided it retain[ed] control and discretion over use of the funds for [exempt] purposes."  Rev. Rul. 68-489, 1968-2 C.B. 210 (1968).  And the amended complaint does not offer

any factual allegations to show that NIF grants—as opposed to any of the infinite array of other possible funding sources—were actually used for the alleged "electioneering" activities. Nor does TZAC offer any legal authority supporting its assumption that a grantee's conduct is automatically attributable to NIF regardless of whether the grantee used NIF's funds to engage in the relevant conduct. The amended complaint thus fails to allege any facts showing that NIF knew or recklessly disregarded that it had "engaged in electioneering activities" through its grantees "contrary to [the] certifications" on its federal tax forms. Am. Compl. ¶ 21.

In addition, and even more fundamentally, the amended complaint fails to allege facts showing a violation of § 501(c)(3) to begin with, let alone facts showing a *knowing* violation. Section 501(c)(3) authorizes tax exemptions for charitable non-profit organizations on the condition that the organization "does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office." The IRS's regulations define such "participation or intervention" to include "the publication or distribution of written or printed statements or the making of oral statements on behalf of or in opposition to such a candidate." 26 C.F.R. § 1.501(c)(3)-1(c)(3)(iii); *see also* 26 C.F.R. § 1.501(c)(3)-1(b)(3)(iii) (applying the restriction to § 501(c)(3) organizations). Yet those same regulations decidedly *permit* "issue advocacy," which includes defending "human and civil rights secured by law." 26 C.F.R. § 1.501(c)(3)-1(d)(2).

Determining whether a charity has crossed the line from permissible issue advocacy to prohibited electioneering "depends upon all of the facts and circumstances of each case." Rev. Rul. 2007-41, 2007-1 C.B. 1421 (2007). "The use of numerous factors and considerations has led critics of the government's approach to refer to it as an ambiguous 'smell' test." Lloyd Hitoshi

Mayer, *Politics at the Pulpit: Tax Benefits, Substantial Burdens, and Institutional Free Exercise*, 89 B.U. L. Rev. 1137, 1147 & n.44 (2009) (collecting sources).

The gravamen of the amended complaint is that NIF and its grantees violated this prohibition by advocating to enforce Israel's Basic Law.  For example, the only paragraph of the amended complaint that directly alleges "electioneering" by NIF states: "During the 2019 Israeli election season NIF helped to gather names for a petition to disqualify Otzma Yehudit[4] candidate [sic] from running for Knesset.  NIF sent out the petition and asked for people to sign.  After the candidate—Michael Ben-Ari—was banned by the Supreme Court NIF called it a victory for democracy.  This is clearly electioneering by opposing candidates for public office."  Am. Compl. ¶ 24.  Yet pursuant to Federal Rule of Civil Procedure 44.1, the Court may take judicial notice that the Supreme Court of Israel disqualified Ben-Ari from the election because of "his anti-Arab ideology and incitement."  *Israel's Supreme Court Bans Jewish Extremist from Election*, AP News (Mar. 17, 2019), https://bit.ly/3aLfYbu.  Such incitement violates Israel's Basic Law on the Knesset, which states that "a person shall not be a candidate for election to the Knesset, if the goals or actions of the list or the actions of the person, expressly or by implication, include ... [i]ncitement to racism."  Basic Law: The Knesset § 7A.[5]

---

[4] Otzma Yehudit means "Jewish Power" in Hebrew.

[5] Along similar lines, TZAC alleges that an attorney affiliated with NIF grantee IRAC "argued before the Israel Supreme Court against the appeal of Baruch Marzel who had been disqualified from running for Knesset by the Israel Central Election Committee."  Am. Compl. ¶ 27.  The complaint then references and incorporates a "picture [posted] on [IRAC's] Facebook account," *id*., which makes clear that the appeal concerned the issue of Marzel's "racism and racial incitement."  Ex. F5.

The amended complaint also alleges that NIF grantee Adalah engaged in electioneering in 2015 when it "call[ed] on the Central Election Commission to reject disqualification motions against MK Haneen Zoabi."  Am. Compl. ¶ 28.  The Court may take judicial notice that Israel's Basic Law on the Knesset provides that "[e]very Israeli citizen who on the day of the admission of a candidates list containing his name is twenty-one years of age or over shall have the right to be elected to the Knesset, unless a court has deprived him of that right by virtue of law," Basic Law: The Knesset § 6(a), and that the Supreme Court of Israel held that MK Zoabi was legally entitled to participate in the 2015 election.  *See, e.g.*, Isabel Kershner, *Israeli Parliament Passes Law Enabling Ouster of Legislators*, N.Y. Times (July 19, 2016), https://nyti.ms/31i9KfX ("The Supreme Court has so far rejected attempts to bar Ms. Zoabi from running for Parliament.").

Accordingly, as NIF argued in its first motion to dismiss, § 501(c)(3) and its implementing regulations do not prohibit this activity at all, much less prohibit it clearly as would be required to support an inference of scienter.  Activity supporting a nonprofit's legitimate exempt purpose, such as advocacy to enforce civil rights, does not automatically become impermissible partisan activity simply because it occurs in the context of an election.  *See* IRS Priv. Ltr. Rul. 91-52-039, 1991 WL 779998 (Sept. 30, 1991) (holding that a mail-bundling organization formed to give employment opportunities to people with mental disabilities was entitled to tax-exempt status, even though the organization "may be mailing or sorting materials that relate to a political campaign of a candidate for public office"); *see also* Rev. Rul. 72-513, 1972-2 C.B. 246 (1972) (holding that a university did not engage in partisan political activity by providing office space and financial support to a student newspaper that endorsed candidates).  And nothing in § 501(c)(3) or its implementing regulations suggests that non-profits must ignore the rules that govern the electoral process.  *See Fulani v. League of Women Voters Educ. Fund*, 882 F.2d 621, 630 (2d Cir.

1989) (holding that the exclusion of a minor-party candidate from the League of Women Voters' Republican and Democratic primary debates was not "partisan," but rather "a logical consequence of the nature and role of primary contests in the electoral process"). If it is not partisan to enforce the norms governing candidate participation in the Republican and Democratic primary debates, it is hard to see why it is necessarily partisan to enforce the laws governing eligibility for office. Put differently, protecting the basic ground rules of democracy is not prohibited "electioneering."

In any event, to resolve this case the Court need not fix the precise limits of § 501(c)(3). Indeed, a backward-looking, quasi-criminal fraud claim seeking $110 million plus penalties (Am. Compl. ¶ 41) is a uniquely ill-suited vehicle to do so. What matters here is that even if TZAC's interpretation of § 501(c)(3) were correct, the amended complaint does not identify *any* administrative or judicial guidance that would have put NIF on notice that it was breaking the law. To the contrary, the enforcement history of § 501(c)(3) suggests just the opposite.

For example, the American Civil Liberties Union Foundation, a § 501(c)(3) organization, served as party counsel in a lawsuit challenging the constitutionality of extreme partisan gerrymandering in *Ohio A. Phillip Randolph Institute v. Smith*, 335 F. Supp. 3d 988 (S.D. Ohio 2018), and served as amicus counsel on a brief urging the Supreme Court to strike down the extreme partisan gerrymanders in *Rucho v. Common Cause* and *Vieth v. Jubelirer*.[6] The congressional maps challenged in those cases were explicitly drawn to benefit specific candidates and parties, but that fact did not convert the ACLU Foundation's public interest litigation into

---

[6] Br. Amici Curiae Am. Civil Liberties Union, N.Y. Civil Liberties Union, ACLU of N.C., & ACLU of Md. in Supp. of Appellee, *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019) (Nos. 18-422, 18-726), 2019 WL 1167922; Br. Amici Curiae Am. Civil Liberties Union & Brennan Ctr. Justice in Supp. of Appellants, *Vieth v. Jubelirer*, 541 U.S. 267 (2004) (No. 02-1580), 2003 WL 22069782.

partisan political activity; the IRS has never suggested the contrary.  The ACLU Foundation has likewise engaged in litigation challenging the constitutionality of ballot-access restrictions on behalf of excluded candidates.  *See, e.g.*, *S.C. Green Party v. S.C. State Election Comm'n*, 612 F.3d 752 (4th Cir. 2010) (ACLU Foundation served as counsel for the South Carolina Green Party and a disqualified candidate for state office, among others).  The ACLU's advocacy in those cases did not lead to the revocation of its non-profit exemption.  NIF had no reason to believe that similar advocacy supporting civil rights in Israel would run afoul of § 501(c)(3).

In sum, the amended complaint fails to allege that NIF "knowingly" misrepresented its compliance with the substantive standards of § 501(c)(3) to any New York authority.  This independent, dispositive flaw further requires dismissal.

## CONCLUSION

As demonstrated above, TZAC's amended complaint is barred by New York's public disclosure bar and does not state a viable claim.  Because TZAC has already had an opportunity to amend its complaint in response to NIF's first motion to dismiss, and because the defects discussed in this motion cannot be remedied by further amendment, the Court should dismiss this action with prejudice.

Dated: August 25, 2020

Respectfully submitted.

/s/  *Jeffrey S. Bucholtz*

Jeffrey S. Bucholtz, *Pro Hac Vice*
Gabriel Krimm, *Pro Hac Vice*
KING & SPALDING LLP
1700 Pennsylvania Ave., NW
Washington, DC 20006
Tel: 202-626-2907
Fax: 202-626-3737
jbucholtz@kslaw.com
gkrimm@kslaw.com

J. Emmett Murphy
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036
Tel: (212) 556-2100
Fax: (212) 556-2222
jemurphy@kslaw.com

Brian Hauss
Arianna Demas
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
Tel: (212) 549-2604
Fax: (212) 549-2649
bhauss@aclu.org
ademas@aclu.org

*Counsel for Defendant New Israel Fund*