```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/15/2021
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                       :

STATE OF NEW YORK *ex rel.* TZAC, INC.    :
                                         :

                           Plaintiff,     :               1:20-cv-02955-GHW
                                         :

                    -against-           :     MEMORANDUM OPINION &
                                         :                ORDER
NEW ISRAEL FUND,                   :

                                         :

                          Defendant.     :
                                         :
------------------------------------------------------------ X

GREGORY H. WOODS, United States District Judge:

         Defendant New Israel Fund ("NIF") is a nonprofit charity organization dedicated to the advancement of democracy in Israel. NIF receives millions of dollars in charitable donations each year, which it distributes through grants to Israeli nonprofit organizations. NIF is registered as a 501(c)(3) organization, meaning that it is exempt from federal taxes and qualifies for exemptions from state and local taxes. As a condition of its 501(c)(3) status, NIF is prohibited from engaging in certain political activities. Specifically, 501(c)(3) entities are forbidden from engaging in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office, and are required to attest to that fact on their yearly federal tax returns.

         Plaintiff-Relator, the Zionist Advocacy Center ("TZAC"), brings this action on behalf of the State of New York (the "State"), alleging that NIF fraudulently obtained and maintains its status as a 501(c)(3) organization because it has engaged in prohibited activities and financially supports organizations that "electioneer" by engaging in advocacy efforts for or against candidates for public office. TZAC claims that NIF's fraudulent certifications on its federal tax returns violated the New York False Claims Act, N.Y. State Fin. Law §§ 187–194 (the "NYFCA"), because NIF submitted

those forms to state authorities and obtained its state and local tax exemptions based on its 501(c)(3)

status.

NIF has moved to dismiss TZAC's amended complaint, advancing three arguments.  First,

NIF argues that TZAC's amended complaint is barred because it is based on information that is

available in the public domain through the Internal Revenue Service (the "IRS")'s database and the

"news media," and TZAC does not fall under the "original source" exception to the NYFCA's

public disclosure bar.  *See* Mem. Law Supp. NIF's Mot. to Dismiss TZAC's Am. Compl. ("Mem.")

6–11, Dkt. No. 37.  Second, NIF argues that its state tax-exempt status does not turn on its federal

tax-exempt status, but rather on whether it "operate[s] on a not-for-profit basis and [whether] no

part of its net earnings inure to the benefit of any officer, director[,] or member of the corporation."

*Id.* at 13 (citation omitted).  NIF asserts that because it satisfies those conditions, its allegedly false

certifications or non-compliance with § 501(c)(3)'s requirements are immaterial to its New York tax

obligations and do not give rise to a claim under the NYFCA.  *Id.* at 14.  Lastly, NIF argues that

even if its allegedly false certifications were material, TZAC has failed to plead scienter with

particularity because it did not provide a factual basis for attributing the conduct of NIF's grantees

to NIF or for TZAC's assertion that NIF knew it engaged in partisan political activity when it

certified its tax returns.  *Id.*  For the reasons set forth below, NIF's motion is denied.

## I.   BACKGROUND

### A.   Overview of 26 U.S.C. § 501(c)(3) and Its Connection to New York Tax Law

Because NIF's status as a 501(c)(3) entity is relevant to this case, a brief overview of that

provision of the U.S. Internal Revenue Code and its relationship to the New York tax code is

warranted.  Entities organized under § 501(c)(3) are exempt from federal taxes and may be eligible

for exemption from state and local taxes.  *See* 26 U.S.C. § 501(c)(3); N.Y. Comp. Codes R. & Reg.

tit. 20, § 1-3.4(b)(6)(i)–(ii).  To qualify as a 501(c)(3) organization, the entity must exist for an

"exempt purpose," which means that the organization must be "organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes" and that "no part of the net earnings of [the organization] inures to the benefit of any private shareholder or individual."  26 U.S.C. § 501(c)(3).

As a condition of their status as tax-exempt entities, 501(c)(3) organizations are prohibited from participating in certain activities.  *See id.*  As relevant here, entities may not "participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office" and violation of this prohibition may result in denial or revocation of their tax-exempt status.  *Id.; see also The Restriction of Political Campaign Intervention by Section 501(c)(3) Tax-Exempt Organizations*, IRS (Sept. 23, 2020), https://www.irs.gov/charities-non-profits/charitable-organizations/the-restriction-of-political-campaign-intervention-by-section-501c3-tax-exempt-organizations (last visited January 25, 2021). "Contributions to political campaign funds or public statements of position (verbal or written) made on behalf of the organization in favor of or in opposition to any candidate for public office clearly violate the prohibition against political campaign activity."  *The Restriction of Political Campaign Intervention by Section 501(c)(3) Tax-Exempt Organizations*, IRS (Sept. 23, 2020), https://www.irs.gov/charities-non-profits/charitable-organizations/the-restriction-of-political-campaign-intervention-by-section-501c3-tax-exempt-organizations (last visited January 25, 2021). This applies to information posted on a 501(c)(3) organization's website.  *Frequently Asked Questions About the Ban on Political Campaign Intervention by 501(c)(3) Organizations: Website Postings and Links*, IRS (Dec. 8, 2020), https://www.irs.gov/charities-non-profits/charitable-organizations/frequently-asked-questions-about-the-ban-on-political-campaign-intervention-by-501c3-organizations-website-postings-and-links (last visited January 25, 2021) ("A website is a form of communication.  If an organization posts something on its website that favors or opposes a candidate for public office, it is

prohibited political campaign activity.  Posting information on its website is the same as if the organization distributed printed material or made oral statements or broadcasts that favored or opposed a candidate.").

Determining whether a 501(c)(3) organization has engaged in impermissible political activity is a fact-specific inquiry.  *The Restriction of Political Campaign Intervention by Section 501(c)(3) Tax-Exempt Organizations*, IRS (Sept. 23, 2020), https://www.irs.gov/charities-non-profits/charitable-organizations/the-restriction-of-political-campaign-intervention-by-section-501c3-tax-exempt-organizations (last visited January 25, 2021).  "[T]he prohibition against partisan activity in section 501(c)(3) bars more than the partisan promotion of certain candidates over other candidates, and . . . an organization's selective promotion of certain parties over others would be inconsistent with its section 501(c)(3) tax-exempt status."  *Fulani v. League of Women Voters Educ. Fund*, 882 F.2d 621, 629 (2d Cir. 1989) (citing *Ass'n of the Bar of the City of New York v. Comm'r.*, 858 F.2d 876, 879–80 (2d Cir. 1988)). Activities conducted in a non-partisan manner, or which do not favor a particular political candidate, are permitted.  For example, 501(c)(3) entities are permitted to engage in

> certain voter education activities (including presenting public forums and publishing voter education guides) conducted in a non-partisan manner . . . .  In addition, other activities intended to encourage people to participate in the electoral process, such as voter registration and get-out-the-vote drives, would not be prohibited political campaign activity if conducted in a non-partisan manner.

*The Restriction of Political Campaign Intervention by Section 501(c)(3) Tax-Exempt Organizations*, IRS (Sept. 23, 2020), https://www.irs.gov/charities-non-profits/charitable-organizations/the-restriction-of-political-campaign-intervention-by-section-501c3-tax-exempt-organizations (last visited January 25, 2021).  To be clear, "[a]n organization may take positions on public policy issues, including issues that divide candidates in an election for public office as long as the message does not in any way favor or oppose a candidate."  *Frequently Asked Questions About the Ban on Political Campaign Intervention by 501(c)(3) Organizations: Organization Position on Issues*, IRS (May 21, 2020), https://www.irs.gov/charities-non-profits/charitable-organizations/frequently-asked-questions-about-the-ban-on-political-campaign-intervention-by-501c3-organizations-organization-position-on-issues (last visited January 25, 2021).

Under the New York Tax Code, nonprofit organizations, including those exempt from federal taxation under § 501(c)(3), may be exempt from New York taxation. *See* tit. 20, § 1-3.4(b)(6)(i)–(ii). Section 1-3.4(b)(6), the New York provision upon which TZAC relies in bringing this action, provides that

> corporations organized other than for profit which do not have stock or shares or certificates for stock or for shares and which are operated on a nonprofit basis no part of the net earnings of which inures to the benefit of any officer, director, or member, including Not-for-Profit Corporations and Religious Corporations[, are exempt from taxation.]

*Id.* Section 1-3.4(b)(i)–(ii) describes the relationship between § 501(c)(3) and the state tax provision.

> (i) A corporation organized other than for profit, as described in this paragraph, which is exempt from Federal income taxation pursuant to subsection (a) of section 501 of the Internal Revenue Code, *will be presumed to be exempt from tax* under article 9-A. If a corporation organized other than for profit is denied exemption from taxation under the Internal Revenue Code, such corporation will be presumed subject to tax under article 9-A.
> (ii) The determination of the Internal Revenue Service, denying or revoking exemption from Federal taxation under the Internal Revenue Code, will ordinarily be followed[.]

*Id.* (emphasis added).[1]

## B.    Factual and Procedural Background

NIF is a 501(c)(3) nonprofit organization that works to advance democracy in Israel. Am. Compl. ¶¶ 2–3. NIF receives millions of dollars in charitable donations each year, which it grants to Israeli nonprofit organizations to advance NIF's mission. *Id.* ¶ 3. Because NIF is registered as a 501(c)(3) entity, its annual revenue of approximately $25 to $30 million, including its donations and investments, is exempt from federal, state, and local taxation. *Id.* ¶ 4.

TZAC is a "New York corporation which advocates on behalf of the Jewish State." *Id.* ¶ 5. TZAC, acting on behalf of the State of New York, filed this *qui tam* action in New York Supreme Court on August 15, 2019, alleging that NIF violated the NYFCA by preparing false tax returns to obtain and

---

[1] Section 501(a) provides that "[a] n organization described in subsection (c) or (d) or section 401(a) shall be exempt from taxation under this subtitle unless such exemption is denied under section 502 or 503." 26 U.S.C. § 501(a).

maintain its status as a tax-exempt entity, and by submitting those false returns to the State.  *See* Notice of Removal Ex. B 3–4, 8, Dkt. No. 1-2.  On November 22, 2019, the State declined to intervene in the state court action.  *See* Notice of Removal Ex. D ¶ 1, Dkt. No. 1-4.  On April 10, 2020, NIF removed this case to federal court claiming that the action raised issues under the United States Internal Revenue Code, specifically § 501(c)(3).  Notice of Removal 1–2, Dkt. No. 1.

TZAC alleges that NIF impermissibly engaged in both direct and indirect electioneering activities, contrary to the certifications on its tax forms that it did not do so.  Am Compl. ¶ 21. TZAC alleges that NIF directly engaged in electioneering activities in 2019, when NIF gathered names for a petition to disqualify a candidate running for the Knesset, Otzma Yehudit, and sent it out to individuals soliciting their signatures.  *Id.* ¶ 24.  After candidate Michael Ben-Ari was banned by the Israeli Supreme Court from running in his election, NIF called it a "victory for democracy." *Id.*

TZAC alleges that NIF engaged in indirect electioneering by knowingly distributing grants to organizations that opposed and supported candidates for public office in Israel.  *Id.* ¶¶ 21, 33.  The political activities in which NIF's grantees allegedly engaged include the following:

- TZAC claims that Israel Religious Action Center ("IRAC"), an organization that received grants from NIF from 2014 to 2018, electioneered in the 2015 and 2019 elections in Israel. *Id.* ¶ 25.  In 2015, an IRAC attorney argued before the Israeli Supreme Court against an appeal of political candidate Baruch Marzel's disqualification by the Israeli Central Election Committee from running for the Knesset, the legislative branch of the Israeli government. *Id.* ¶ 27.  In 2019, IRAC published a video about the danger of the Otzma Yehudit Party, which targeted political candidates Bentzi Gopstein, Itamar Ben Gvir, Michael Ben-Ari, and Baruch Marzel.  *Id.* ¶ 25.

- TZAC also alleges that Adalah, an organization that received grants from NIF from 2012 to 2018, called on the Israeli Central Election Committee to reject disqualification motions against Israeli politician MK Haneen Zoabi. *Id.* ¶ 28.

- TZAC alleges that in 2018, Mossawa, an organization that received grants from NIF from 2007 to 2018, attacked a sign from the Jewish Home Campaign as racist, and attacked the Likud Campaign, claiming that the Liked Campaign "want[ed] the Israeli [people] to decide between a fascist society and a pluralistic society that respects human dignity and diversity." *Id.* ¶ 29.

- TZAC alleges that in 2018, Adam Teva, an organization that received grants from NIF in 2014, 2016, and 2017, posted a list of candidates who pledged to follow a protocol to preserve trees and said it would keep the list on its website until the next election date. *Id.* ¶ 30.

TZAC also points to NIF's statements describing its New Initiative for Democracy ("NIFD") campaign as proof that NIF knew it was "involving itself in campaigning." *Id.* ¶ 32. On NIF's website, the stated purpose of the campaign is to "equip Israel's pro-democracy and progressive forces with the tools to fight Israel's regressive right-and win." *Id.* As part of its strategy for the NIFD campaign, NIF explains that it can transform military solutions into political solutions by "reclaiming national security to include progressive ideals" through its partnership with the Council for Peace and Security (the "CPS"). *Id.* ¶ 33. TZAC alleges that the CPS, a grantee of NIF since at least as early as 2014, advanced this mission by mounting a large campaign against Benjamin Netanyahu before the 2015 elections. *Id.* ¶ 34. In that campaign, the CPS argued that by voting for Benjamin Netanyahu, the "situation with the Palestinians [would] not change; however, the voters [had] a chance to make a change by voting in the election." *Id.* TZAC also alleges that the CPS campaigned in the streets of Israel and on its YouTube and Facebook pages. *Id.*

TZAC asserts that NIF knowingly or recklessly permitted its grantees to engage in these activities, despite the fact that NIF states on its website that grantees should not electioneer, because the grantees post their activities on their websites and NIF claims to monitor its grantees to ensure their compliance with its rule.  *Id.* ¶ 31–32.  TZAC also asserts that NIF knew of its grantees' activities because the grantees share newspaper and free media coverage with NIF.  *Id.* ¶ 32.

TZAC filed the operative complaint (the "Amended Complaint") on July 17, 2020, alleging that NIF violated the NYFCA, which prohibits an actor from "knowingly make[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or a local government."  *Id.* ¶¶ 35–37 (citing N.Y. State Fin. Law § 189(1)(g)).  The allegedly false statements that serve as the basis for TZAC's claim are NIF's certifications on its yearly IRS Form 990 for the years 2008 through 2017, which were submitted to both federal and state authorities.[2]  *Id.* ¶¶ 9–20.  Specifically, NIF certified that it did not "engage in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office," which TZAC asserts was false because NIF and its grantees did engage in such activities.  *Id.* ¶¶ 8, 9.  TZAC contends that had NIF disclosed its activities on its Form 990s, NIF would not have been qualified to receive a tax exemption under § 501(c)(3), and therefore, it would not have received a tax exemption under Section 1-3.4 in the State and City of New York.  *Id.* ¶¶ 20–22. Therefore, TZAC reasons, by submitting these false statements to the federal and state authorities, and continuing to receive state and local tax exemptions based on that information, NIF has violated the NYFCA.

---

[2] For the purpose of this motion, the Court accepts as true the allegation in the Amended Complaint that NIF's Form 990s were provided to the State in the same form as those submitted to the federal authorities.

NIF moved to dismiss the operative complaint on August 25, 2020.  NIF's Notice Mot. to Dismiss Am. Compl., Dkt. No. 36.  In support of its motion, NIF has submitted 55 exhibits that it has divided into seven categories:

- the "A Exhibits":  the financial section of NIF's website and NIF's yearly financial reports, which were published by NIF itself and republished on NGO Monitor's website;

- the "B Exhibits":  IRS's repository of tax returns, its search page, and the search results for NIF;

- the "C Exhibits":  an online profile of NIF maintained by Charity Navigator;

- the "D Exhibits":  an online profile of NIF and NIF's yearly Form 990s, published by ProPublica;

- the "E Exhibits":  an online profile of NIF and reports analyzing NIF's yearly financial reports, published by NGO Monitor;

- the "F Exhibits":  social media posts and articles published by NIF and its grantees; and

- the "G Exhibits":  articles about NIF and its grantees, published by the newspapers *Haaretz* and *The Jerusalem Post*, and the magazine, *+972*.

Decl. J. Emmett Murphy ("Murphy Decl."), Dkt. No. 38.  TZAC opposed the motion on September 14, 2020.  Mem. Law Opp'n to Mot. to Dismiss TZAC's Am. Compl. ("Opp'n"), Dkt. No. 39.  NIF replied on September 21, 2020.  Reply Supp. NIF's Mot. to Dismiss TZAC's Am. Compl. ("Reply"), Dkt. No. 40.  On January 11, 2021, at the Court's request, the State submitted a brief as an interested party on the limited issue of how the scope of the NYFCA's "news media" provision should be interpreted.  State of New York's Statement of Interest ("State's Brief"), Dkt. No. 45; *see* Req. Briefing State of New York, Dkt. No. 43.  On January 19, 2021, NIF replied to that brief.  Resp. to State of New York's Statement of Interest ("NIF's Resp."), Dkt. No. 46-1.

## II.  LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 544).

A court must accept all facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam).  But the Court is "not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013).  And a complaint that offers "labels and conclusions" or "naked assertion[s]" without "further factual enhancement" will not survive a motion to dismiss.  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555, 557). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice*." DeJesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 87–88 (2d Cir. 2013) (quoting *Iqbal,* 556 U.S. at 678–79).

"A complaint can be dismissed for failure to state a claim pursuant to a Rule 12(b)(6) motion raising an affirmative defense 'if the defense appears on the face of the complaint.'" *Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 158 (2d Cir. 2003) (quoting *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998)); *see also Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) ("[A] defendant may raise an affirmative

defense in a pre-answer Rule 12(b)(6) motion if the defense appears on the face of the complaint.").

"In considering a motion to dismiss under Rule 12(b)(6), the court may look[ ] only to the

complaint; documents that are attached as exhibits to, incorporated by reference, or integral to the

complaint; and matters of which judicial notice may be taken." *Lopez v. Nike, Inc.,* No.

20CV905PGGJLC, 2021 WL 128574, at *3 (S.D.N.Y. Jan. 14, 2021) (citation omitted).

The NYFCA is an anti-fraud statute, so claims brought under the statute must also satisfy

the heightened pleading requirements of Fed. R. Civ. P. 9(b). Courts in this circuit routinely apply

Rule 9(b) to NYFCA claims removed to federal court. *See, e.g., Power Auth. ex rel. Solar Liberty Energy*

*Sys., Inc. v. Advanced Energy Indus., Inc.,* No. 19-CV-1542-LJV, 2020 WL 5995186, at *8 (W.D.N.Y.

Oct. 9, 2020); *New York ex rel. Khurana v. Spherion Corp.,* No. 15 CIV. 6605 (JFK), 2016 WL 6652735,

at *8 (S.D.N.Y. Nov. 10, 2016) (citing *Gold v. Morrison-Knudsen Co.,* 68 F.3d 1475, 1476–77 (2d Cir.

1995)); *see also Kane ex rel. United States v. Healthfirst, Inc.,* 120 F. Supp. 3d 370, 382 (S.D.N.Y. 2015)

(explaining that claims under the "NYFCA 'fall within the express scope of Rule 9(b)'" (quoting

*Wood ex rel. United States v. Applied Rsch. Assocs., Inc.,* 328 F. App'x 744, 747 (2d Cir. 2009))).

Under Rule 9(b), claims alleging fraud "must state with particularity the circumstances

constituting fraud." Fed. R. Civ. P. 9(b). This "ordinarily requires a complaint alleging fraud to '(1)

specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state

where and when the statements were made, and (4) explain why the statements were fraudulent.'"

*United States ex rel. Chorches v. Am. Med. Response, Inc.,* 865 F.3d 71, 81 (2d Cir. 2017) (quoting *United*

*States ex rel. Ladas v. Exelis, Inc.,* 824 F.3d 16, 25 (2d Cir. 2016)). "Rule 9(b) is "designed to provide a

defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from

improvident charges of wrongdoing, and to protect a defendant against the institution of a strike

suit." *Id.* at 86 (quoting *Ladas,* 824 F.3d at 25).

### III.   DISCUSSION

NIF advances three arguments in support of its motion.  First, NIF argues that TZAC's claim is prohibited by the NYFCA's public disclosure bar and that the original source exception does not apply to TZAC.  Second, NIF argues that TZAC has failed to plead that NIF's allegedly false certifications or non-compliance with § 501(c)(3) are material to its tax obligations under New York law.  Lastly, NIF argues that even if its allegedly false certifications were material to its tax obligations, TZAC has failed to plead with particularity that NIF knew that those certifications were false, as required by Federal Rule of Civil Procedure 9(b) for an NYFCA claim.  *Id.*

### A.   The Federal and New York False Claims Acts

Before turning to the substance of the motion, the Court will provide a brief background of the Federal and New York False Claims Acts.  The Federal False Claims Act (the "Federal FCA"), 31 U.S.C. §§ 3729–3733*, was "originally adopted following a series of sensational congressional investigations into the sale of provisions and munitions to the War Department" during the Civil War "to stop . . . plundering of the public treasury."  *United States v. McNinch*, 356 U.S. 595, 599 (1958).  "Testimony before the Congress [at that time] painted a sordid picture of how the United States had been billed for nonexistent or worthless goods, charged exorbitant prices for goods delivered, and generally robbed in purchasing the necessities of war."  *Id.*  In 2007, the New York State legislature enacted its own version of the False Claims Act.  At the time the NYFCA was enacted, it was modeled on the Federal FCA.  *Spherion Corp.*, 2016 WL 6652735, at *8.  A defendant is liable under the NYFCA if "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or a local government."  N.Y. State Fin. Law § 189(1)(g).

The Federal FCA and the NYFCA permit relators to bring suit, on behalf of the federal or state government, respectively, against parties who knowingly defraud that government.  *See* 31

U.S.C. § 3730(b)(1) ("A person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action shall be brought in the name of the Government."); N.Y. State Fin. Law § 190(2)(a) (permitting *qui tam* civil actions to be brought "on behalf of the person and the people of the state of New York or a local government."). Like the Federal FCA, the government may elect to intervene in a *qui tam* action brought under the NYFCA within a set period of time. N.Y. State Fin. Law § 190(2)(b). When the State "decline[s] to supersede or intervene in the action, the NYS FCA allows the *qui tam* plaintiff to continue its claims on behalf of the government and entitles the plaintiff to receive between 25 percent and 30 percent of the amount recovered if the action is successful." *Spherion Corp.*, 2016 WL 6652735, at *9 (citing N.Y. State Fin. Law § 190(6)(b)). Thus, by offering relators an opportunity to share in the award, private persons are incentivized to identify and act against fraudulent schemes against the government.

Where the NYFCA is "modeled on the federal FCA[,] courts regularly look to federal law when interpreting [that law]." *See id.* at *8; *see also Dhaliwal v. Salix Pharms., Ltd.*, 752 F. App'x 99, 100 (2d Cir. 2019) ("[B]ecause '[t]he NYFCA follows the federal False Claims Act,' New York courts 'look toward federal law when interpreting the New York act.'" (quoting *State ex rel. Seiden v. Utica First Ins.*, 943 N.Y.S.2d 36, 39 (App. Div. 2012) (second alteration in original))). However, as discussed below, certain provisions of the NYFCA were amended in 2010 to include language that does not appear in the Federal FCA; therefore, cases discussing the federal statute do not provide guidance on the NYFCA where the State has intentionally deviated from the text of the federal statute. "[T]he New York Court of Appeals has held that the Act and its amendments apply retroactively." *Spherion Corp.*, 2016 WL 6652735, at *8 (*citing People ex rel. Schneiderman v. Sprint Nextel Corp.*, 26 N.Y.3d 98, 113 (2015), *cert. denied sub nom. Sprint Nextel Corp. v. New York*, 136 S. Ct. 2387 (2016)).

**B.    TZAC's Claim is Not Barred by the NYFCA's Public Disclosure Bar**

The Amended Complaint contains information that was not publicly disclosed as provided for under the "government disclosure" and "news media" provisions of the NYFCA's public disclosure bar.  Therefore, TZAC's claim is not barred by the public disclosure bar and the Court will not dismiss the Amended Complaint on this basis.

Both the Federal FCA and the NYFCA bar actions where the same allegations made by the plaintiff have been publicly disclosed by certain sources.  The bars serve to protect against "'parasitic lawsuits' based upon publicly disclosed information in which would-be relators 'seek remuneration although they contributed nothing to the exposure of the fraud.'"  *United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1157 (2d Cir. 1993) (quoting *United States ex rel. John Doe v. John Doe Corp.*, 960 F.2d 318, 319 (2d Cir. 1992)).  In line with the purpose of the statutes, the bars are "intended to confine the right to bring *qui tam* actions to those who bring frauds against the public treasury to the attention of the government and the courts; no public purpose is served by allowing opportunistic outsiders to file suit based on allegations of fraud that have already been publicized . . . by others."  *Chorches*, 865 F.3d at 80 n.5; *see State ex rel. Jam. Hosp. Med. Ctr., Inc. v. UnitedHealth Grp., Inc.*, 922 N.Y.S.2d 342, 343 (App. Div. 2011) (dismissing NYFCA action under the public disclosure bar).

The federal public disclosure bar provides that

> [t]he court shall dismiss an action or claim under [the Federal FCA], unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed--(i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or (iii) from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A).  To proceed with a claim under the NYFCA, the relator must overcome its version of the public disclosure bar, which provides that

[t]he court shall dismiss a qui tam action under [the NYFCA], unless opposed by the state or an applicable local government, or unless the qui tam plaintiff is an original source of the information, if substantially the same allegations or transactions as alleged in the action were publicly disclosed . . . (ii) in a federal, New York state or New York local government report, hearing, audit, or investigation that is made on the public record or disseminated broadly to the general public; provided that such information shall not be deemed "publicly disclosed" in a report or investigation because it was disclosed or provided pursuant to article six of the public officers law, or under any other federal, state or local law, rule or program enabling the public to request, receive or view documents or information in the possession of public officials or public agencies; [or] (iii) in the news media, provided that such allegations or transactions are not "publicly disclosed" in the "news media" merely because information of allegations or transactions have been posted on the internet or on a computer network.

N.Y. State Fin. Law § 190(9)(b).

The public disclosure bar is an affirmative defense that can be decided on a Rule 12(b)(6) motion but only if the defense appears on the face of the complaint.[3] *See Coopers & Lybrand, LLP*, 322 F.3d at 158. And, while the court generally may not consider documents outside the pleadings in deciding a 12(b)(6) motion, it "may take judicial notice of the fact that press coverage and judicially noticeable public records contained certain information, without regard to the truth of their contents." *Spherion Corp.*, 2017 WL 1437204, at *3 (citing *Chen*, 966 F. Supp. 2d at 294 (citing in turn, *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008)). "The Court may also consider documents incorporated by reference in the complaint and documents that are 'integral' to the complaint because the plaintiff 'relies heavily upon [their] terms and effect.'" *Id.* (alteration in original) (citing *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)). For a document to be incorporated by reference, the complaint must make a "clear, definite, and substantial

---

[3] Courts faced with motions to dismiss claims under the current version of the Federal FCA have predominantly found that the public disclosure bar is properly analyzed under Rule 12(b)(6), not Rule 12(b)(1), as was the case under a prior version of the statute. *See Spherion Corp.*, 2016 WL 6652735, at *11 (collecting cases). Indeed, the Second Circuit has definitively ruled on this question, joining "the majority of our sister circuits that have addressed the issue in holding that the public disclosure bar is no longer jurisdictional." *Chorches*, 865 F.3d at 80. And this Court agrees with the *Spherion* court that, as with the Federal FCA, because the public disclosure provision of the NYFCA no longer references jurisdiction, it provides a basis for dismissal appropriate for adjudication in a Rule 12(b)(6) motion, not for lack of jurisdiction under Rule 12(b)(1).

reference" to it.  *N.Y. Dist. Council of Carpenters Pension Fund v. Forde*, 939 F. Supp. 2d 268, 276 (S.D.N.Y. 2013).  "In order for the contents of a document to be deemed integral to the complaint, they must be deemed necessary to the plaintiff's statement of a claim under Rule 8."  *Vaher v. Town of Orangetown, N.Y.*, 916 F. Supp. 2d 404, 423 n.16 (S.D.N.Y. 2013).  As stated above, NIF has submitted 55 exhibits for the Court's consideration.[4]

The public disclosure bar applies where "material elements" of the fraud were previously publicly disclosed.  *United States ex rel. Foreman v. AECOM*, 454 F. Supp. 3d 254, 262 (S.D.N.Y. 2020) (quoting *United States ex rel. Patriarca v. Siemens Healthcare Diagnostics, Inc.*, 295 F. Supp. 3d 186, 197 (E.D.N.Y. 2018)).  The alleged fraud itself does not have to have been exposed.  *Id.*  "Earlier disclosures will bar a relator's claim if they were sufficient to set the government squarely upon the trail of the alleged fraud."  *Id.*  "[I]f X + Y = Z, Z represents the allegation of fraud and X and Y represent its essential elements.  In order to disclose the fraudulent *transaction* publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, *i.e.,* the conclusion that fraud has been committed."  *United States ex rel. Kester v. Novartis Pharms. Corp.*, 43 F. Supp. 3d 332, 347 (S.D.N.Y. 2014) (alteration in original) (quoting *United States ex. rel. Springfield Terminal Ry. v. Quinn,* 14 F.3d 645, 654 (D.C. Cir. 1994)).

"A court must first determine if 'substantially the same' allegations or transactions in the action were publicly disclosed.  If that is the case, the action must be dismissed unless the plaintiff

---

[4] In a mere footnote in its opening brief, NIF has asked that the Court consider its exhibits as documents incorporated by reference into the Amended Complaint or documents integral to the Amended Complaint, or documents appropriate for judicial notice. Mem. at 6 n.2.  Here, the Amended Complaint specifically references NIF's Form 990s for the years of 2008–2017, and the allegedly fraudulent certifications on those forms serve as the basis of TZAC's claim. Am. Compl. ¶¶ 9–20.  Therefore, the Court may properly consider the Form 990s in deciding this motion.  The Court interprets NIF's blanket request for judicial notice as including documents that fall within the following two categories: (1) government documents available from reliable sources, and (2) other documents available on the Internet for which the Court may only to take judicial notice of the fact that they are publicly available.  TZAC has not opposed NIF's request.  In light of this non-opposition and the fact that the Court ultimately did not rely upon many of NIF's submissions in ruling on this motion, the Court does not analyze here whether each individual exhibit is appropriate for judicial notice.  Rather, to the extent the Court relies on one of NIF's exhibits, it finds that judicial notice is proper and grants judicial notice as to that exhibit.

qualifies as an 'original source'" under the NYFCA.  *Spherion Corp.,* 2017 WL 1437204, at *4.  An

"original source" is defined in the NYFCA as

> a person who (a) prior to a public disclosure under [Section 190(b)] has voluntarily
> disclosed to the state or a local government the information on which allegations or
> transactions in a cause of action are based, or (b) who has knowledge that is
> independent of and materially adds to the publicly disclosed allegations or transactions,
> and who has voluntarily provided the information to the state or a local government
> before or simultaneous with filing an action under [the NYFCA].

N.Y. State Fin. Law § 188(8).

### i. The Government Disclosure Provision of the NYFCA's Public Disclosure Bar

The initial question is whether NIF's IRS Form 990s, which contain the allegedly fraudulent

certifications, fall within the scope of the NYFCA's public disclosure bar as being disclosed "in a

federal, New York state or New York local government report, hearing, audit, or investigation[.]"

The NYFCA provides that a *qui tam* action shall be dismissed if the allegations were publicly

disclosed in

> a federal, New York state or New York local government report, hearing, audit, or
> investigation that is made on the public record or disseminated broadly to the general
> public; provided that such information shall not be deemed 'publicly disclosed' in a
> report or investigation because it was disclosed or provided pursuant to [New York's
> Freedom of Information Law], or under any other federal, state or local law, rule or
> program enabling the public to request, receive or view documents or information in
> the possession of public officials or public agencies[.]

N.Y. State Fin. Law § 190(9)(b)(ii).[5]

---

[5] This provision varies from the Federal FCA, which does not contain a carveout for information provided under Freedom of Information laws, or other laws, rules, or programs that permit the public to access government information.  The difference between the two statutes is illustrated by the Supreme Court's decision in *Schindler Elevator Corp. v. U.S. ex rel. Kirk*, which held that "[a]written agency response to a FOIA request" and "[a]ny records the agency produces along with its written FOIA response" are considered reports within the meaning of the Federal FCA's public disclosure bar.  563 U.S. 401, 411 (2011).  However, even under the Federal FCA, the Supreme Court left open the question of whether records released under FOIA, but not attached to a written response, fell within the scope of the public disclosure bar.  *Id.* at 414.

As support for its argument that the Form 990s were published in "government reports," NIF has provided the Court with three websites maintained by the IRS.[6]  *See* Mem. at 5–7; Murphy Decl. ¶¶ 15–17.  The IRS permits the public to download "the most recent 990 Series filings on record," which at this time means NIF's Form 990 filings from 2017-2020.  Murphy Decl. Ex. B1 ECF p. 2, Dkt. No. 38-13.  The IRS also maintains a database which permits the public to run searches for filings from tax-exempt organizations.  Murphy Decl. Ex. B2, Dkt. No. 38-14.  NIF's Form 990 returns are available through this database for the years 2015-2018.  Murphy Decl. Ex. B3, Dkt. No. 38-15.[7]

The parties have provided limited briefing on whether the Form 990s made accessible by the IRS fall within the NYFCA's "government report" provision.  The sole case that NIF provided for its argument—*United States ex rel. Rosner v. WB/Stellar IP Owner, L.L.C.*, 739 F. Supp. 2d 396, 407 (S.D.N.Y. 2010) (holding that a public database on a city agency's website was a report subject to the public disclosure bar because it "synthesized tax benefit histories for many different properties over many years, organized by block and lot number")—is not instructive because it was decided before the NYFCA was amended in 2010 to include the carveout for information provided pursuant to laws requiring public access.  *See* Mem. at 6–7.  Thus, even accepting NIF's argument that the IRS's provision of the Form 990s can be considered disclosure of the information in "government reports," NIF faces another hurdle.  The NYFCA has narrowed the public disclosure bar by providing that information is not considered "publicly disclosed" if it was disclosed or provided under a federal "law, rule or program enabling the public to request, receive or view documents or information in the possession of public officials or public agencies[.]"  N.Y. State Fin.

---

[6] As discussed below, in addition to NIF's argument that its Form 990s are publicly available through the IRS's websites as "government reports," it also submits that these forms were disseminated by the "news media" through ProPublica.
[7] As an initial note, even assuming that the Form 990s procured from the IRS's websites should be considered publicly disclosed within the meaning of the NYFCA, only the returns for the years 2015–2020 are available through the methods identified by NIF, where TZAC has alleged that NIF also made false certifications on its returns for 2008-2014.

Law § 190(9)(b)(ii).  In other words, the question becomes whether IRS made the Form 990s

accessible because it was required to do so because of "law[s], rule[s], or program[s]" that provided

for public access to that information.  If so, based on the plain meaning of the NYFCA, the forms

were not "publicly disclosed" as to trigger the public disclosure bar, and NIF's argument fails.

There exists federal law that answers precisely this question.  As a condition of their tax-

exempt status, 501(c)(3) organizations must make certain documents, including their yearly Form

990s, available for public inspection.  *See* 26 U.S.C. § 6104(b); *see also* 26 C.F.R. § 601.702(d)(3).  The

statute reads

> (b) Inspection of annual returns.--The information required to be furnished by
> sections 6033 [which provides that "every organization exempt from taxation under
> section 501(a) shall file an annual return"], 6034, and 6058, together with the names
> and addresses of such organizations and trusts, shall be made available to the public
> at such times and in such places as the Secretary may prescribe.

26 U.S.C. § 6104; *see also* 26 U.S.C. § 6033(a); *Exempt Organization Public Disclosure and Availability*

*Requirements*, IRS (Aug. 28, 2020), https://www.irs.gov/charities-non-profits/exempt-organization-

public-disclosure-and-availability-requirements (last accessed February 1, 2021) ("Tax-exempt

organizations must make annual returns and exemption applications filed with the IRS available for

public inspection and copying upon request.  In addition, the IRS makes these documents

available.").  The text of Section 6104 requires public access to the Form 990s, which the IRS

accomplishes by maintaining various databases on its website.[8]  Therefore, the IRS's disclosure of

the Form 990s appears to fall outside the scope of the NYFCA's public disclosure bar because the

forms are provided pursuant to "federal, state or local law, rule or program enabling the public to

---

[8] "To assist the general public, the IRS maintains and updates two different publicly available compilations of
information on organizations eligible to receive tax-deductible contributions under § 170 [including 501(c)(3)
organizations]." Rev. Proc. 2018-32, 2018-23 I.R.B. 739 (2018).  The IRS previously issued a paper version of the
publication compiling information on these organizations, but in 2011, made the information available electronically
through databases on the IRS website. Rev. Proc. 2011-33, 2011-25 I.R.B. 887 (2011).  In May of 2018, the IRS
expanded the capabilities of its databases, including the development of the "Tax Exempt Organization Search"—the
database identified by NIF that allows the public to search for a tax-exempt organization and access its Form 990s. Rev.
Proc. 2018-32, 2018-23 I.R.B. 739 (2018); *see also* Murphy Decl. Exs. B1 and B3.

request, receive or view documents or information in the possession of public officials or public agencies[.]"  When viewing the plain language of the NYFCA in conjunction with the federal provisions requiring disclosure of the Form 990s, this conclusion is inescapable.  Thus, the public disclosure bar does not apply to the Form 990s accessed through the IRS's website, and NIF's argument fails.  At summary judgment, NIF may be able to provide additional evidence as to why the Forms 990s accessible through the IRS's website should be considered publicly disclosed within the meaning of the NYFCA.  However, the Court does not reach that conclusion now with the information before it.

### ii.  The "News Media" Provision of the NYFCA's Public Disclosure Bar

The primary dispute between the parties as to the NYFCA's public disclosure bar is whether the information in the Amended Complaint was previously disclosed by the "news media."  The Court has determined that it was not, except for four articles that do not reveal NIF's alleged fraud.

Although the NYFCA largely tracks the language of the Federal FCA, there is a notable difference between the two statutes that is relevant to this dispute.[9]  After the NYFCA was passed in 2007, some New York State legislators were concerned that "many of the terms of the False Claims Act [were] misinterpreted by federal courts—including the Supreme Court—to create loopholes that make it harder for law enforcement and whistleblowers to fight fraud."  Eric T. Schneiderman, *Senator Eric. T. Schneiderman Shepherds Historic Anti-Fraud Taxpayer Protection Measure Through Legislature*,

---

[9] Another significant difference between the Federal FCA and NYFCA—though not pertinent to this motion—is that the Federal FCA contains a provision known as the "tax bar."  The tax bar provides that the Federal FCA "does not apply to claims, records, or statements made under the Internal Revenue Code of 1986."  31 U.S.C. § 3729(d); *see also U.S. ex rel. Lissack v. Sakura Glob. Capital Markets, Inc.*, 377 F.3d 145, 152–53 (2d Cir. 2004) (holding that the tax bar also prohibits cases "where the falsity of the underlying claim depends on a violation of the Tax Code").  Instead, the discretion to prosecute federal tax violations is reserved for the IRS, which has its own whistleblower program.  *See* 26 U.S.C. § 7623; *see also Lissack*, 377 F.3d at 156 (2d Cir. 2004) ("the evident purpose of the Tax Bar . . . is to prevent private litigants from interfering with the IRS's efforts to enforce the tax laws.").  The NYFCA, however, applies to "claims, records, or statements made under the tax law" provided that the suit satisfies certain conditions, including a threshold amount for damages pleaded.  *See* N.Y. State Fin. Law § 189(4)(a)–(b).  The existence of the Federal FCA's tax bar may explain why TZAC has chosen to pursue an NYFCA claim here.

N.Y. State Senate (July 1, 2010), https://www.nysenate.gov/newsroom/press-releases/eric-t-schneiderman/senator-eric-t-schneiderman-shepherds-historic-anti (last visited January 26, 2021). President Barack Obama signed the Fraud Enforcement and Recovery Act ("FERA") in 2009 and the Patient Protection and Affordable Care Act ("PPACA") in 2010, amending the Federal FCA and expanding liability under the statute by encouraging more whistleblower and *qui tam* actions against parties who improperly obtained government funds.  Also in 2010, former New York State Senator Eric Schneiderman introduced amendments to the NYFCA.  The bill was signed into law on August 13, 2010.  Former Senator Schneiderman described the revised statute as a "false claims act on steroids" that "went even further than [the federal] amendments in cracking down on corrupt contractors and protecting whistleblowers in significant ways." *Id.*  Like the federal amendments, the amendments to the NYFCA also sought to "expand liability for conspiracies to defraud taxpayers[.]" *Id.*  Here, the relevant amendment to the NYFCA is the change to its public disclosure bar, clarifying that information is not considered publicly disclosed in the "news media" merely by virtue of being "posted on the internet or on a computer network[;]" the federal statute is silent on the subject. *Compare* N.Y. State Fin. Law § 190(9)(b)(iii), *with* 31 U.S.C. § 3730(e)(4)(A)(iii).

In its opening brief, NIF argued that the amendment's clarifying language on the scope of "news media" "only codifies the view of the federal courts, which have applied the federal public disclosure bar to a broad range of websites 'intended to disseminate information' to an interested public audience . . . [and that] courts have rejected public disclosure arguments based on obscure and secluded web postings . . . and—just like the New York statute—have rejected the notion 'that anything posted online would automatically constitute a public disclosure[.]" Mem. at 7–8 (citations omitted).  According to NIF, federal courts "have applied the bar to internet publications that share the function and purpose of traditional news outlets: informing the public on recent events and previously unknown facts." *Id.* at 8.  In contrast, TZAC argued that information disseminated on

"[a] company's own website clearly does not constitute [disclosure in the] news media, except when that company is itself a news organization."  Opp'n at 5.

At the Court's request, the State briefed its perspective as to the significance of this textual difference between the state and federal acts.  The State informed the Court that it disagreed with both NIF and TZAC's positions.  The State argued that NIF's interpretation of the scope of "news media" was far too broad and requested that the Court not disregard the change in the NYFCA's text.  *See* State's Brief at 4–5 ("This amendment forecloses any argument . . . that would result in all publicly available online information being deemed to have been publicly disclosed 'in the news media.'  And because many federal courts since 2010 have followed the path blazed by *Cintas* and *Walt Disney World*, this amendment makes clear that the federal precedents that have adopted those arguments are not persuasive authority regarding the meaning of the NYFCA." (footnote omitted)).  However, the State also disagreed with TZAC's position, finding that its interpretation was too narrow, and placed "unwarranted emphasis on an online source's subjective self-description."  *Id.* at 8–9.

Because the statute itself does not define what "news media" is, and only provides guidance on what it is not, the Court will analyze the language under the plain meaning of the term.  "[The] starting point in statutory interpretation is the statute's plain meaning, if it has one."  *United States v. Jones*, 965 F.3d 190, 194 (2d Cir. 2020) (quoting *United States v. Dauray*, 215 F.3d 257, 260 (2d Cir. 2000)).  "If the meaning is plain, the inquiry ends there."  *United States v. Rowland*, 826 F.3d 100, 108 (2d Cir. 2016). "If, however, the terms are ambiguous or unclear, [the Court] may consider legislative history and other tools of statutory interpretation."  *Nwozuzu v. Holder*, 726 F.3d 323, 327 (2d Cir. 2013).  Indeed, the State has suggested that the Court "focus on whether the source of the disclosure is 'news media' within the plain meaning of that term, and should look for guidance to the federal cases that most faithfully attempt to determine and apply the plain

meaning of 'news media.'"  State's Brief at 1.

In response to the State's Brief, NIF argues that its interpretation of "news media" is consistent with the plain meaning of the term, and that both the State's and its own interpretations reject the conclusion that anything posted on the internet should be considered "news media." NIF's Resp. at 1, 3. But, according to NIF, the Internet has advanced the "proliferation of nontraditional news outlets," such as "social media platforms like Twitter and Facebook." *Id.* at 4. NIF argues that, therefore, NIF's and the grantees' websites and social media accounts should similarly be considered "news media" because they were published by organizations "engaged in advocacy on political and social issues discussing their own and each other's involvement with those issues." *Id.* at 6.  And, according to NIF, the newspapers, magazine, *and* the watchdog organizations it cited would easily meet the definition of "news media" because they have the typical characteristics of the traditional press.  *Id.*

Merriam-Webster defines news as "a report of recent events," "previously unknown information," "something having a specified influence or effect," "material reported in a newspaper or news periodical or on a newscast," "matter that is newsworthy," or a newscast.  *See* News, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/news (last visited January 26, 2021).  As relevant here, Merriam-Webster defines media as "mass media" or "a medium of cultivation, conveyance, or expression" and defines mass media as "[media] of communication (such as newspapers, radio, or television) that is designed to reach the mass of the people[.]"  *See* Media, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/media (last visited January 26, 2021); Mass Medium, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/mass%20media (last visited January 26, 2021).

The Court has searched for applicable Second Circuit or state law precedent on the meaning of the term "news media" in the context of the NYFCA and found none.[10]  Given the intentional divergence between the statutory texts of the Federal FCA and the NYFCA after its 2010 amendment, it would not be appropriate to look to cases interpreting the Federal FCA's broader "news media" provision.  However, the State has also asked the Court to consider the analysis in *United States ex rel. Integra Med Analytics LLC v. Providence Health & Services* ("*Integra*"), a Central District of California case, for guidance in interpreting the plain meaning of this term.  *See* No. CV 17-1694 PSG, 2019 WL 3282619 (C.D. Cal. July 16, 2019), *motion to certify appeal granted*, 2019 WL 6973547 (C.D. Cal. Oct. 8, 2019) (citations and quotations omitted).

The *Integra* court identified five factors that serve as "useful guideposts in determining whether information from an online source has been disclosed 'from the news media.'"  *Id.* at *14–15.  Those five factors are: (1) "the extent to which the information typically conveyed by a source would be considered newsworthy"; (2) the extent to which there is "editorial independence, or at least some separation, between the original source of information and the medium that conveys it"; (3) the extent to which the source intends "to disseminate information widely, as opposed to only to a few individuals"; (4) the extent to which the source "functions like [a] traditional news outlet[ ]" (i.e., a newspaper, radio, or television station); and (5) the extent to which

---

[10] However, as the State points out, New York law defines "news media" in other contexts:  under New York Judiciary Law § 218, "news media" is defined as

> any news reporting or news gathering agency and any employee or agent associated with such agency, including television, radio, radio and television networks, news services, newspapers, magazines, trade papers, in-house publications, professional journals or any other news reporting or news gathering agency, the function of which is to inform the public, or some segment thereof.

N.Y. Jud. Law § 218(2)(c).  And the New York Civil Rights Law has "[s]pecial provisions relating to persons employed by, or connected with, news media" and under Section 79-h, specifically defines newspapers, magazines, news agencies, press associations, wires services, professional journalists, and newscasters.  N.Y. Civ. Rights Law § 79-h.

the source "could reasonably be described as 'news media' as at least some people would that term in everyday speech" which is "the most important consideration." *Id.*

Some of these factors involve a deeper dive into the facts than others. For example, for the second factor—the extent to which there is "editorial independence, or at least some separation, between the original source of information and the medium that conveys it"—the *Integra* court looked to "the sense in which a news media entity is ordinarily viewed as one that collects information from outside sources, exercises some editorial judgment in deciding what to publish, and then transmits the published information to an audience—put more simply, it curates information—in contrast to an entity that simply publishes information about itself." *Id.* at *14. The *Integra* court described the fourth factor as examining "the extent to which the conveyance of newsworthy information is the primary purpose of [the] entity publishing the online source or whether the dissemination of such information is merely ancillary to some other purpose." *Id.* at *15. "None [of] these factors on their own are necessarily dispositive of whether an online source should be considered news media, and other factors may be relevant in a given case." *Id.*

This approach is consistent with Merriam-Webster's definitions of the words "news" and "media" and in the absence of governing law, the Court agrees that the careful analysis and five-factor test provided by the *Integra* court is a reasonable place to start its inquiry, and that "[a] framework like that set forth in *Integra* provides sufficient flexibility to capture the wide variety of 'news media' sources available online, while still remaining tethered to the text of the NYFCA." State's Brief at 7.

### 1. Application to NIF's Exhibits

For clarity, the Court will analyze whether NIF's exhibits come from "news media" by source type. First, the Court will turn to the information published by the "watchdog organizations," NGO Monitor, Charity Navigator, and ProPublica. The "A Exhibits" include NIF's

financial reports, published on NIF's own website and republished on the website of NGO Monitor. *See* Murphy Decl. ¶¶ 3–14. As its "E Exhibits", NIF has also submitted NGO Monitor's summaries of NIF's Form 990s. *See id.* ¶¶ 30–41. In the websites submitted by NIF in the "C Exhibits" and "D Exhibits", Charity Navigator and ProPublica maintain profiles of NIF and make available to the public NIF's Form 990s. *See id.* ¶¶ 18–29.

In its response to the State's Brief, NIF argues that watchdog organizations "dedicated to gathering, analyzing, and broadly distributing news about nonprofits" should be considered "news media."[11] NIF's Resp. at 6. Neither the Amended Complaint nor the websites submitted by NIF provide enough information for the Court to assess the *Integra* factors, or NIF's new argument as to the purpose of these watchdog organizations. NIF's statements have raised questions of fact, which are generally inappropriate for a motion to dismiss. Based on the limited information before it, namely the Amended Complaint and the exhibits submitted by NIF in support of its motion, it appears to the Court that the goal of these watchdog organizations is to provide a targeted search engine for publicly available government filings, by republishing, linking, or summarizing those filings, which in the Court's eyes, may be a purpose entirely different from that of a "news media" source. In any event, the Court cannot make that determination with the evidence before it.

Next, the Court will turn to the information disseminated by NIF and its grantees. The "A Exhibits", discussed in part above, also include NIF's "Financials" page and were published by NIF

---

[11] This is a narrower approach than the one taken in NIF's opening brief: that the term "news media" includes public websites (such as watchdog NGO Monitor) that "inform the public on recent events and previously unknown facts [and] intend[ ] to give the public an accurate account." Mem. at 8. That argument advances an overly broad interpretation of the meaning of "news media" under the NYFCA. The New York legislature's 2010 amendment to the NYFCA provides that a source is not "news media" "merely because . . . [it was] posted on the internet or on a computer network." N.Y. State Fin. Law § 190(9)(b)(iii). NIF argues that these sites should be viewed as "news media" because they "inform the public." NIF proposes a subjective test in which whether a site constitutes "news media" depends on the intent of its poster—if a poster "intended" to inform the public, the information would then constitute "news media." Such a broad construction would render the statutory carveout a nullity—any post on the internet would constitute "news media" if the poster thought that she was informing the public—and isn't that arguably nearly all information posted on the web that is purported to be factual?

on its website.  The "F Exhibits" are press releases and social media posts by NIF and its grantees.[12]

At this juncture, the Court also cannot conclude that the sources of these exhibits are "news media."

NIF appears to concede that these websites would not be considered "traditional press."  *See* Mem.

at 9.  NIF's initial argument—"if an organization like NIF or one of its grantees is publishing news

on its website or public social media account, then it *is* a 'news organization' in the eyes of the public

disclosure bar"—is overly broad.  Mem. at 9 (emphasis in original) (citation omitted).  While this

explanation may be in line with the dictionary definition of "news," it renders the word "media"

inoperative in the phrase "news media."  Furthermore, there is zero separation between those

sources and their subjects:  the exhibits are all reports, articles, and social media posts by NIF itself

and its grantees, publicizing their own views, initiatives, and activities.  *See* Murphy Decl. ¶¶ 41–53.

However, NIF's new argument that these websites qualify as "news media" based on "their

content, audience, and function" fares no better.  NIF's Resp. at 6.  NIF claims the websites and

social media accounts

> (1) frequently report on events considered "newsworthy" by the traditional press; (2)
> curate information to fit the interests of their audience; (3) disseminate that
> information to thousands of interested followers and donors; (4) highlight these events
> as part of their primary, civic-focused missions; and (5) could be referred to as part of
> the "news media" in everyday speech for all of the reasons just stated.

*Id.*  But as with the watchdog organizations, this argument is not supported by the facts in the

Amended Complaint, nor by the information available on the face of NIF's exhibits.  NIF relies on

its proffers alone to support its conclusion that the Court should consider these sources as falling

within the scope of "news media."  The Court is not willing to accept NIF's statements at face value

and determines that a full assessment under the *Integra* factors should be conducted when the

relevant evidence is before the Court.

---

[12] Two of NIF's "F" exhibits are not in English.  *See* Murphy Decl. ¶¶ 45, 50; Murphy Decl. Exs. F4 and F9, Dkt. Nos. 38-43, 38-48.  NIF has not provided the Court with certified translations of these websites.  Therefore, the Court declines to consider them at this time.

The information contained in the "G Exhibits", the only documents clearly from traditional news sources, can be considered publicly disclosed by "news media," and TZAC does not appear to dispute this point. The "G Exhibits" are articles published in the newspapers *Haaretz* and *The Jerusalem Post*, and the magazine, *+972*. However, the Court must assess whether "substantially the same allegations or transactions as alleged in the action" were disclosed by these sources. N.Y. State Fin. Law § 190(9)(b). With only the information contained in the "G Exhibits", the Court does not expect that the government could have been set "squarely upon the trail of an alleged fraud" by combining the publicly available information. *AECOM*, 454 F. Supp. 3d at 262.

Exhibit G1 is an article in the Israeli newspaper *Haaretz*, dated March 7, 2019. In the article, New Israel Fund CEO Daniel Sokatch is quoted as saying

> Israel's Supreme Court banned Kahanists from the Knesset in the 1980s and they are still designated as terrorist groups in the United States and other countries . . . There is no question that Kahanists do not belong in the Knesset . . . The fact that [Otzma Yehudit is] being courted, embraced, and empowered by right-wing parties and leaders is a travesty for Israeli democracy. It certainly illuminates the fact that these leaders, especially the Prime Minister [Benjamin Netanyahu] who orchestrated the Kahanists' comeback, do not share core values with most Israelis, and certainly not with the American Jewish community.

Murphy Decl. Ex. G1 ECF pp. 2–3, Dkt. No. 38-52 (alteration in original). Viewed in the light most favorable to TZAC, these statements could be viewed as electioneering. However, these statements were made in 2019, and NIF made its allegedly false certifications in 2008–2017. Mr. Sokatch's 2019 statements could not have been the basis for the allegedly fraudulent statements made in prior years.

Exhibit G2 is an article in *The Jerusalem Post*, published on February 18, 2015, that discussed NIF grantee Adalah's advocacy efforts in a legal proceeding regarding the Central Elections Committee's disqualification of Haneen Zoabi, a candidate for political office. Murphy Decl. Ex. G2 ECF p. 3, Dkt. No. 38-53. This exhibit did not publicly disclose the alleged fraud, as Adalah's connection to NIF is not mentioned anywhere in the article.

The Court has viewed the articles submitted as Exhibits G3 and G4 together, as Exhibit G3 references the CPS, the grantee that is the subject of Exhibit G4. Exhibit G3 is an article published by *Haaretz*, on September 18, 2014, about NIF's New Initiatives for Democracy Campaign. *See* Murphy Decl. Ex. G3, Dkt. No. 38-54. In the article, Mr. Sokatch describes the goals of the initiative, including "assembl[ing] 'a progressive infrastructure to put forward a new vision and push back' against anti-democratic efforts in Israel[.]" *Id.* at ECF p. 2. From Mr. Sokatch's description of campaign in this article, NIF's efforts appear to be permissible issue advocacy. *See id.* ("These are new constituency-building efforts in communities that we know share significant values and have common interests, but don't see themselves as part of that movement. An Israel that is open, that is egalitarian, that is pluralistic – we think there's a big base for that in Israel[.]").

The article also describes NIF's support of its grantees, who engage in pro-democracy work. *Id.* at ECF p. 3. "While NIF's focus on civil society and human rights has not changed, its funding strategy is, as it moves away from project support to making larger donations for organizational support. 'It is a different strategy, because we are looking for partners that can have a national impact and both empower existing progressives and build bridges to organizations that are not progressive, but share some of our values,' [said NIF's spokeswoman]." *Id.* One of the grantees mentioned by name in that article is the CPS. *Id.* ("NIF has allocated . . . $200,000 to the Council for Peace and Security."). Exhibit G4 is a March 9, 2015 article published by *+972* magazine, describing the "Peace and Security Association's" efforts to campaign against Benjamin Netanyahu. NIF claims that the Council for Peace and Security is also known as Peace and Security Association. Murphy Decl. ¶ 57. As TZAC points out, it is not clear from the articles that these organizations are one and the same. Opp'n at 7.

The information contained in these Exhibits G3 and G4 are not "substantially the same" as the allegations in the Amended Complaint. In the Amended Complaint, TZAC asserts that NIF

offered its grantees "general grants" and that NIF claimed to monitor the actions of its grantees to make sure they were not violating any rules, including NIF's requirement that grantees should not electioneer. Am. Compl. ¶¶ 31-32. Although Exhibit G3 states that NIF's funding strategy was moving away from "project support," viewed in the light most favorable to TZAC, these articles do not inform the reader that the CPS's efforts against Benjamin Netanyahu were funded with NIF money, as alleged by TZAC, and therefore attributable to NIF. And, this connection is key because, as explained below, an organization does not necessarily violate its 501(c)(3) obligations by disbursing funds to non-exempt organizations.

Nor are the "G Exhibits" enough to put the government on the trail of the specific fraud described by TZAC. The linchpin of TZAC's claim is the impact of NIF's Form 990 certifications on its state and local tax obligations under New York law. These articles do not mention that NIF is registered as a 501(c)(3) organization. They do not inform the reader that based on this designation, NIF is exempt from state and local taxes, nor describe what activities NIF is prohibited from participating in as a 501(c)(3) entity. Thus, the publicly disclosed information does not reveal that NIF "knowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or a local government." N.Y. State Fin. Law § 189(1)(g) (emphasis added).

Based on the facts alleged in the Amended Complaint and the exhibits properly considered by the Court, it is not apparent that the public disclosure bar prohibits TZAC from pursuing its claim. *Integra*, 2019 WL 3282619, at *15 ("The public disclosure bar is an affirmative defense, and an affirmative defense can only be adjudicated on a motion to dismiss when the allegations in the complaint or information that the court can take judicial notice of are sufficient to establish the defense."); *see also Kelly-Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013) (an affirmative defense may be "may be adjudicated" on a motion to dismiss "where the facts necessary to establish the defense

are evident on the face of the complaint." (citing *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004)).  As with its "government reports" argument, NIF may be able to better support this defense at summary judgment, but the Court declines to dismiss the Amended Complaint on this basis at this stage of the case. [13]

### C.    TZAC Has Pleaded a Plausible Tax Fraud Theory

TZAC has plausibly alleged a tax fraud theory that, accepted as true, gives rise to liability under the NYFCA because NIF's 501(c)(3) status is material to the benefit it received from the state. Specifically, TZAC asserts that NIF defrauded the government because in falsely certifying that it had not "engage[d] in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office" on its federal tax forms, it received and maintained its federal tax-exempt status under § 501(c)(3), which in turn resulted in NIF receiving an exemption from state and local taxes.  Am. Compl. ¶¶ 4, 9.

"'Courts confronting the issue of materiality must ask whether the conduct at issue has 'a natural tendency to influence, or [is] capable of influencing, the payment or receipt of money or property.'"  *New York v. Medimmune, Inc.*, 342 F. Supp. 544, 556 (S.D.N.Y. 2018) (quoting *Universal Health Servs. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2002 (2016) (citing in turn, 31 U.S.C. § 3729(b)(4)); *see* N.Y. State Fin. Law § 188(5) ("'[M]aterial' means having a natural tendency to influence, or be[ing] capable of influencing[,] the payment or receipt of money or property.");  *see also id.* § 189(1)(g) (imposing liability on a person who "knowingly makes . . . a false record or statement material to an obligation to pay or transmit money or property to the state or a local government").  Thus, TZAC must show that NIF's allegedly false statements on its federal tax forms have a "natural tendency to influence" its New York tax obligations.

---

[13] Because the Court has determined that TZAC's allegations were not publicly disclosed within the meaning of the NYFCA, the Court need not reach whether TZAC falls within the original source exception to the public disclosure bar.

"To substantiate tax exempt status, one must typically point to a specific provision of law conferring exempt status."  Advisory Op. Petition No. C10031A, No. TSB-A-10(7)C, 2010 WL 2721216, at *2 (N.Y. Comm'r of Tax'n & Fin., June 23, 2010).  The relevant New York tax regulation provides an exemption for:

> (6) corporations organized other than for profit which do not have stock or shares or certificates for stock or for shares and which are operated on a nonprofit basis no part of the net earnings of which inures to the benefit of any officer, director, or member, including Not-for-Profit Corporations and Religious Corporations.

tit. 20, § 1-3.4(b)(6).  Under Section 1-3.4(b)(6)(i), "a corporation organized other than for profit, as described in this paragraph, which is exempt from Federal income taxation pursuant to subsection (a) of section 501 of the Internal Revenue Code, will be presumed to be exempt from tax under article 9-A."  *Id.*

NIF argues that it satisfies the requirements to qualify for a tax exemption under Section 1-3.4(b) notwithstanding its allegedly undeserved 501(c)(3) designation, because it is a nonprofit organization as defined under Section 1-3.4 (b)(6).  Mem. at 11.  Therefore, it claims, that any certification on its federal tax forms, fraudulent or not, would not have affected its state tax-exempt status.  As the basis for this argument, NIF relies on a June 23, 2010 advisory opinion by the New York Commissioner of Taxation and Finance, which clarified that, while an entity's 501(c)(3) status can lead to a presumption of tax-exempt status under state law, it is not a prerequisite.  *See* Mem. at 13 (citing Advisory Op., 2010 WL 2721216, at *2).   In that opinion, the Commissioner of Taxation and Finance determined that the petitioner, who did not fall under any of the federal tax exemption provisions of § 501 and had never filed a Form 990, nonetheless "qualif[ied] as exempt from the [state] corporate franchise tax."  *Id.* The Commissioner explained that "Regulation 20 NYCRR § 1-3.4 (b)(6), provides that failure to have a Federal exemption creates only a presumption of taxability."  *Id.*  "However, this presumption may be rebutted."  *Id.*

If the IRS revoked NIF's 501(c)(3) status, the plain language of Section 1-3.4 provides that New York would "ordinarily" follow suit. *See* tit. 20, § 1-3.4(b)(6)(ii) ("The determination of the Internal Revenue Service, denying or revoking exemption from Federal taxation under the Internal Revenue Code, will ordinarily be followed."). Therefore, even if NIF was otherwise eligible for a state tax exemption, the revocation of its 501(c)(3) status would still have an impact on its state tax status because NIF would then have to rebut the presumption that the State should follow the IRS's decision. The materiality standard does not require TZAC to plead that NIF's certification was the dispositive factor in obtaining its state tax exemption, only that the certifications had the "natural tendency" to, or were "capable of influencing," NIF's state tax obligations. The statutory text clearly states that it does. If NIF had provided a different response on its Form 990s, that answer would have had an effect on its ability to obtain and maintain its state tax-exempt status. TZAC has asserted that NIF would not have obtained its current state tax-exempt status but for its status as a 501(c)(3) entity at the time the State made its determination. Am. Compl. ¶ 22. Whether the State would have granted NIF an exemption based on some other criteria if the federal tax presumption was not applicable, is a hypothetical question that the Court will not engage with at this time. At best, this is an issue of fact, not a question to be resolved on a motion to dismiss. Based on the text of the New York statute, NIF's certifications on its Form 990s are indeed material to its New York tax-exempt status under Section 1-3.4(b)(6). Thus, the Amended Complaint survives this challenge.

### D. TZAC Has Adequately Pleaded That NIF Knowingly Submitted False Certifications Stating That It Did Not Engage in Prohibited Political Activities[14]

TZAC has adequately pleaded that NIF "knowingly ma[d]e, us[ed], or caus[ed] to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or a local government," in violation of the NYFCA. *See* N.Y. State Fin. Law § 189(1)(g). On NIF's Form 990s, which are alleged to have been submitted to the State to obtain its state and local tax exemptions, NIF certified that "it had not 'engage[d] in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office'" in prior years. Am. Compl. ¶¶ 9–20 (alteration in original). This certification tracks the language in § 501(c)(3), which states that exempt organizations are specifically forbidden from "participat[ing] in, or interven[ing] in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office." 26 U.S.C. § 501(c)(3). As the basis for dismissal, NIF argues that TZAC has failed to allege "NIF knew it had engaged in partisan political activity in violation of § 501(c)(3)." Mem. at 14. NIF additionally asserts that TZAC has failed to plead an underlying violation of § 501(c)(3)'s restrictions because the Amended Complaint lacks "any particularized factual basis for attributing the conduct of NIF's grantees to NIF itself." *Id.* The Court will address each of these arguments below.

To survive dismissal, TZAC is required to plead that NIF knowingly made, used, or caused to be made or used, false records or statements that were material to its state and local tax obligations. *See* N.Y. State Fin. Law § 189(1)(g). The NYFCA defines "knowing and knowingly" to mean that the person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of

---

[14] Both parties frame the issue as whether TZAC has adequately pleaded a violation of Section 501(c)(3). Because the parties appear to be in agreement and have submitted briefing under this assumption, the Court accepts their framing. The Court merely notes that a more accurate description of the issue is whether NIF has knowingly submitted false statements to the State.

the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." *Id.* § 188(3)(a).  The terms "knowing and "knowingly" "require no proof of specific intent to defraud, provided, however that acts occurring by mistake or as a result of mere negligence are not covered by this article." *Id.*

First, TZAC alleges that

[d]uring the 2019 Israeli election season NIF helped to gather names for a petition to disqualify Otzma Yehudit candidate from running for Knesset. NIF sent out the petition and asked for people to sign.  After the candidate—Michael Ben-Ari[—]was banned by the Supreme Court NIF called it a victory for democracy. This is clearly electioneering by opposing candidates for public office.

Am. Compl. ¶ 24.[15]

The problem with TZAC's reliance on NIF's 2019 alleged electioneering activities to support its claim is a timing issue, one that is apparent on the face of the Amended Complaint.  The only fraudulent statements TZAC has identified are NIF's certifications on its tax returns for the years 2008–2017.  *See id.* ¶¶ 9–20.  NIF's 2019 activities cannot serve as the basis for TZAC's assertion that NIF falsely certified that "it had not 'engage[d] in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office'" on its tax forms in prior years.  *Id.* ¶ 9 (alteration in original); *see id.* ¶¶ 10–20.  In alleging that NIF made false certifications on its forms, TZAC is required to satisfy Rule 9(b)'s requirement that claims alleging fraud "must state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  However, TZAC has failed to explain why these 2019 actions render NIF's 2008–2017 certifications fraudulent.  *See Chorches*, 865 F.3d at 81.  It is unclear how NIF could have known its certifications on its tax returns were false based on future conduct.

---

[15] The fact that the candidate was later disqualified by the Supreme Court because "his anti-Arab ideology and incitement" violated Israel's Basic Law on the Knesset is irrelevant to this analysis.  Based on the information before the Court, NIF's advocacy efforts are alleged to be more than permissible issue advocacy or an opposition of violations of Israel's Basic Law.  *See* Mem. at 20.  Instead, as alleged, the petition distributed by NIF targeted a specific candidate and sought to have him disqualified from the race, which is inconsistent with the statement made on NIF's tax forms.

Next, TZAC has alleged that NIF knew its grantees engaged in impermissible electioneering activities.  Liability on this basis heavily relies on the premise that those activities can be attributed to NIF, rendering NIF's certifications that it did not "engage[ ] in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office" false.  Am. Compl. ¶¶ 9–20. "Determining whether an organization engaged in prohibited political activity by 'participating or intervening, directly or indirectly, in any political campaign on behalf of or in opposition to any candidate for public office depends upon all of the facts and circumstances of each case.'"  *People v. Trump*, 88 N.Y.S.3d 830, 845–46 (Sup. Ct. 2018) (quoting Rev. Rul. 2007-41, 2007-1 C.B. 1421 (2007)).  "[A]n organization will not jeopardize its exemption under section 501(c)(3) of the Code, even though it distributes funds to nonexempt organizations, provided it retains control and discretion over use of the funds for section 501(c)(3) purposes."  I.R.S. Priv. Ltr. Rul. 201323035 (June 7, 2013) (citing Rev. Rul. 68-489, 1968-2 C.B. 210 (1968)).  Exempt organizations are required to maintain adequate documentation or adequate controls over finances to demonstrate that no funds are used for non-exempt purposes.  *See id.*; *see also Church in Bos. v. Comm'r*, 71 T.C. 102, 108 (1978); Rev. Rul. 56-304, 1956-2 C.B. 306 (1956) (providing that records and case histories should be maintained to show the name and address of each recipient of aid, the amount distributed to each, the purpose for which the aid was given, the manner in which the recipient was selected, and the relationship, if any, between the recipient and organization insiders).

Here, while TZAC has not alleged that NIF's funds were specifically used by its grantees to engage in the electioneering activities, it has alleged that NIF gives "general grants" to its grantees. *See* Am. Compl. ¶¶ 31–32.  Accepting this statement as true and viewing it in the light most favorable to the non-moving party, the Court views this allegation as meaning that NIF's grantees were given funds that were not earmarked for a specific non-electioneering purpose, and that the grantees, not NIF, were given discretion as to how to spend the funds.  At the pleading stage, this is

sufficient to establish that NIF was reckless in preventing its funds from being spent on the political

activities described on its Form 990s, which were submitted to the State.  Furthermore, TZAC has

asserted that NIF imposed its own rule that "grantees shouldn't electioneer."  *Id.* ¶ 31.  Therefore,

"because these grantees proudly post on their websites what they have been doing and NIF says that

it monitors actions of its grantees to make sure they aren't violating any rules," NIF is adequately

pleaded to have known that its funds were being impermissibly spent on political activities, in

violation of its own requirement.  *Id.* ¶¶ 31–32.  At the very least, TZAC has adequately alleged that

NIF was reckless in its supervision of its grantees and permitted them to ignore NIF's own

conditions for funding.  *Id.*

TZAC also points to NIF's statements describing the NIFD campaign and partnership with

the CPS as further proof that NIF knew it was electioneering.  Section 501(c)(3)'s ban on political

campaign intervention includes statements made on the organization's website.  *Frequently Asked*

*Questions About the Ban on Political Campaign Intervention by 501(c)(3) Organizations: Website Postings and*

*Links*, IRS (Dec. 8, 2020), https://www.irs.gov/charities-non-profits/charitable-

organizations/frequently-asked-questions-about-the-ban-on-political-campaign-intervention-by-

501c3-organizations-website-postings-and-links (last visited January 25, 2021).  TZAC alleges that

on its website, NIF described the purpose of the campaign as "equip[ping] Israel's pro-democracy

and progressive forces with the tools to fight Israel's regressive right-and win" and that

> [t]hrough our partnership with the Council for Peace and Security (CPS) . . ., we intend
> to redefine the security discourse.  By amplifying CPS' resources and outreach, we can
> expand the current narrative, which exploits security issues for the purposes of
> defending the occupation.  With our assistance increasing organizational resources,
> CPS will focus on articulating new and compelling ideas on the immediate and long-
> term security challenges facing the country and on redefining the security paradigm in
> ways consistent with progressive values . . . .

*Id.* ¶ 33.  TZAC further alleges that the CPS received grants from NIF and launched a campaign to

vote Benjamin Netanyahu out of office.  *Id.* ¶¶ 33–34.  Based on these facts and read in the light

most favorable to TZAC, NIF's highlighting of its relationship with the CPS and their shared goal of fighting against "Israel's regressive right" supports TZAC's allegations that NIF engaged in impermissible political campaigning against a particular candidate, rendering the certifications it submitted to the State false; NIF's actions need not be construed as permissible non-partisan issue advocacy, because when read in the light most favorable to the non-moving party, it can be viewed as an endorsement of the CPS's campaign against a particular candidate and party.[16]  Therefore, TZAC has adequately pleaded a claim under the NYFCA.

## IV.   CONCLUSION

For the reasons stated above, NIF's motion to dismiss is DENIED.

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 37.

SO ORDERED.

Dated:  February 15, 2021

_____
GREGORY H. WOODS
United States District Judge

---

[16] To be clear, the Court is only reaching the limited conclusion that, when reading the facts alleged in the Amended Complaint in the light most favorable to the plaintiff, TZAC has adequately alleged that NIF engaged in political activities which contradicted its certifications on its tax forms submitted to the State, and that those certifications materially impacted its state and local tax obligations because the State relied on them.  The Court is not drawing any conclusions regarding the qualification or continuing qualification of NIF as a 501(c)(3) organization.  *See* 26 U.S.C. § 7428(e) (describing the appropriate fora for challenging classifications by the IRS); *see also* 26 U.S.C. § 7623(b) (describing the IRS's whistleblower program); 26 C.F.R. § 301.7623-1(c).