UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK *ex rel.* TZAC, INC.<br><br>　　　　　　Plaintiff-Relator,<br><br>　v.<br><br>NEW ISRAEL FUND,<br><br>　　　　　　Defendant. | **No. 1:20-cv-2955-GHW**<br><br>**ANSWER** |

Defendant New Israel Fund answers Plaintiff-Relator TZAC, Inc.'s Amended Complaint as follows:

**I.   Nature of the Case**

1.   This is a false claims act claim. The Qui Tam Plaintiff and Relator, The Zionist Advocacy Center ("TZAC" or "Plaintiff" or "Relator") alleges that the Defendant fraudulently obtained and maintains its status of being substantially exempt from taxes by repeatedly and fraudulently certifying that it refrains from electioneering activities. As set forth in more detail below, NIF regularly and syst[e]matically supports unlawful electioneering in violation of the strict requirements for tax exempt organizations.

**ANSWER:** NIF need not respond to TZAC's summary of this action in the first sentence of Paragraph 1. NIF denies the remaining allegations in Paragraph 1.

**II.   Parties**

2.   Defendant New Israel Fund ("NIF") is a District of Columbia non-profit corporation with its princip[al] place of business in the State of New York, County of New York. Although the stated purpose of NIF is to help strengthen Israel's democracy, NIF consistently opposes Israeli security by supporting organizations which seek to undermine Israel.

**ANSWER:** NIF admits that it is a non-profit corporation and that its largest U.S. office is in New York City. NIF denies the remaining allegations in Paragraph 2.

3.   As part of its agenda NIF meddles in Israeli elections by financially supporting organizations which constantly and systematically oppose some candidates running for office while supporting others. On its website NIF even discusses "our concerted campaign to equip

Israel's pro-democracy and progressive forces with the tools to fight Israel's regressive right-and win." This shows that NIF know clearly that it is involving itself in campaigning for officials and cannot claim that it didn't know about these activities.

**ANSWER:** NIF admits that the quoted statement appears on its website. NIF respectfully refers the Court to that document for its complete and accurate contents. NIF denies the remaining allegations in Paragraph 3.

4. NIF is registered under Section 501(c)(3) of the Internal Revenue Code and therefore the income it receives from its donations and investments is tax exempt under Federal, State, and local law. Its headquarters are located at 6 East 39th Street New York, NY 10016. Its annual revenue is approximately $25 to $30 million, all of which would be subject to state and local taxation if NIF were not tax exempt.

**ANSWER:** NIF admits that it has been recognized by the Internal Revenue Service (IRS) as an organization exempt from taxation under 26 U.S.C. § 501(c)(3). NIF admits that its largest U.S. office is located at 6 East 39th Street New York, NY 10016. NIF admits that its annual revenue is approximately $25 to $30 million. NIF need not respond to the legal conclusions alleged in Paragraph 4. To the extent a further response to the allegations in Paragraph 4 is required, NIF denies those allegations.

5. Plaintiff-Relator the Zionist Advocacy Center ("Plaintiff") is a New York corporation which advocates on behalf of the Jewish State. Plaintiff's principal place of business is in the State of New York, County of New York.

**ANSWER:** NIF lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 5 and, therefore, denies them.

**III. Compliance with Requirements of Suit**

6. This matter will be filed under seal as required by law; shortly thereafter, a copy of the Complaint, Sealing Order, and Relator's disclosure of evidence will be served on the office of the New York Attorney General.

**ANSWER:** NIF lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 6 and, therefore, denies them.

7.      Relator will not serve the Complaint or Amended Complaint or any other papers in this matter until and unless it becomes unsealed. Thus, if the Complaint or Amended Complaint is served on the Defendant, it means that the matter has been duly unsealed.

**ANSWER:**  NIF lacks knowledge or information sufficient to form a belief about the allegations in Paragraph 7 and, therefore, denies them.

### IV.     A Brief Statement of the Fraudulent Scheme

8.      As set forth in more detail below, the Defendant falsely certified to the Internal Revenue Service that it did not make any payments or incur any amounts to influence the results of any election. These certifications were false in that Defendant has systematically and regularly supported organizations engaged in such electioneering. As a result of the false statements, Defendant enjoyed and continues to enjoy minimal taxation status on the millions of dollars of annual revenue from its donations and investments.

**ANSWER:**  NIF need not respond to the legal conclusions alleged in Paragraph 8.  To the extent a response to the allegations in Paragraph 8 is required, NIF denies those allegations.

### V.      The Specific Fraudulent Statements of the Defendant

9.      In its 2017 IRS Form 990 (Part IV Line 3), the Defendant certified that it had not "engage[d] in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office." This tracks the language of Internal Revenue Code Section 501(c)(3) which forbids such organizations from engaging in activities to "participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office."

**ANSWER:**  NIF admits that the quoted language in the first sentence of Paragraph 9 appears on its 2017 IRS Form 990 and that NIF answered "no" to the question of whether it had "engage[d] in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office."  NIF further refers the Court to its 2017 IRS Form 990 for its complete and accurate contents.  NIF admits that 26 U.S.C. § 501(c)(3) refers to organizations "no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation (except as otherwise provided in subsection (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political

campaign on behalf of (or in opposition to) any candidate for public office." NIF further refers the Court to 26 U.S.C. § 501 for its complete and accurate contents. To the extent a further response to the allegations in Paragraph 9 is required, NIF denies those allegations.

10. The 2017 Form 990 was executed by Jennifer Spitzer Gorovitz (VP Finance) on or about November 8, 2018 and submitted to Federal and State authorities at or about the same time.

**ANSWER:** NIF admits that Jennifer Spitzer Gorovitz signed NIF's 2017 Form 990 on or about November 8, 2018. NIF admits that it submitted its 2017 Form 990 to federal and New York authorities at or about the same time.

11. Similarly, in its 2016 IRS Form 990 the Defendant made substantially similar certifications; the form was executed by Jennifer Spitzer Gorovitz on or about November 14, 2017 and submitted to Federal and State authorities at or about the same time.

**ANSWER:** NIF admits that it answered "no" to the question of whether it had "engage[d] in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office" on its 2016 IRS Form 990. NIF admits that Jennifer Spitzer Gorovitz signed NIF's 2016 Form 990 on or about November 14, 2017. NIF admits that it submitted its 2016 Form 990 to federal and New York authorities at or about the same time.

12. Similarly, in its 2015 IRS Form 990 the Defendant made substantially similar certifications; the form was executed by Anthony Fullington (CFO) on or about October 03, 2016 and submitted to Federal and State authorities at or about the same time.

**ANSWER:** NIF admits that it answered "no" to the question of whether it had "engage[d] in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office" on its 2015 IRS Form 990. NIF admits that Anthony Fullington signed NIF's 2015 Form 990 on or about October 3, 2016. NIF admits that it submitted its 2015 Form 990 to federal and New York authorities at or about the same time.

13. Similarly, in its 2014 IRS Form 990 the Defendant made substantially similar certifications; the form was executed by Anthony Fullington on or about October 06, 2015 and submitted to Federal and State authorities at or about the same time.

**ANSWER:** NIF admits that it answered "no" to the question of whether it had "engage[d] in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office" on its 2014 IRS Form 990. NIF admits that Anthony Fullington signed NIF's 2014 Form 990 on or about October 6, 2015. NIF admits that it submitted its 2014 Form 990 to federal and New York authorities at or about the same time.

14. Similarly, in its 2013 IRS Form 990 the Defendant made substantially similar certifications; the form was executed by Anthony Fullington on or about October 07, 2014 and submitted to Federal and State authorities at or about the same time.

**ANSWER:** NIF admits that it answered "no" to the question of whether it had "engage[d] in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office" on its 2013 IRS Form 990. NIF admits that Anthony Fullington signed NIF's 2013 Form 990 on or about October 7, 2014. NIF admits that it submitted its 2013 Form 990 to federal and New York authorities at or about the same time.

15. Similarly, in its 2012 IRS Form 990 the Defendant made substantially similar certifications; the form was executed by Anthony Fullington on or about October 03, 2013 and submitted to Federal and State authorities at or about the same time.

**ANSWER:** NIF admits that it answered "no" to the question of whether it had "engage[d] in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office" on its 2012 IRS Form 990. NIF admits that Anthony Fullington signed NIF's 2012 Form 990 on or about October 3, 2013. NIF admits that it submitted its 2012 Form 990 to federal and New York authorities at or about the same time.

16. Similarly, in its 2011 IRS Form 990 the Defendant made substantially similar certifications; the form was executed by Anthony Fullington on or about October 18, 2012 and submitted to Federal and State authorities at or about the same time.

**ANSWER:** NIF admits that it answered "no" to the question of whether it had "engage[d] in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office" on its 2011 IRS Form 990. NIF admits that Anthony Fullington signed NIF's 2011 Form 990 on or about October 18, 2012. NIF admits that it submitted its 2011 Form 990 to federal and New York authorities at or about the same time.

17. Similarly, in its 2010 IRS Form 990 the Defendant made substantially similar certifications; the form was executed by Daniel Sokatch around November 28, 2011 and submitted to Federal and State authorities at or about the same time.

**ANSWER:** NIF admits that it answered "no" to the question of whether it had "engage[d] in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office" on its 2010 IRS Form 990. NIF admits that Daniel Sokatch signed NIF's 2010 Form 990 on or about November 28, 2011. NIF admits that it submitted its 2010 Form 990 to federal and New York authorities at or about the same time.

18. Similarly, in its 2009 IRS Form 990 the Defendant made substantially similar certifications; the form was executed by Anthony Fullington on or about November 12, 2010 and submitted to Federal and State authorities at or about the same time.

**ANSWER:** NIF admits that it answered "no" to the question of whether it had "engage[d] in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office" on its 2009 IRS Form 990. NIF admits that Anthony Fullington signed NIF's 2009 Form 990 on or about November 12, 2010. NIF admits that it submitted its 2009 Form 990 to federal and New York authorities at or about the same time.

19. Similarly, in its 2008 IRS Form 990 the Defendant made substantially similar certifications; the form was executed by Nimalka Wijesooriya, on or about November 16, 2009 and submitted to Federal and State authorities at or about the same time.

**ANSWER:** NIF admits that it answered "no" to the question of whether it had "engage[d] in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office" on its 2008 IRS Form 990. NIF admits that Nimalka Wijesooriya signed NIF's 2008 Form 990 on or about November 16, 2009. NIF admits that it submitted its 2008 Form 990 to federal and New York authorities at or about the same time.

20. The form 990 was prepared by outside accountants; however, the finance and executive committee of the NIF reviewed it to ensure accuracy before it was filed with the IRS.

**ANSWER:** NIF admits that the Form 990s referenced in the Amended Complaint were prepared by outside accountants and circulated for review by committees or members of NIF's board before being filed with the IRS. To the extent a further response to the allegations in Paragraph 20 is required, NIF denies those allegations.

21. As set forth in more detail below the Defendant engaged in electioneering activities contrary to its certifications. If the Defendant had disclosed its activities to the IRS then it would not have been eligible for 501(c)(3) tax exemption.

**ANSWER:** NIF need not respond to the legal conclusions alleged in Paragraph 21. To the extent a response to the allegations in Paragraph 21 is required, NIF denies those allegations.

22. As a result of NIF's federal tax exemption, it receives exemption from taxation in the State and City of New York based on rule 20 N.Y.C.R.R. 1-3.4(b)(6)(i), (ii).

**ANSWER:** NIF need not respond to the legal conclusions alleged in Paragraph 22. To the extent a response to the allegations in Paragraph 22 is required, NIF denies those allegations.

**VI.     The Specific Activities of the Defendant**

23.     For at least the past 10 years and continuing through the present NIF has consistently electioneered in Israel by giving grants to organizations which oppose and support candidates for public office in Israel.

**ANSWER:**  NIF need not respond to the legal conclusions alleged in Paragraph 23.  To the extent a response to the allegations in Paragraph 23 is required, NIF denies those allegations.

24.     In 2019 NIF got involved in electioneering directly. During the 2019 Israeli election season NIF helped to gather names for a petition to disqualify Otzma Yehudit candidate from running for Knesset. NIF sent out the petition and asked for people to sign. After the candidate— Michael Ben-Ari – was banned by the Supreme Court NIF called it a victory for democracy. This is clearly electioneering by opposing candidates for public office.

**ANSWER:**  The Court's order denying NIF's motion to dismiss held that the allegations in Paragraph 24 cannot support TZAC's claims.  *See* Memorandum Opinion & Order at 35, Doc. 48.  To the extent a response is required, NIF admits that its website and Twitter account published information regarding a petition to disqualify Otzma Yehudit candidates from running for Knesset.  NIF admits that the NIF website characterized the disqualification of Michael Ben Ari as "a victory for democracy."  NIF need not respond to the legal conclusions alleged in Paragraph 24.  To the extent a further response to the allegations in Paragraph 24 is required, NIF denies those allegations.

25.     Israel Religious Action Center ("IRAC") received grants from NIF in 2014, 2015, 2016, 2017, 2018 and as also set forth in more detail below, electioneered in the 2015 and 2019 election in Israel. In 2019 IRAC published a video about the danger of the Otzma Yehudit Party. The video targeted Bentzi Gopstein, Itamar Ben Gvir, Michael Ben-Ari and Baruch Marzel.

**ANSWER:**  NIF admits that the Movement for Progressive Judaism, of which the Israel Religious Action Center ("IRAC") is a department, received grants from NIF in 2014, 2015, 2016, and 2017.  NIF need not respond to the legal conclusions in Paragraph 25.  The Court's order denying NIF's motion to dismiss precludes TZAC from relying on NIF's 2018 grants or IRAC's 2019 conduct to support TZAC's claims.  *See* Opinion & Order at 35*.*  To the extent a response is

8

required, NIF admits that the Movement for Progressive Judaism, of which IRAC is a department, received grants from NIF in 2018. NIF respectfully refers the Court to the video referenced in Paragraph 25 for its complete and accurate contents and denies any allegations that are inconsistent with the video's contents.

26. While opposing one candidate is enough to be violating NIF's Internal Revenue Status, the fact that IRAC was constantly opposing more than one candidate with NIF's knowledge makes NIF's conduct all the more egregious.

**ANSWER:** NIF need not respond to the legal conclusions alleged in Paragraph 26. To the extent a response to the allegations in Paragraph 26 is required, NIF denies those allegations.

27. This is not the first time that IRAC electioneered; IRAC electioneered in the previous election in Israel, in 2015. An IRAC attorney argued before the Israel Supreme Court against the appeal of Baruch Marzel who had been disqualified from running for Knesset by the Israel Central Election Committee. IRAC proudly posted that fact with a picture on their Facebook account.

**ANSWER:** NIF admits that attorney Ruti Karmi argued before the Israel Supreme Court against the appeal of Baruch Marzel. NIF admits that IRAC posted about that event on its Facebook page and respectfully refers the Court to the Facebook post for its complete and accurate contents. NIF need not respond to the legal conclusions alleged in Paragraph 27. To the extent a further response to the allegations in Paragraph 27 is required, NIF denies those allegations.

28. Another organization, Adalah, received general grants from NIF in 2012, 2013, 2014, 2015, 2016, 2017 and 2018. In 2015 Adalah admitted to calling on the Central Election Commission to reject disqualification motions against MK Haneen Zoabi.

**ANSWER:** NIF admits that Adalah received grants from NIF in 2012, 2013, 2014, 2015, 2016, and 2017. NIF admits that in 2015 Adalah filed responses to motions to disqualify MK Haneen Zoabi from running in Knesset elections. The Court's order denying NIF's motion to dismiss precludes TZAC from relying on NIF's 2018 grants to support TZAC's claims. *See* Opinion & Order at 35. To the extent a response is required, NIF admits that Adalah received

grants from NIF in 2018. To the extent that a further response to the allegations in Paragraph 28 is required, NIF denies those allegations.

29. NIF gave grants to Mossawa in 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017 and 2018. In 2018 Mossawa attacked a sign from Jewish Home Campaign as racist, clearly insinuating that it does not approve of Jewish Home and its candidates and that no one should vote for them. Mossawa also attacked the Likud Campaign and said that Likud wants the Israeli[s] to decide between a fascist society and a pluralistic society that respects human dignity and diversity. This is a clear attack on the Likud campaign and is clearly opposing Likud candidates running for public office.

**ANSWER:** The Court's order denying NIF's motion to dismiss precludes TZAC from relying on NIF's 2018 grants or Mossawa's 2018 conduct to support its claims. *See* Opinion & Order at 35. To the extent a response to Paragraph 29 is required, NIF admits that it gave grants to Mossawa in 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017 and 2018. NIF admits that, in 2018, The Mossawa Center posted tweets calling a sign from Jewish Home Campaign "racist" and stating that the Likud Party "wants us to choose between a #Fascist society that stokes fears of difference & a pluralistic society that respects #HumanDignity and #Diversity." NIF respectfully refers the Court to those tweets for their complete and accurate contents. To the extent that a further response to the allegations in Paragraph 29 is required, NIF denies those allegations.

30. Adam Teva received grants from NIF in 2014, 2016 and 2017. In 2018 Adam Teva posted a list of candidates who undertook a pledge to follow a certain protocol to preserve trees. This protocol was on the pledge which Adam Teva posted on their website. Adam Teva said that the list of candidates will be kept on their website until the next election date. This is clear electioneering because the list was put up specifically for the election.

**ANSWER:** The Court's order denying NIF's motion to dismiss precludes TZAC from relying on Adam Teva's 2018 conduct to support TZAC's claims. *See* Opinion & Order at 35. NIF therefore need not respond to the allegations in Paragraph 30. To the extent a response to Paragraph 30 is required, NIF admits that Adam Teva received grants from NIF in 2014, 2016 and

2017. NIF admits that, in 2018, the Adam Teva Facebook account posted a list of candidates who undertook a pledge to follow a certain protocol to preserve trees. NIF respectfully refers the Court to that posting for its complete and accurate contents. To the extent that a further response to the allegations in Paragraph 30 is required, NIF denies those allegations.

31. NIF gave and continues to give general grants on a constant basis to organizations that are involved in electioneering which it knows about. NIF pays lip service to its own requirement listed on its web site that grantees shouldn't electioneer. Instead, NIF has knowingly or recklessly allowed grantees to electioneer.

**ANSWER:** NIF need not respond to the legal conclusions alleged in Paragraph 31. To the extent that a response to the allegations in Paragraph 31 is required, NIF denies those allegations.

32. NIF knows that these grantees are electioneering because these grantees proudly post on their websites what they have been doing and NIF says that it monitors actions of its grantees to make sure they aren't violating any rules. As noted above, on its website NIF even writes that "New Initiatives for Democracy (NIFD) is our concerted campaign to equip Israel's pro-democracy and progressive forces with the tools to fight Israel's regressive right-and win." This shows that NIF know clearly that it is involving itself in campaigning for officials and cannot claim that it didn't know about these activities. NIF also alleges that grantees make a point of sharing newspapers and free media coverage with NIF. This shows that NIF know the activities of its grantees and does not stop giving grants to these organizations that are electioneering with its knowledge, on the contrary NIF promotes the electioneering activities.

**ANSWER:** NIF admits that the quoted language in Paragraph 32 appears on NIF's website. NIF respectfully refers the Court to that statement for its complete and accurate contents. NIF need not respond to the legal conclusions alleged in Paragraph 32. To the extent that a further response to the allegations in Paragraph 32 is required, NIF denies those allegations.

33. Furthermore, NIF has a webpage dedicated to explaining its strategies for its NIFD. One section explains that NIF can move from military to political solutions by "reclaiming national security to include progressive ideals." NIF goes on to explain:

> Through our partnership with the Council for Peace and Security (CPS)…, we intend to redefine the security discourse. By amplifying CPS' resources and outreach, we can expand the current narrative, which exploits security issues for the purposes of defending the occupation. With our assistance increasing

organizational resources, CPS will focus on articulating new and compelling ideas on the immediate and long-term security challenges facing the country and on redefining the security paradigm in ways consistent with progressive values…

**ANSWER:** NIF admits that the language in Paragraph 33 appears on NIF's website. NIF respectfully refers the Court to that statement for its complete and accurate contents. To the extent that a further response to the allegations in Paragraph 33 is required, NIF denies those allegations.

34. CPS received grants from NIF beginning at least as early as 2014. One of CPS' "new and compelling idea on the… security challenges" was to tell Israelis before the 2015 elections to vote Benjamin Netanyahu out of office. CPS made a large campaign which explained, in the Hebrew language, that with Benjamin Netanyahu in office, the situation with the Palestinians will not change; however, the voters have a chance to make a change by voting in the election. They campaigned in the street in Israel, as well as on their YouTube and Facebook pages. This is very clearly electioneering by convincing voters to vote against Benjamin Netanyahu in order to make change.

**ANSWER:** NIF admits that it provided grants to the Council for Peace and Security (CPS) in 2014. NIF lacks the information necessary to form a belief about the allegations concerning the alleged public statements described in Paragraph 34. NIF need not respond to the legal conclusions alleged in Paragraph 34. To the extent that a further response to the allegations in Paragraph 34 is required, NIF denies those allegations.

### VII.   (Count I) Violation of the False Claims Act

35. The False Claims Act imposes liability on a person or entity who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or a local government" New York State Finance Law Section 189(g).

**ANSWER:** NIF admits that the quoted language in Paragraph 35 appears in the New York False Claims Act and respectfully refers the Court to the New York False Claims Act for its complete and accurate contents. To the extent that a further response to the allegations in Paragraph 35 is required, NIF denies those allegations.

36. NIF states that they monitor their grantees['] activities carefully to ensure that the organizations are not doing anything problematic. Even though NIF knows that these organizations

are electioneering, NIF has taken no actions to stop them, stop funding them and even goes so far as to promote these activities.

**ANSWER:** NIF lacks the information necessary to form a belief about the allegations concerning the alleged statements described in Paragraph 36 and, therefore, denies them. NIF denies the remaining allegations in Paragraph 36.

37. Thus, the Defendant violated the False Claims Act by preparing fraudulent tax returns as signed by different representatives as set forth above and electioneering in campaigns in Israel.

**ANSWER:** NIF need not respond to the legal conclusions alleged in Paragraph 37. To the extent a response is required, NIF denies the allegations in Paragraph 37.

**VIII.   Relief Sought**

38. On behalf of the government, Relator is seeking judgment for the triple damages and civil penalties set forth in New York State Finance Law Section 189(h).

**ANSWER:** NIF need not respond to TZAC's summary of this action. To the extent that a response to the allegations in Paragraph 38 is required, NIF denies those allegations.

39. The fraudulent conduct described above resulted in avoided taxes on at least approximately 250 million dollars in income.

**ANSWER:** NIF need not respond to the legal conclusions alleged in Paragraph 39. To the extent that a response to the allegations in Paragraph 39 is required, NIF denies those allegations.

40. Assuming a combined state and local tax rate of approximately 15%, this resulted in approximately $37,500,000 in avoided taxes. Multiplying this by 3 gives a total of approximately $110 million dollars.

**ANSWER:** NIF need not respond to the legal conclusions alleged in Paragraph 40. To the extent that a response to the allegations in Paragraph 40 is required, NIF denies those allegations.

41. Accordingly, Relator seeks judgment in the amount of $110 million dollars against Defendant and in favor of the State of New York, together with costs, interest, civil penalties, an appropriate qui tam award, and such other and further relief as the Court deems just.

**ANSWER:** NIF denies that TZAC or the State of New York is entitled to any relief whatsoever. NIF likewise specifically denies all allegations of the Amended Complaint not expressly admitted.

**DEFENSES**

Without assuming the burden of proof where it otherwise rests with TZAC, NIF pleads the following defenses to TZAC's claims and alleges as follows in support of those defenses:

**First Defense**
**(Public Disclosure Bar)**

42. TZAC's allegations are based on information disclosed to the public through multiple generally accessible websites, including public-record databases made available by federal and New York authorities, news stories published by professional news outlets, and reports and commentary on current events published by NIF, NIF's grantees, and multiple charity watchdog organizations.

43. The web-based publications referenced in Paragraph 42 of this Answer regularly convey "newsworthy" information. Specifically, they convey information about organizations active in public affairs that solicit and expend funds to advance civic causes. They likewise convey information about the public affairs that those organizations seek to influence.

44. The web-based publications referenced in Paragraph 42 exercise editorial judgment in determining what to publish. They frequently publish information that is not primarily or exclusively self-referential.

14

45. The web-based publications referenced in Paragraph 42 distribute their publications to a sizeable public audience, including many thousands of website visitors, subscribers, and social-media "followers."

46. The web-based publications referenced in Paragraph 42 distribute "newsworthy" information as an integral part of their core missions to participate in and make an impact on public debate.

47. A large portion of the public relies on the web-based publications referenced in Paragraph 42 as sources of news, and thus considers those sources to be components of the "news media."

48. The New York False Claims Act directs courts to "dismiss a *qui tam* action" if the allegations it relies on are "substantially the same [as] allegations or transactions" that have been "publicly disclosed" in "the news media" or "government report[s]." N.Y. State Fin. Law § 190(9)(b).

49. The facts TZAC alleges in the Amended Complaint are "substantially the same [as] allegations or transactions" that have been "publicly disclosed" in "the news media" and "government report[s]." *Id.* Specifically, the information has been published on multiple generally accessible websites, including public-record databases made available by federal and New York authorities, news stories published by professional news outlets, and reports and commentary on current events published by NIF, NIF's grantees, and multiple charity watchdog organizations.

50. As a result of those public disclosures, the New York False Claims Act requires the Court to "dismiss [this] *qui tam* action." *Id.*

**Second Defense**
**(Federal Preemption of New York Law)**

51. Under the U.S. Constitution's Supremacy Clause, federal law is "the supreme Law of the Land … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI.

52. The federal Internal Revenue Code provides that "the administration and enforcement of" federal tax law "shall be performed by or under the supervision of the Secretary of the Treasury" "[e]xcept as otherwise expressly provided by law." 26 U.S.C. § 7801(a)(1).

53. Federal law further provides that to litigate the "continuing qualification of [a § 501(c)(3)] organization" in court, "an appropriate pleading" must be filed in "the United States Tax Court, the United States Court of Federal Claims, or the district court of the United States for the District of Columbia." 26 U.S.C. § 7428(a). Such a pleading is "appropriate" only if filed "by the organization the qualification or classification of which is at issue." *Id.* § 7428(b)(1).

54. In this lawsuit, TZAC seeks to review NIF's qualification as a § 501(c)(3) organization and enforce federal tax law on the State of New York's behalf.

55. Specifically, TZAC claims that NIF fraudulently avoided its New York tax obligations by "falsely certif[ying] to the *Internal Revenue Service*" that its conduct was consistent with entitlement to a *federal* income-tax exemption under 26 U.S.C. §§ 501(a) and 501(c)(3). *See* Am. Compl. ¶ 8 (emphasis added).

56. TZAC maintains that had NIF "disclosed its activities *to the IRS* then it would not have been *eligible* for" its federal income tax exemption. *Id.* ¶ 21 (emphasis added).

16

57. According to TZAC, NIF's exemption from New York taxation "result[s from] NIF's federal tax exemption," *id.* ¶ 22, which results from NIF's allegedly false statements to the IRS, *id.* ¶ 21.

58. Accordingly, TZAC's claim requires proof of a "fraud on the IRS."

59. Federal law preempts TZAC from pursuing such a claim in this Court.

## Third Defense
### (Attribution Under Applicable Tax Laws)

60. To the extent any of the conduct of NIF's grantees constitutes "direct or indirect political campaign activities on behalf of or in opposition to candidates for public office" within the meaning of the IRS Form 990 or any other applicable legal standard, that conduct is not in any way attributable to NIF for purposes of (or in connection with) its federal or state tax exemptions.

## Fourth Defense
### (Materiality)

61. To the extent any of NIF's statements or certifications could be considered "false" or "fraudulent" under the New York False Claims Act, none of those statements or certifications were in any way material to any obligation on the part of NIF to pay or transmit money to New York.

## Fifth Defense
### (Failure to State a Claim)

62. TZAC's Amended Complaint fails to state a claim against NIF upon which relief can be granted.

## Sixth Defense
## (Limitation on Action)

63. TZAC's suit is barred to the extent the applicable statutes of limitation and/or repose have expired.

## Seventh Defense
## (Laches)

64. TZAC's suit is barred under the doctrine of laches.

## Eighth Defense
## (Unclean Hands, Waiver, and Estoppel)

65. TZAC's suit is barred by equity, including the doctrines of unclean hands, waiver, and estoppel.

## Ninth Defense
## (Good Faith)

66. NIF acted reasonably and in good faith at all times based on all relevant facts and circumstances known by it at the time it so acted.

## Tenth Defense
## (Scienter)

67. NIF lacked the requisite scienter.

## Eleventh Defense
## (Lack of Mitigation)

68. New York has failed to take reasonable and necessary steps to mitigate any alleged damages.

## Twelfth Defense
## (Unjust Enrichment)

69. TZAC's suit is barred because, and to the extent that, any relief or recovery would unjustly enrich or constitute a windfall to TZAC or New York.

70. NIF reserves the right to amend this Answer and to assert additional defenses, including affirmative defenses, that may come to light through the discovery process or otherwise, under applicable law.

\* \* \*

Having fully answered TZAC's Amended Complaint, NIF prays that the Court dismiss this action with prejudice, enter judgment in favor of NIF, and grant NIF its costs and other relief as may be appropriate.

Dated: March 2, 2021

Respectfully submitted.

/s/  *Jeffrey S. Bucholtz*

| | |
|---|---|
| Jeffrey S. Bucholtz, *Pro Hac Vice* | Brian Hauss |
| Gabriel Krimm, *Pro Hac Vice* | Arianna Demas |
| KING & SPALDING LLP | AMERICAN CIVIL LIBERTIES |
| 1700 Pennsylvania Ave., NW | UNION FOUNDATION |
| Washington, DC 20006 | 125 Broad St., 18th Floor |
| Tel: 202-626-2907 | New York, NY 10004 |
| Fax: 202-626-3737 | Tel: (212) 549-2604 |
| jbucholtz@kslaw.com | Fax: (212) 549-2649 |
| gkrimm@kslaw.com | bhauss@aclu.org |
| | ademas@aclu.org |

J. Emmett Murphy
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036
Tel: (212) 556-2100
Fax: (212) 556-2222
jemurphy@kslaw.com

*Counsel for Defendant New Israel Fund*